# ASSET PURCHASE AGREEMENT

## BY AND AMONG

## STRACK AND VAN TIL SUPER MARKET, INC.,

## SVT, LLC,

## RACEWAY CENTRAL, LLC,

## CURRENCY EXPRESS, INC.

## AND

## INDIANA GROCERY GROUP, LLC

## July 14, 2017

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** ...................................................................................... 1

SECTION 1.1   DEFINITIONS ............................................................................. 1

SECTION 1.2   INTERPRETATIONS ................................................................... 20

**ARTICLE II PURCHASE AND SALE** .................................................................. 22

SECTION 2.1   PURCHASE AND SALE OF ASSETS ......................................... 22

SECTION 2.2   ASSUMED LIABILITIES ........................................................... 22

SECTION 2.3   CONSIDERATION; DEPOSIT AMOUNT ................................... 22

SECTION 2.4   CLOSING; CLOSING SCHEDULE ............................................ 23

SECTION 2.5   CLOSING PAYMENTS AND DELIVERIES .............................. 24

SECTION 2.6   INVENTORY ............................................................................... 26

SECTION 2.7   ALLOCATION ............................................................................ 27

SECTION 2.8   PURCHASE PRICE ADJUSTMENT ......................................... 28

SECTION 2.9   DELIVERY OF POSSESSION ................................................... 31

SECTION 2.10  COOPERATION ......................................................................... 31

SECTION 2.11  WITHHOLDING ........................................................................ 31

SECTION 2.12  DESIGNATION RIGHTS CONTRACTS ................................... 32

**ARTICLE III SELLERS' REPRESENTATIONS AND WARRANTIES** ............ 34

SECTION 3.1   ORGANIZATION OF SELLERS; GOOD STANDING ............... 34

SECTION 3.2   AUTHORIZATION OF TRANSACTION ................................... 34

SECTION 3.3   NONCONTRAVENTION; GOVERNMENT FILINGS ............... 34

SECTION 3.4   TITLE TO ASSETS; SUFFICIENCY ........................................ 35

SECTION 3.5   REAL PROPERTY ...................................................................... 35

SECTION 3.6   LITIGATION; DECREES ........................................................... 36

SECTION 3.7   LABOR RELATIONS .................................................................. 36

SECTION 3.8   BROKERS' FEES ........................................................................ 36

SECTION 3.9   TAXES ........................................................................................ 37

SECTION 3.10  TANGIBLE PERSONAL PROPERTY ....................................... 38

SECTION 3.11  TRANSFERRED CONTRACTS ................................................. 38

SECTION 3.12  EMPLOYEE BENEFITS ............................................................ 39

SECTION 3.13  COMPLIANCE WITH LAWS; PERMITS ................................. 39

SECTION 3.14  ENVIRONMENTAL MATTERS ................................................ 40

i

SECTION 3.15  STATEMENT OF SALES ................................................. 41

SECTION 3.16  INSURANCE ................................................................... 41

SECTION 3.17  INTELLECTUAL PROPERTY ........................................... 41

SECTION 3.18  DATA SECURITY ........................................................... 42

SECTION 3.19  NO OTHER REPRESENTATIONS OR WARRANTIES ............ 42

**ARTICLE IV BUYER'S REPRESENTATIONS AND WARRANTIES ............... 43**

SECTION 4.1  ORGANIZATION OF BUYER; GOOD STANDING ................. 43

SECTION 4.2  AUTHORIZATION OF TRANSACTION .............................. 43

SECTION 4.3  NONCONTRAVENTION .................................................. 43

SECTION 4.4  LITIGATION; DECREES .................................................. 44

SECTION 4.5  BROKERS' FEES ........................................................... 44

SECTION 4.6  SUFFICIENT FUNDS; ADEQUATE ASSURANCES ................ 44

**ARTICLE V PRE-CLOSING COVENANTS .................................................. 44**

SECTION 5.1  EFFORTS; COOPERATION; PERMITS ............................... 44

SECTION 5.2  CONDUCT OF THE BUSINESS PENDING CLOSING .............. 45

SECTION 5.3  REGULATORY APPROVALS ........................................... 47

SECTION 5.4  BANKRUPTCY COURT MATTERS ................................... 47

SECTION 5.5  NOTICE OF DEVELOPMENTS ........................................ 47

SECTION 5.6  ACCESS; NO CONTACT ................................................ 47

SECTION 5.7  BULK TRANSFER LAWS ................................................ 48

SECTION 5.8  REPLACEMENT BONDING REQUIREMENTS ..................... 48

SECTION 5.9  ASSUMPTION AND ASSIGNMENT OF TRANSFERRED CONTRACTS; CURE COSTS 49

SECTION 5.10  CONFIDENTIALITY ....................................................... 51

SECTION 5.11  REPORTING ................................................................. 51

SECTION 5.12  TITLE TO OWNED REAL PROPERTY .............................. 51

**ARTICLE VI OTHER COVENANTS ......................................................... 52**

SECTION 6.1  FURTHER ASSURANCES ................................................ 52

SECTION 6.2  ACCESS; ENFORCEMENT; RECORD RETENTION .............. 52

SECTION 6.3  TREATMENT OF AFFECTED LABOR AGREEMENTS ........... 53

SECTION 6.4  COVERED EMPLOYEES ................................................. 53

SECTION 6.5  CERTAIN TAX MATTERS ............................................... 55

SECTION 6.6  INSURANCE MATTERS .................................................. 56

SECTION 6.7  ACKNOWLEDGEMENTS ................................................ 56

SECTION 6.8  PRESS RELEASES AND PUBLIC ANNOUNCEMENTS .......... 57

ii

SECTION 6.9   SELLER MARKS ............................................................. 57

SECTION 6.10   LICENSE TO BUSINESS INTELLECTUAL PROPERTY ......................... 58

**ARTICLE VII CONDITIONS TO OBLIGATION TO CLOSE ........................................... 58**

SECTION 7.1   CONDITIONS TO BUYER'S OBLIGATIONS TO EFFECT THE CLOSING ................ 58

SECTION 7.2   CONDITIONS TO SELLERS' OBLIGATIONS TO EFFECT THE CLOSING ............... 59

SECTION 7.5   NO FRUSTRATION OF CLOSING CONDITIONS ..................................... 60

**ARTICLE VIII TERMINATION RIGHTS ........................................................ 60**

SECTION 8.1   TERMINATION OF AGREEMENT ................................................. 60

SECTION 8.2   EFFECT OF TERMINATION .................................................... 61

SECTION 8.3   TERMINATION AND ADJUSTMENT RIGHTS OF BUYER AS TO STORES AND
RELATED ACQUIRED ASSETS .................................................................. 61

**ARTICLE IX MISCELLANEOUS ................................................................ 63**

SECTION 9.1   SURVIVAL ................................................................... 63

SECTION 9.2   EXPENSES .................................................................. 63

SECTION 9.3   ENTIRE AGREEMENT .......................................................... 63

SECTION 9.4   INCORPORATION OF EXHIBITS AND DISCLOSURE SCHEDULE ..................... 63

SECTION 9.5   AMENDMENTS AND WAIVERS .................................................. 63

SECTION 9.6   SUCCESSION AND ASSIGNMENT ............................................... 63

SECTION 9.7   NOTICES .................................................................... 64

SECTION 9.8   GOVERNING LAW ............................................................ 65

SECTION 9.9   SUBMISSION TO JURISDICTION; SERVICE OF PROCESS ......................... 65

SECTION 9.10   WAIVER OF JURY TRIAL ..................................................... 66

SECTION 9.11   SPECIFIC PERFORMANCE ..................................................... 66

SECTION 9.12   SEVERABILITY .............................................................. 66

SECTION 9.13   NO THIRD PARTY BENEFICIARIES ............................................ 66

SECTION 9.14   NON-RECOURSE ............................................................. 66

SECTION 9.15   MUTUAL DRAFTING .......................................................... 67

SECTION 9.16   DISCLOSURE SCHEDULE ..................................................... 67

SECTION 9.17   HEADINGS; TABLE OF CONTENTS ............................................. 67

SECTION 9.18   COUNTERPARTS; FACSIMILE AND ELECTRONIC SIGNATURES .................. 67

SECTION 9.19   TIME OF ESSENCE .......................................................... 67

WEIL:\96189313\21\76248.0003

Exhibit A – Bidding Procedures Order
Exhibit B – Escrow Agreement
Exhibit C – Form of Sale Order
Exhibit D – [Reserved.]
Exhibit E – Form of Bill of Sale
Exhibit F – Form of Assignment and Assumption Agreement
Exhibit G – Form of Lease Assignment Agreement
Exhibit H – Services Agreement
Exhibit I – Form of Trademark Assignment Agreement
Exhibit J – Deed

Schedule A – Base Amount Credit

WEIL:\96189313\21\76248.0003

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of July 14, 2017 by and among Strack and Van Til Super Market, Inc., an Indiana corporation ("SVT Super Market"), SVT, LLC, an Indiana limited liability company ("SVT"), Raceway Central, LLC, an Illinois limited liability company ("Raceway"), Currency Express, Inc., an Indiana corporation ("Currency Express"; and together with SVT Super Market, SVT and Raceway, "Sellers") and Indiana Grocery Group, LLC, a Delaware limited liability company ("Buyer"). Sellers and Buyer are each referred to herein as a "Party" and collectively as the "Parties".

### WITNESSETH

WHEREAS, on May 4, 2017 (the "Petition Date"), Sellers and certain of their affiliates (collectively, the "Debtors") commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"), which cases have been transferred to and are now pending in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "Bankruptcy Court");

WHEREAS, on June 2, 2017, the Delaware Bankruptcy Court entered an order (a) Approving Bidding Procedures (the "Bidding Procedures") for Sale of Debtors' Assets, (b) Approving Stalking Horse Bid Protections, (c) Authorizing Designation of Additional Stalking Horse Bidders, (d) Scheduling Auction for and Hearings to Approve Sale of Debtors' Assets, (e) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearings, (f) Approving Assumption and Assignment Procedures, and (g) Granting Related Relief [Del. Docket No. 338] in the form attached as Exhibit A (the "Bidding Procedures Order");

WHEREAS, Sellers operate twenty (20) supermarkets at the locations set forth in Section 1 of the Disclosure Schedule under the names "Strack & Van Til Market", "Town & Country Market" and "Ultra Foods" (each a "Store" and, collectively, the "Stores"), the Commissary and Headquarters (each defined below); and

WHEREAS, subject to the terms and upon the conditions set forth herein, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to purchase, acquire and assume from Sellers, all of the Acquired Assets and Assumed Liabilities, all as more specifically provided herein.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1    Definitions. For purposes of this Agreement:

"Acquired Assets" means all of Sellers' right, title, and interest in, to and under all of the business, assets, properties, contractual rights, goodwill, going concern value, rights and claims,

WEIL:\96189313\21\76248.0003

except as otherwise provided herein, primarily related to the Business, wherever situated and of whatever kind and nature, real or personal, tangible or intangible, whether or not reflected on the books and records of Sellers (other than the Excluded Assets) to be acquired, in the aggregate, at the Closing as the same shall exist on the Closing Date. Without limiting the foregoing, the Acquired Assets include all of Sellers' rights, title and interests in, to and under each of the following assets:

(a)     all rights and interests of Sellers with respect to the Owned Real Property, together with all facilities, improvements, fixtures and other appurtenances thereto and rights in respect thereof and all servitudes, easements, rights-of-way, other surface use agreements, and water use agreements to the extent used in connection with the Business;

(b)     the Furnishings and Equipment;

(c)     any and all automobiles, trucks, tractors, and trailers primarily used or held for use in the Business as set forth on Section 1.1 of the Disclosure Schedules under the heading "Rolling Stock";

(d)     [Reserved.];

(e)     subject to Section 2.6(a), the saleable Inventory (other than Excluded Inventory) at the Stores, the Commissary and the Warehouse;

(f)     to the maximum extent permitted by the Bankruptcy Code or applicable law, all Business Intellectual Property;

(g)     to the maximum extent permitted by the Bankruptcy Code, the Assumed Leases, together with (to the extent of the Sellers' interest therein) the buildings, fixtures and improvements located on or attached to such real property, and (to the maximum extent transferable and permitted by the Bankruptcy Code) all rights arising therefrom (including all options and rights of first refusal) and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto, subject to the rights of the applicable landlord (including rights to ownership or use of such property) under such Assumed Leases;

(h)     to the maximum extent permitted by the Bankruptcy Code, all Transferred Contracts (other than the Assumed Leases, which are included as Acquired Assets pursuant to clause (g) above), the rights and benefits accruing thereunder and to the extent in the possession or control of any Seller, all material documents related thereto;

(i)     the Commissary;

(j)     all deposits (including security deposits, prepaid rent, electricity, telephone or otherwise and environmental-related deposits related to the Stores) and prepaid or deferred charges and expenses previously paid by Sellers relating to the Transferred Contracts or any Permit to be transferred to Buyer (not including any amounts paid in connection with any Affected Labor Agreement or other Contract with any Covered Employee, agent or consultant related to the Business, none of which amounts, if any, shall be deemed a reimbursable expense to Sellers under this Agreement) (collectively, the "Prepaid Expenses");

2

(k)     all files, documents, instruments, papers, computer files, information and records and all other books and records of Sellers in any media primarily relating to the Acquired Assets, including real property documents, surveys (boundary and topographical), construction drawings, soil reports, EEO-1 reports for each Property for the year preceding the Closing (to the extent available), all records relating to Liabilities which constitute Assumed Liabilities, asbestos inspections, environmental reports and assessments, fixture plans, personnel records of Covered Employees, ledgers, journals, studies, reports, budgets, forecasts, projections and competitive or capital spending analyses of the Properties, and information relating to Taxes (collectively, the "Files and Records");

(l)     to the extent applicable, all audio and video tapes or devices that are available for sale or rental at the Stores to the extent they are owned by Sellers;

(m)     to the extent requested by Buyer and to the extent assignable to Buyer under applicable Law, all Permits held, used or intended to be used by Sellers exclusively in connection with or exclusively related to the Business, including all beer, wine, spirits and liquor licenses and similar Permits, and all of the rights and benefits accruing thereunder (for the avoidance of doubt, solely to the extent that the applicable Governmental Authority consents or otherwise approves the assignment or transfer of the applicable Permit (but only to the extent such consent or approval is required by the terms of such Permit));

(n)     only if and to the extent Sellers have not sold, or entered into an agreement to sell, as of the Closing Date, the Other Stores located in the state of Indiana and the Sellers' assets primarily related to the operations thereof, to the extent assignable to Buyer under applicable Law, those Permits held by Sellers exclusively in connection with, or exclusively related to, the purchase and sale by the Other Stores located in the state of Indiana of beer, wine, spirits or liquor set forth on Section 1.1 of the Disclosure Schedule under the heading "Other Store Permits" (for the avoidance of doubt, solely to the extent that the applicable Governmental Authority consents or otherwise approves the assignment or transfer of the applicable Permit (but only to the extent such consent or approval is required by the terms of such Permit));

(o)     all insurance proceeds received by Sellers in respect of any damage to or loss of any Store (to the extent such Store remains an Acquired Asset after giving effect to the provision of Section 8.3) as a result of events or circumstances occurring prior to the Closing Date, to the extent such damage or loss has not been repaired or restored at the time of the Closing;

(p)     With respect to each Store, the amount of cash set forth on Section 1.1 of the Disclosure Schedule under the heading "Per Store Cash Closing Balance" to be left at each Store following the close of business on the date which is the day before the Closing Date (the "Per Store Cash Closing Balance");

(q)     all rights to refunds of Taxes to the extent such Taxes constitute Assumed Liabilities;

(r)     any rights, demands, claims, causes of action, rights of recovery, or rights of setoff or subrogation and other claims of Sellers or their Affiliates against any Person other than Sellers or any officer or director thereof, Buyer or any of their respective Affiliates (collectively,

3

"Causes of Action") arising out of or relating to any of the Acquired Assets, including any rights against third parties under Transferred Contracts, but excluding all allowances, payments, prepayments, overpayments, credits, reimbursements, rebates, or refunds or rights of setoff or subrogation with respect thereto referenced in clause (i) of the definition of Excluded Assets;

(s)     all rights, title and interest of Sellers in and to any property subject to a Personal Property Lease that is used in or held for use in the Business, to the extent any such Personal Property Lease is a Transferred Contract;

(t)     to the extent transferable, all rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent primarily relating to the Business or any of the Acquired Assets, or any services provided to Sellers primarily in connection with the Business or the Acquired Assets, or to the extent otherwise primarily affecting any Acquired Assets, other than any warranties, representations and guarantees pertaining exclusively to any Excluded Assets;

(u)     all of Sellers' rights, claims, causes of action and avoidance claims under Chapter 5 of the Bankruptcy Code (whether or not asserted as of the Effective Time) to the extent they relate to vendors, employees, landlords, suppliers, customers and other counterparties of Sellers that relate to any of the Acquired Assets, or the operation of the Business at the Properties (other than any such claims, Causes of Action or rights against any officers or directors of Sellers) (the "Avoidance Actions");

(v)     to the extent transferable, all Systems primarily related to the Business that are owned by the Sellers (the "Business Systems");

(w)     to the extent transferable, all Software primarily related to the Business that is owned by Sellers (the "Business Software");

(x)     the Headquarters; and

(y)     without limiting the foregoing, all other business, assets, rights or properties used primarily in or located at the Stores and not specifically set forth herein (other than any Excluded Assets).

"Adjustment Amount" has the meaning set forth in Section 2.8(a).

"Affected Labor Agreements" means the collective bargaining agreements covering any of the Covered Employees, each of which is listed on Section 1.1 of the Disclosure Schedule under the heading "Affected Labor Agreements".

"Affected Unions" means the unions identified on Section 1.1 of the Disclosure Schedule under the heading "Affected Unions".

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to

4

direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by Contract, or otherwise.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Allocation Objection Notice</u>" has the meaning set forth in <u>Section 2.7</u>.

"<u>Allocation Principles</u>" has the meaning set forth in <u>Section 2.7</u>.

"<u>Antitrust Law</u>" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other Laws and Decrees that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition, whether in the United States or elsewhere.

"<u>Assignment and Assumption Agreement</u>" has the meaning set forth in <u>Section 2.5(a)(i)(D)</u>.

"<u>Assumed Leases</u>" means those Leases that are Transferred Contracts.

"<u>Assumed Liabilities</u>" means, subject to the terms and conditions set forth in this Agreement, and provided that the following shall not include any Excluded Liabilities, as of the Closing, the following obligations of Sellers related to the Acquired Assets, and no others, shall be assumed by Buyer:

(a)     all Liabilities relating to Buyer's ownership or operation of the Acquired Assets, to the extent arising from events, facts or circumstances that occur from and after the Closing, but excluding any Liabilities to the extent relating to Sellers' ownership or operation of the Acquired Assets prior to the Closing or relating to any services that were sold or provided by the Sellers prior to the Closing;

(b)     all Liabilities of Sellers under the Transferred Contracts (excluding all Cure Costs, except to the extent provided herein), in each case to the extent arising and relating solely to the period from and after the Closing;

(c)     all Liabilities under the Modified Labor Agreements, to the extent arising and relating solely to the period from and after the Closing;

(d)     all Liabilities, other than Excluded Liabilities, of Sellers under the Owned Real Property, in each case, to the extent arising and relating solely to the period from and after the Closing;

(e)     all Personal Property Taxes and Real Property Taxes that are unpaid as of the Closing Date, all amounts allocated to Buyer under <u>Section 2.8</u> and all Transfer Taxes allocated to Buyer pursuant to <u>Section 6.5</u>;

(f)     all Cure Costs payable with respect to Transferred Contracts (other than Assumed Real Property Leases) in excess of Sellers' Cure Cost Cap;

5

(g)      all Liabilities of Gift Cards sold at the Stores;

(h)      all Liabilities relating to, or in respect of vacation days, sick days or other paid time-off, that is earned or accrued by, or with respect to, Covered Employees; and

(i)      all Liabilities of Currency Express to fulfill money orders issued in the ordinary course of Currency Express' business.

Notwithstanding the foregoing or any other provisions of this Agreement, Buyer shall not assume hereunder, and "Assumed Liabilities" shall not include, Liabilities under any Contract to the extent such Liabilities arise as a result of a breach or failure of such Contract occurring prior to, as of, or as a result of, the Closing (including Cure Costs, except to the extent provided herein).

"Assumed Real Property Leases" means those Real Property Leases that are Transferred Contracts.

"Assumption Notice" has the meaning set forth in Section 5.9(b).

"Avoidance Actions" has the meaning set forth in the definition of Acquired Assets.

"Auction" means the auction undertaken pursuant to the Bidding Procedures Order.

"Bankruptcy and Equity Exception" has the meaning set forth in Section 3.2.

"Bankruptcy Cases" means the Chapter 11 cases of Sellers and certain of their Affiliates.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Base Amount" has the meaning set forth in Section 2.3(a).

"Base Amount Credit" means (a) if the Sale Order is entered on or before July 18, 2017 and the Closing occurs on or before August 2, 2017, $8,000,000, (b) if the Sale Order is entered on or before July 18, 2017 and the Closing occurs on a date after August 2, 2017, such amount as set forth on Part I of Schedule A or (c) if the Sale Order is entered on any date after July 18, 2017, such amount as set forth on Part II of Schedule A.

"BCP" has the meaning set forth in Section 3.18(b).

"Bidding Procedures" has the meaning set forth in the recitals.

"Bidding Procedures Order" has the meaning set forth in the recitals.

"Bill of Sale" has the meaning set forth in Section 2.5(a)(i)(C).

6

"Bonding Requirements" means standby letters of credit, guarantees, indemnity bonds, and other financial commitment credit support instruments issued by third parties on behalf of Sellers or any of their respective Subsidiaries or Affiliates regarding any of the Acquired Assets.

"Business" means the operation of the Stores, Currency Express and the Commissary by Sellers.

"Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the laws of the State of Delaware or is a day on which banking institutions located in the State of Delaware are authorized or required by Law or other governmental action to close.

"Business Intellectual Property" means all copyrights, data processing software, licenses, technology, trade secrets, know-how, customer lists, inventions, patents, patent applications, trademarks (including registrations and applications therefor) trade names, domain names, and the goodwill associated therewith, and other proprietary information and rights employed or utilized in the conduct of the Business, including specifically, but not by way of limitation, the names "Currency Express," "Town & Country Fresh Market," "Strack and Van Til", "Ultra Foods", "Key Market", "Pay Low Foods", any Trademark or other indicia of origin that includes such names, or any related abbreviations, acronyms or other formatives based on such names, whether alone or in combination with any other words, phrases, or designs (in each case, other than the "Van Til" name alone, or any Seller Marks), and all registrations, applications and renewals thereof, all rights and goodwill associated therewith.

"Business Software" has the meaning set forth in the definition of Acquired Assets.

"Business Systems" has the meaning set forth in the definition of Acquired Assets.

"Buyer" has the meaning set forth in the preamble.

"Buyer Assumption Notice" has the meaning set forth in Section 2.12(b).

"Buyer Termination Payment" means an amount equal to the Deposit Amount (as may be adjusted from time-to-time pursuant to Section 2.3(b)).

"Cash Equivalents" means cash, checks, money orders, funds in time and demand deposits or similar accounts, marketable securities, short-term investments, and other cash equivalents and liquid investments.

"Casualty / Condemnation Event" has the meaning set forth in Section 8.3(a).

"Causes of Action" has the meaning set forth in the definition of Acquired Assets.

"CGI" means Central Grocers, Inc., an Illinois corporation.

"Closing" means the closing of the acquisition transactions of Properties as contemplated by this Agreement.

7

"Closing Adjustment Amount" has the meaning set forth in Section 2.8(b).

"Closing Date" has the meaning set forth in Section 2.4(a).

"Closing Inventory Valuation" has the meaning set forth in Section 2.6(a).

"Closing Statement" has the meaning set forth in Section 2.8(b).

"COBRA" has the meaning set forth in Section 6.4(e).

"Commissary" means that certain commissary located at 555 Coolwood Drive, Valparaiso, Indiana, 46385.

"Confidentiality Agreement" means the confidentiality agreement, dated as of May 25, 2017, by and between Buyer and CGI.

"Consent" means any consent, waiver, approval, exemption, order or authorization of, or registration, declaration or filing with or notice to, any Person.

"Contract" means any written agreement, contract, arrangement, commitment, promise, obligation, right, instrument, document, sales order, purchase order or other similar understanding that is binding on any Person or any part of its property under applicable Law (including commitments to enter into any of such).

"Contracting Parties" has the meaning set forth in Section 9.14.

"Copyrights" has the meaning set forth in the definition of Intellectual Property.

"Covered Employee" means an employee of Sellers or any of their respective Affiliates at the Closing who actually performs services at any of the Properties.

"Cure Costs" means any and all amounts, costs or expenses that must be paid or actions or obligations that must be performed or satisfied pursuant to the Bankruptcy Code to effectuate the assumption by the applicable Seller, and the assignment to Buyer, of the Transferred Contracts, as determined by the Bankruptcy Court or agreed to by Sellers and the non-Seller counterparty to the applicable Transferred Contract.

"Data Security Policies" has the meaning set forth in Section 3.18(b).

"Debtors" has the meaning set forth in the preamble.

"Decree" means any judgment, decree, ruling, appeal, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order, or any other order of any Governmental Authority.

"Delaware Bankruptcy Court" has the meaning set forth in the recitals.

"Deposit Amount" has the meaning set forth in Section 2.3(b).

WEIL:\96189313\21\76248.0003

"Designation Rights Contract" means all Contracts of Sellers primarily related to the Business other than the Transferred Contracts and the Excluded Contracts.

"Designation Rights Contracts Proceeds" has the meaning set forth in Section 2.12(b).

"Disclosure Schedule" has the meaning set forth in Article III.

"Distribution Center" means the real property located at 2601 Ellis Drive, Joliet, Illinois 60433, the distribution center and the other facilities located thereon, any improvements, fixtures and other appurtenances thereto, any rights in respect thereof and any other assets of Sellers located thereat, or used in the operation thereof.

"Dispute Amount Contract" has the meaning set forth in Section 2.12(d).

"Dispute Notice" has the meaning set forth in Section 2.8(c).

"Disputed Items" has the meaning set forth in Section 2.8(c).

"Effective Time" has the meaning set forth in Section 2.4(a).

"Employee Benefit Plans" has the meaning set forth in Section 3.12(a).

"Environmental Law" means any applicable foreign, federal, state or local Law currently in effect relating to pollution, the protection of the environment or natural resources.

"Environmental Liability" means all liabilities, monetary obligations, financial assurance requirements, losses, damages, punitive damages, consequential damages, treble damages, natural resource damages, costs and expenses (including all fees, disbursements and expenses of counsel, experts and consultants and costs of investigations and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any Governmental Authority or any third party, and which relate to (i) the compliance or actual or alleged non-compliance with or violation of any Environmental Law or term or condition of any environmental Permit; or (ii) any actual or alleged environmental condition or the presence, use, handling, storage, disposal, Release or threatened Release of, or exposure to, any Hazardous Material.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, with respect to any entity, trade or business, any other entity, trade or business that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the IRC or Section 4001(b)(1) of ERISA that includes or included the first entity, trade or business, or that is, or was at the relevant time, a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

"Escrow" means the escrow established with the Escrow Agent pursuant to the Escrow Agreement.

"Escrow Agent" means Citibank, N.A.

"Escrow Agreement" means that certain Escrow Agreement, dated as of June 26, 2017, by and among Sellers, Buyer, and the Escrow Agent, a copy of which is attached hereto as Exhibit B.

"Estimated Adjustment Amount" has the meaning set forth in Section 2.4(c).

"Estimated Inventory Valuation" has the meaning set forth in Section 2.4(c).

"Estimated Purchase Price" has the meaning set forth in Section 2.4(c).

"Estimated Statement" has the meaning set forth in Section 2.4(c).

"Excluded Assets" means all assets of Sellers in and to the following:

(a)     the Other Stores, the Warehouse and the Distribution Center;

(b)     any asset of Sellers that is not primarily related to the Business, including, except as otherwise included as part of Files and Records, (i) organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to Sellers' organization, maintenance, existence, and operation; (ii) books and records in any media related to (A) Taxes paid or payable by Sellers (including all Taxes that constitute Excluded Liabilities) or (B) any Liabilities not included in Assumed Liabilities; and (iii) except as otherwise provided in this Agreement, any Tax refund, deposit, prepayment, credit, attribute, or other Tax asset of or with respect to any Seller;

(c)     except as otherwise provided in clause (y) of the definition of Acquired Assets, all capital stock and other equity interests of Sellers or any of their respective Subsidiaries, including without limitation all stock of CGI owned by any of the Sellers and all rights as a cooperative member or patron of CGI and any and all rights to patronage rebates, refunds and any other amounts owed by CGI to any Seller;

(d)     all Cash Equivalents (except as otherwise included as part of the Acquired Assets as provided in clause (p) of the definition of Acquired Assets) and accounts receivable;

(e)     all Permits that are not part of the Acquired Assets as provided herein;

(f)     all insurance policies and binders and, except to the extent otherwise included as part of the Acquired Assets or set forth in Section 8.3, all claims, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders;

(g)     all of Sellers' rights under this Agreement or any Related Agreement;

(h)     all Causes of Action arising out of or related to the Excluded Assets;

10

(i)      except as otherwise provided in this Agreement (including, for the avoidance of doubt, the Disclosure Schedule), any other payment, allowance, credit (including Trade Credits (as defined in Section 2.6(a) of the Disclosure Schedule)), overpayment, prepayment, refund, reimbursement, or rebate, and any setoff or subrogation claims of the Sellers or their Affiliates with respect to any of the foregoing, arising from the operation of the  Properties or the Warehouse prior to the applicable Closing;

(j)      all Intellectual Property owned, used or held for use by Sellers, other than Business Intellectual Property, Business Systems and Business Software;

(k)      all Contracts set forth on Section 1.1 of the Disclosure Schedule (which list of Excluded Contracts set forth in such Section of the Disclosure Schedule may be supplemented from and after the date of this Agreement as provided in <u>Section 2.12</u>) (the "<u>Excluded Contracts</u>");

(l)      all Excluded Inventory;

(m)      all deposits and prepaid expenses (i) previously paid by Sellers to CGI or any other Affiliate of Sellers and (ii) previously paid to SuperValu;

(n)      all rights and interests in Employee Benefit Plans; and

(o)      those items set forth on Section 1.1 of the Disclosure Schedule under the heading "Other Excluded Assets" (as amended or supplemented from time to time in accordance with this Agreement).

"<u>Excluded Contracts</u>" has the meaning set forth in the definition of Excluded Assets.

"<u>Excluded Inventory</u>" has the meaning set forth in Section 2.6 of the Disclosure Schedule under the heading "Excluded Inventory".

"<u>Excluded Liabilities</u>" means any Liabilities of Sellers or any predecessor or Affiliate of Sellers, of any nature whatsoever, existing before or on the Closing Date or arising thereafter, other than the Assumed Liabilities, including all of the Liabilities of Sellers or of any predecessor or Affiliate of Sellers (including as described in the preceding sentence) not specifically and expressly assumed by Buyer pursuant to this Agreement. For the avoidance of doubt, and without limiting the foregoing, Buyer shall not be obligated to assume, and it does not assume, and hereby disclaims all of the following Liabilities of Sellers or of any predecessor or Affiliate of Sellers other than the Assumed Liabilities (and any such Liabilities shall be considered Excluded Liabilities for all purposes of this Agreement):

(a)      any Liability arising out of, under or in connection with the Excluded Assets;

(b)      any Liability of Sellers and Affiliates of Sellers for Taxes (except for Real Property Taxes or Personal Property Taxes, or as provided for in <u>Section 2.8</u> or <u>Section 6.5</u>);

(c)      all accounts payable;

11

(d)      (i) all Cure Costs with respect to Assumed Real Property Leases and Excluded Contracts and (ii) all Cure Costs for Transferred Contracts (other than Assumed Real Property Leases) up to the Sellers' Cure Cost Cap;

(e)      all Liabilities of Sellers under this Agreement or any Related Agreement and the transactions contemplated hereby or thereby;

(f)      all Liabilities of Sellers and Affiliates of Sellers related to current or former employees, officers, directors or consultants of Sellers and Affiliates of Sellers, including, without limitation, those arising under any Law, Affected Labor Agreement, Employee Benefit Plan or other Contract with any Covered Employee, agent or consultant, except as otherwise expressly (x) included as part of the Assumed Liabilities as provided in clause (h) of the definition of Assumed Liabilities, (y) provided in a Modified Labor Agreement (to the extent arising and relating solely to the period from and after the Closing) or (z) provided in Section 6.4(e);

(g)      without limiting the generality of clause (f) above, all Liabilities relating to, or in respect of, any wages, bonuses or other compensation or benefits, including without limitation, vacation days, sick days or other paid time-off, that is earned or accrued by, or with respect to, officers, directors or contractors of Sellers or any Affiliate of Sellers prior to the Closing;

(h)      Pre-Closing Environmental Liabilities; and

(i)      any Liability that is not an Assumed Liability.

"Files and Records" has the meaning set forth in the definition of Acquired Assets.

"Final Closing Statement" has the meaning set forth in Section 2.8(c).

"FIRPTA Affidavit" means an affidavit of an officer of each Seller (or, if such Seller is a disregarded entity for U.S. federal income tax purposes, its regarded owner), sworn to under penalty of perjury, setting forth such Seller's (or, if applicable, regarded owner's) name, address and federal tax identification number and stating that such Seller (or, if applicable, regarded owner) is not a "foreign person" within the meaning of section 1445 of the IRC and otherwise complying with the treasury regulations issued pursuant to section 1445 of the IRC.

"Furnishings and Equipment" means all tangible personal property (other than Inventory and Intellectual Property), including fixtures, trade fixtures, store models, shelving, and equipment (including information technology (other than such technology used by Sellers pursuant to licenses that prohibit the sublicense or transfer thereof and for which consent to sublicense or transfer has not been obtained by Sellers) and refrigeration equipment), in each case that is located at the Properties and used or intended to be used in the Business; "Furnishings and Equipment" includes tangible personal property bearing Seller Marks, such as, to the extent applicable and by way of example only, shopping carts at the Stores.

"GAAP" means United States generally accepted accounting principles consistently applied.

12

"Gift Cards" means any proprietary gift cards issued by Sellers for use at the Stores.

"Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

"Hazardous Materials" means (a) any petroleum, petroleum-derived substances or petroleum products, flammable explosives, radioactive materials, radon, asbestos, or PCBs and (b) any chemicals, wastes, materials or substances which are regulated, classified or defined as "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," "pollutant" or "contaminant" or any similar denomination under any Environmental Law.

"Headquarters" means the real property consisting of the office complex located at 2244 45th Street, Highland, Indiana 46322 together with the land, buildings and improvements appurtenant thereto, together with all assets, personal property and vehicles located thereat, as more particularly described in Section 1.1 of the Disclosure Schedule under the heading "Headquarters".

"Holdback Amount" has the meaning set forth in Section 2.5(a)(i)(B).

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Independent Accountant" has the meaning set forth in Section 2.7.

"In-Store Operations Lease" means any Lease or other Contract relating to the installation, use or operation of ATM or similar banking machines, in-store banking facilities, photo-finishing equipment, pharmacies or audio and video rental facilities at the Properties or primarily related to the operations on the Properties.

"Insurance Policies" has the meaning set forth in Section 3.16.

"Intellectual Property" means (a) all issued patents and patent applications, together with all reissuances, continuations, continuations-in-part, divisionals, extensions and reexaminations thereof ("Patents"); (b) all Trademarks; (c) all copyrights, together with all registrations and applications for registration therefor and renewals in connection therewith ("Copyrights"); (d) all trade secrets, know-how, technology, improvements, and inventions; and (e) all Software.

"Inventory" means all food, beverages (including, to the extent transferable to Buyer under applicable Law, alcohol), and other merchandise and products (including general merchandise items), offered for sale to customers at the Stores, whether in broken or unbroken units and all supplies, containers, labels, packaging material and maintenance supplies located at the Stores, the Commissary and the Warehouse.

"Inventory Date" has the meaning set forth in Section 2.6(a).

"Inventory Purchase Instructions" has the meaning set forth in Section 2.6(a).

13

"<u>Inventory Taker</u>" has the meaning set forth in <u>Section 2.6(a)</u>.

"<u>IRC</u>" means the Internal Revenue Code of 1986, as amended.

"<u>IRP</u>" has the meaning set forth in <u>Section 3.18(b)</u>.

"<u>IRS</u>" means the Internal Revenue Service.

"<u>Joint Written Instructions</u>" means written instructions from SVT Super Market and Buyer, a form of which is attached to the Escrow Agreement as an exhibit thereto, directing the Escrow Agent to deliver the amounts to be released from the Escrow as provided for under this Agreement.

"<u>Knowledge</u>" of Sellers (and other words of similar import) means the actual knowledge, after reasonable inquiry, of those Persons set forth on Section 1.1 of the Disclosure Schedule under the heading "Seller Knowledge Parties". "<u>Knowledge</u>" of Buyer (and other words of similar import) means the actual knowledge, after reasonable inquiry, of those Persons set forth on Section 1.1 of the Disclosure Schedule under the heading "Buyer Knowledge Parties".

"<u>Law</u>" means any constitution applicable to, and any statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority.

"<u>Lease Assignment Agreement</u>" has the meaning set forth in <u>Section 2.5(a)(i)(E)</u>.

"<u>Leases</u>" means all leases, subleases, licenses, concessions, options, contracts, extension letters, easements, reciprocal easements, assignments, termination agreements, subordination agreements, nondisturbance agreements, estoppel certificates and other agreements (written or oral), and any amendments or supplements to the foregoing, and recorded memoranda of any of the foregoing, pursuant to which any Seller holds any leasehold or subleasehold estates and other rights in respect of any Property.

"<u>Liability</u>" means all indebtedness, losses, claims (including "claims" as defined in section 101(5) of the Bankruptcy Code), damages, expenses, fines or other penalties, costs, royalties, proceedings, deficiencies, duties, obligations and other liabilities (including those arising out of any Litigation, such as any settlement or compromise thereof or judgment or award therein) of a Person (whether absolute, accrued, contingent, fixed, liquidated or unliquidated, or otherwise, or whether known or unknown, or whether due or to become due, and whether in Contract, tort, strict liability or otherwise, and whether or not resulting from third-party claims).

"<u>Lien</u>" means any mortgage, pledge, lien, charge, security interest, option, right of first refusal, right of first offer, servitude, easement, hypothecation, restrictive covenant, encroachment, security agreement, equitable interest, earn-out, conditional sale or other title retention device or arrangement, deed of trust, or other similar encumbrance or restriction of any kind, in each case whether contingent, fixed or otherwise or whether relating to any property or right or the income or profits therefrom; provided, however, that "Lien" shall not be deemed to include any license of Intellectual Property.

14

"Litigation" means any action, cause of action, arbitration, suit, claim, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, investigative or arbitral, whether at Law or in equity and whether before any Governmental Authority.

"Material Adverse Effect" means any effect, change, condition, circumstance, development or event that, individually or in the aggregate with all other effects, changes, conditions, circumstances, developments or events has had, or would reasonably be expected to have, a material adverse effect on the business, assets, operation, condition (financial or otherwise) or results of operation of the Business or the Acquired Assets (excluding the Excluded Assets and the Excluded Liabilities), taken as a whole, other than any effect, change, condition, circumstance, development or event arising from or related to: (a) general business or economic conditions in any of the geographical areas in which the Stores operate; (b) any condition or occurrence affecting retail groceries generally; (c) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (d) financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (e) the occurrence of any act of God or natural disaster, including any fire, flood, hurricane, tornado, or other weather event; (f) changes in Law or accounting rules; (g) the taking of any action expressly contemplated by this Agreement or any Related Agreement or taken with the prior written consent of Buyer; (h) any filing or motion made by Sellers under sections 1113 or 1114 of the Bankruptcy Code with respect to any unions, employees, retirees, retiree benefits or collective bargaining agreements; (i) the sale of any assets or stores (other than the Acquired Assets) to any third parties by any Seller or any of its Affiliates; (j) any effects or changes arising from or related to the breach of the Agreement by Buyer; or (k) the filing of the Bankruptcy Cases; provided, however, that in the case of the foregoing clauses (a) through (f), such effects, changes, conditions, circumstances, developments or events shall be taken into account in determining whether any material adverse effect has occurred to the extent that any such effects, changes, conditions, circumstances, developments or events have, or would reasonably be expected to have, a disproportionate effect on the Business (excluding the Excluded Assets and the Excluded Liabilities) or the Acquired Assets relative to other participants operating in the retail grocery industry.

"Material Casualty" has the meaning set forth in Section 8.3(a).

"Modified Labor Agreements" has the meaning set forth in Section 6.3.

"Multiemployer Plan" means any "multiemployer plan" within the meaning of Section 3(37) or Section 4001(a)(3) of ERISA that is subject to Title IV of ERISA.

"Non-Party Affiliates" has the meaning set forth in Section 9.14.

"Objection" and "Objections" have the meanings set forth in Section 5.12(a).

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award.

WEIL:\96189313\21\76248.0003

"Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business through the date hereof consistent with past practice.

"Other Assets Amount" has the meaning set forth in Section 2.3(a).

"Other Stores" means the sixteen (16) stores set forth in Section 1.1 of the Disclosure Schedule under the heading "Other Stores".

"Outside Date" shall mean the earlier of: (a) the first business day that is forty (40) days following the expiration of the Target Closing Date, or (b) October 1, 2017.

"Outstanding Money Order Balance" means the aggregate amount of outstanding and unpaid money orders issued by Currency Express prior to the Closing Date.

"Owned Real Property" has the meaning set forth in Section 3.5(b).

"Party" and "Parties" have the meanings set forth in the preamble.

"Patents" has the meaning set forth in the definition of Intellectual Property.

"PCBs" means polychlorinated biphenyls.

"Percentage Rent Proration" has the meaning set forth in Section 2.8(a)(iv).

"Percentage Rents" has the meaning set forth in Section 2.8(a)(iv).

"Permit" means any franchise, approval, authorization, consent, clearance, permit, license, order, registration, certificate, variance or similar right issued, granted by, given by or under the authority of a Governmental Authority or pursuant to any Law, including Environmental Law.

"Permitted Lien" means (a) Liens for Taxes not yet due and payable; (b) mechanic's, workmen's, repairmen's, warehousemen's, carrier's or other similar Liens, including all statutory liens, arising or incurred in the Ordinary Course of Business or with respect to the Owned Real Property, that in each case have been bonded over or otherwise secured in a manner acceptable to Buyer in Buyer's reasonable discretion; (c) with respect to leased or licensed real or personal property, the terms and conditions of the Lease applicable thereto; (d) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property that do not or would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect; (e) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects with respect to any Property or any Owned Real Property that do not or would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect; (f) matters that would be disclosed on an accurate survey of the real property that do not or would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect; (g) any liens shown in any title commitment, report or policy, or

16

otherwise of record that do not or would not reasonably be expected to adversely affect the current occupancy or use of the real property in any material respect; (h) any other Liens that Buyer has expressly stated are acceptable to Buyer in a writing delivered to Sellers; and (i) other than any of the Liens set forth in the foregoing clauses (a) through (g) and other than any Lien that is required to be removed or cured by the applicable tenant under the applicable Lease or was created by such tenant, any Liens on the fee property underlying any Lease that do not or would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect or impose any material adverse obligations on Buyer following the Closing.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

"Personal Property Leases" has the meaning set forth in Section 3.10(b).

"Personal Property Tax Adjustment" has the meaning set forth in Section 2.8(a)(i).

"Personal Property Taxes" means the personal property Taxes associated with the Acquired Assets that are imposed on a periodic basis and are required to be paid for a Straddle Tax Period or for any Tax period that begins after the Closing Date.

"Per Store Cash Closing Balance" has the meaning set forth in the definition of Acquired Assets.

"Petition Date" has the meaning set forth in the recitals.

"Pre-Closing Environmental Liabilities" mean any and all Environmental Liabilities to the extent related to or arising from the Acquired Assets, the Leased Real Property or the Business, or based on events or occurrences commencing, on or prior to the Closing Date.

"Prepaid Expenses" has the meaning set forth in the definition of Acquired Assets.

"Properties" means, collectively, the Stores, the Commissary and the Headquarters.

"Purchase Price" has the meaning set forth in Section 2.3(a).

"Purchase Price Allocation" has the meaning set forth in Section 2.7.

"Real Property Leases" has the meaning set forth in Section 3.5(a).

"Real Property Tax Adjustment" has the meaning set forth in Section 2.8(a)(ii).

"Real Property Taxes" means the real property Taxes of Sellers, and assessments, including commercial rent Taxes, ad valorem, sewer rents, business improvement district, license, intangibles and other similar Taxes associated with the Real Property Leases or associated with the Owned Real Property that are required to be paid for a Straddle Tax Period or for any Tax period that begins after the Closing Date.

17

"Registered" means, with respect to Intellectual Property, issued, registered, renewed or the subject of a pending application.

"Registered Business Intellectual Property" has the meaning set forth in Section 3.17(a).

"Rejection Notice" has the meaning set forth in Section 2.12(d).

"Related Agreements" means the Bill of Sale, the Assignment and Assumption Agreement, and the Lease Assignment Agreement.

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment.

"Removal Notice" has the meaning set forth in Section 5.12(b).

"Representative" means, when used with respect to a Person, the Person's controlled Affiliates (including Subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives and, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants).

"Sale Hearing" means a hearing before the Bankruptcy Court to approve this Agreement and the Sale Order.

"Sale Order" means an order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit C (with such changes as are reasonably acceptable to each Party), among other things, (a) approving (i) this Agreement and the execution, delivery, and performance by Sellers of this Agreement and the other instruments and agreements contemplated hereby, (ii) the sale of the Acquired Assets to Buyer free and clear of all Liens (other than any Permitted Liens), (iii) the assumption of the Assumed Liabilities by Buyer on the terms set forth herein and (iv) the assumption and assignment to Buyer of the Transferred Contracts on the terms set forth herein; (b) determining that Buyer is a good faith purchaser and has provided adequate assurance of future performance with respect to the Transferred Contracts; and (c) providing that (w) the Closing will occur in accordance with the terms and conditions hereof; (x) Buyer will not have any derivative, successor, transferee or vicarious Liability for Liabilities of Sellers or any Affiliates of Sellers by reason of any theory of Law or equity (whether under federal or state Law or otherwise) as a result of the transactions contemplated by this Agreement, including but not limited to any Liabilities on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Business prior to, with respect to each Acquired Asset, the Closing for such Acquired Asset, or on account of any Multiemployer Plan or ERISA; and (y) to the maximum extent permitted by the Bankruptcy Code, the so-called "bulk sales," "bulk transfer" and similar Laws (including those relating to Taxes) in any applicable jurisdictions do not apply.

"Seller Marks" means all Trademarks set forth on Section 1.1 of the Disclosure Schedule under the heading "Seller Marks", including, for the avoidance of doubt, the "CGI", "Central Grocers, Inc." and "Centrella" names, and any name or Trademark or other indicia of origin that includes, relates to or derives from any such name, or any related abbreviations, acronyms or

other formatives based on any such name, whether alone or in combination with any other words, phrases, or designs, and all registrations, applications and renewals thereof, and any name or Trademark or other indicia of origin that is confusingly similar thereto or derived therefrom.

"Seller Rejection Notice" has the meaning set forth in Section 2.12(c).

"Sellers" has the meaning set forth in the preamble.

"Sellers' Cure Cost Cap" means an amount equal to $1 million.

"Sellers' Inventory Taker" has the meaning set forth in Section 2.6(a).

"Software" means any and all: (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code; (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise; (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons; and (d) all documentation, including user manuals and other training documentation related to any of the foregoing.

"Straddle Tax Period" means a Tax period that includes (but does not end on) the Closing Date.

"Store" and "Stores" have the meanings set forth in the recitals.

"Subsidiary" means, with respect to any Person, on any date, any Person (a) the accounts of which would be consolidated with and into those of the applicable Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date or (b) of which securities or other ownership interests representing more than fifty percent of the equity or more than fifty percent (50%) of the ordinary voting power or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests or more than fifty percent (50%) of the profits or losses of which are, as of such date, owned, controlled or held by the applicable Person or one or more subsidiaries of such Person.

"SVT" has the meaning set forth in the preamble.

"SVT Super Market" has the meaning set forth in the preamble.

"Systems" means all Software, systems, servers, computers, hardware, firmware, middleware, networks, data communications lines, routers, hubs, switches and other information technology equipment that are used to process, store, maintain and operate business data, information, and functions.

"Target Closing Date" shall mean (a) if the Sale Order has been entered on or before July 18, 2017, August 2, 2017 or (b) if the Sale Order is entered after July 18, 2017, the first Business Day immediately following the date that is fourteen (14) days after the date on which the entry of the Sale Order occurs.

19

"Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, escheat, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Title Commitment" has the meaning set forth in Section 5.12(a).

"Trademark Assignment Agreement" has the meaning set forth in Section 2.5(a)(i)(G).

"Trademarks" means trademarks, service marks, trade dress, logos, trade names, and Internet domain names, together with all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith.

"Transfer Tax" has the meaning set forth in Section 6.5(a).

"Transferred Contracts" has the meaning set forth in Section 5.9(a).

"Unpaid Tax Liability Amount" has the meaning set forth in Section 2.3(a).

"Utility Proration" has the meaning set forth in Section 2.8(a)(iii).

"Warehouse" means that certain warehouse located at located at 101 45th Avenue, Suite A, Munster, IN  46321.

"Warn Act Laws" has the meaning set forth in Section 3.7.

"WISP" has the meaning set forth in Section 3.18(b).

Section 1.2    Interpretations. Unless otherwise indicated herein to the contrary:

(a)    When a reference is made in this Agreement to an Article, Section, Exhibit, Schedule, clause or subclause, such reference shall be to an Article, Section, Exhibit, Schedule, clause or subclause of this Agreement.

(b)    The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

20

(c)      The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)      The word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if."

(e)      The use of "or" herein is not intended to be exclusive.

(f)      The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

(g)      All terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.

(h)      References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder. References to any Contract are to that Contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof. References herein to a Person are also to its successors and permitted assigns. Any reference herein to a Governmental Authority shall be deemed to include reference to any successor thereto. References from or through any date means, unless otherwise specified, from and including or through and including such date, respectively.

(i)      Any reference herein to "Dollars" or "$" shall mean United States dollars.

(j)      References in this Agreement to materials or information "furnished to Buyer" and other phrases of similar import include all materials or information made available to Buyer or its Representatives in the data room prepared by Sellers or provided to Buyer or its Representatives in response to requests for materials or information, in each case, on or prior to 5:00 p.m. Central time on the day prior to the date of this Agreement.

(k)      References to "days" shall refer to calendar days unless Business Days are specified. If any period expires on a day which is not a Business Day or any event or condition is required by the terms of this Agreement to occur or be fulfilled on a day which is not a Business Day, such period shall expire or such event or condition shall occur or be fulfilled, as the case may be, on the next succeeding Business Day.

(l)      Unless the context otherwise requires, the word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if."

21

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Assets. On the terms and subject to the conditions set forth in this Agreement, Buyer will purchase from Sellers, and Sellers will sell, transfer, assign, convey, and deliver to Buyer on the Closing Date the Acquired Assets free and clear of all Liens (other than any Permitted Liens). Nothing herein shall be deemed to sell, transfer, assign, convey or deliver the Excluded Assets to Buyer, and Sellers shall retain all right, title and interest in, to, and under the Excluded Assets.

Section 2.2    Assumed Liabilities. On the terms and subject to the conditions set forth in this Agreement, Buyer shall assume only the Assumed Liabilities at the Closing. Buyer agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all such Assumed Liabilities in accordance with the terms thereof. Notwithstanding anything in this Agreement to the contrary, Buyer shall not assume, and shall be deemed not have assumed, any of the Excluded Liabilities.

Section 2.3    Consideration; Deposit Amount.

(a)    The consideration for the Acquired Assets shall be (i) an aggregate Dollar amount equal to the sum of (A) $73,100,000 (the "Base Amount"), *plus* (B) an aggregate Dollar amount equal to the sum of all Closing Inventory Valuations, *plus* (C) an amount equal to the sum of all Closing Adjustment Amounts (which may be a positive or a negative number), *plus* (D) the aggregate amount of all Per Store Cash Closing Balances, *plus* (E), $1,696,000 (the "Other Assets Amount"), *less* (F) $2,904,000 (such amount representing the cumulative amount of Real Property Taxes and Personal Property Taxes that are accrued but unpaid as of the end of the Closing Date, and is referenced herein as the "Unpaid Tax Liability Amount"), *less* (G) the Base Amount Credit, *less* (H) $280,000 representing cumulative anticipated savings by the Sellers resulting from Buyer's acquisition of Store 8781, *less* (I) the Outstanding Money Order Balance (such calculation, the "Purchase Price"); *plus* (ii) Buyer's assumption of the Assumed Liabilities, in each case subject to adjustment in accordance with Section 2.8(d), Section 5.12(b) and Section 8.3.

(b)    Upon the execution of this Agreement, pursuant to the terms of the Escrow Agreement, Buyer shall, (i) within two (2) Business Days following the date hereof, deposit with the Escrow Agent the sum of an initial deposit of $10,000,000 and (ii) in the event that the Closing has not occurred on or prior to Target Closing Date, by 5:00 p.m. Eastern time on each day following the Target Closing Date until the earlier of the Closing Date and the Outside Date, deposit with the Escrow Agent $200,000, in each case, by wire transfer of immediately available funds (collectively the amounts deposited pursuant to clauses (i) and (ii) hereof, the "Deposit Amount"), to be released by the Escrow Agent and delivered to the Parties in accordance with the provisions of this Agreement and the Escrow Agreement.

(c)    Pursuant to and in accordance with the Escrow Agreement:

(i)    if this Agreement is terminated by Sellers pursuant to Section 8.1(e), the Parties shall deliver Joint Written Instructions to the Escrow Agent directing the Escrow

22

Agent to deliver (x) an amount equal to the Buyer Termination Payment to Sellers, and (y) any accrued investment income on the funds in Escrow to Buyer;

(ii)     if this Agreement is terminated for any reason other than by any Seller pursuant to Section 8.1(e), the Parties shall deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver all funds held in Escrow (together with all accrued investment income thereon, if any) to Buyer.

(iii)    Sellers acknowledge and agree that, except in the case of fraud or willful misconduct, payment and delivery of the Buyer Termination Payment pursuant to Section 2.3(c)(i) will constitute liquidated damages and be the sole and exclusive remedy of Sellers and their respective Representatives and Affiliates, whether at Law or in equity, in the event of termination of this Agreement pursuant to Section 8.1(e) and upon the payment and delivery thereof to Sellers, Sellers and their respective Representatives and Affiliates will be deemed to have fully released and discharged Buyer and its Representatives and Affiliates from any Liability resulting from the termination of this Agreement.

Section 2.4     Closing.

(a)     The Closing shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York (or such other location as shall be mutually agreed upon by Sellers and Buyer) commencing at 10:00 a.m. Eastern time on such date (the "Closing Date") that is (i) the later of (x) the third (3rd) Business Day following the date upon which all of the conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated hereby set forth in Section 7.1 and Section 7.2 (other than conditions that by their nature are to be satisfied at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived and (y) the Target Closing Date or (ii) on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto. Subject to Section 8.3(c), for purposes of this Agreement and the transactions contemplated hereby, the Closing will be deemed to occur and be effective, and title to and risk of loss associated with the applicable Acquired Assets, shall be deemed to occur at 12:01 a.m., Central time, on the Closing Date (the "Effective Time").

(b)     Notwithstanding anything to the contrary in Section 2.4(a), at Buyer's election, upon written notice to the Sellers on or prior to the Closing Date (as determined pursuant to Section 2.4(a)), the Buyer may defer the Closing to a date that is a Business Day no earlier than (x) if the Sale Order is entered on or prior to July 18, 2017, August 2, 2017 and no later than September 10, 2017 and (y) if the Sale Order is entered on a date after July 18, 2017, such date that is fifty four (54) days following the date  the Bankruptcy Court enters the Sale Order (in either case, such date, the "Deferred Closing Date"), which date shall be specified in Buyer's notice to Sellers; provided, that, from and after the later of (A) the date of such notice or (B) the date upon which all of the conditions set forth in Section 7.1 are first satisfied: (i) references in this Agreement to the Closing Date shall be deemed to refer to the Deferred Closing Date other than such references thereto in Article III, (ii) references to the Closing in Section 7.1(a) and Section 7.1(b) shall refer to 12:01 a.m. Central time on the date on which the Closing should have occurred pursuant to Section 2.4(a) hereof but for this Section 2.4(b), (iii) other than those

23

conditions that by their nature are to be satisfied at the Closing itself, all conditions to Buyer's obligations to close pursuant to <u>Section 7.1</u> shall be deemed to have been satisfied and waived; and (iv) Buyer shall have waived all rights to treat any Store subject to a Material Casualty as an Excluded Asset pursuant to <u>Section 8.3(a)</u>.

(c)     At least five (5) Business Days prior to the Closing Date, Sellers shall prepare and deliver to Buyer a statement (the "<u>Estimated Statement</u>") setting forth, with reasonable supporting detail, the Base Amount and Sellers' good faith estimate of (i) for each Store and the Commissary, the total value of the Inventory to be at such Store or the Commissary, as applicable, at the Closing (such estimate for each Store, the Warehouse and the Commissary, the "Estimated Inventory Valuation" for such Store, the Warehouse or the Commissary, as applicable), (ii) the Adjustment Amount (the "<u>Estimated Adjustment Amount</u>") and (iii) the Purchase Price to be paid on the Closing Date calculated in accordance with <u>Section 2.3</u>, in each case, with respect to the Acquired Assets (such amount, the "<u>Estimated Purchase Price</u>"). Following delivery by Sellers to Buyer of the Estimated Statement, and until the close of business on the Business Day prior to the Closing Date, Buyer shall be permitted to review Sellers' calculations contained therein and, subject to the limitations set forth in <u>Section 5.6</u>, Sellers shall provide Buyer and its Representatives with such access during normal business hours to Sellers' books and records and management of Sellers and their respective Affiliates as Buyer may reasonably request in order for Buyer and Buyer's Representatives to review the Estimated Statement. Sellers shall consider in good faith any reasonable revisions to the calculations set forth in the Estimated Statement proposed in good faith by Buyer. To the extent Sellers agree to any such revisions, such revisions shall be binding on the Parties for purposes of determining the Estimated Statement and the Estimated Purchase Price provided for therein. As soon as practicable after the calculation of the Closing Inventory Valuation for a Store, the Commissary and/or the Warehouse is made available by the Inventory Taker, in accordance with <u>Section 2.6</u>, and prior to the Closing, Sellers shall update the Estimated Statement to reflect the calculation of the Closing Inventory Valuation for such applicable Property as follows: If the Closing Inventory Valuation at a Store, the Commissary and/or the Warehouse is greater than the Estimated Inventory Valuation for such Property on the Estimated Statement, then the Estimated Inventory Valuation reflected therein shall be increased, on a dollar for dollar basis, by such difference. If the Closing Inventory Valuation at a Store, the Commissary or the Warehouse, as applicable, is less than the Estimated Inventory Valuation for such Property on the Estimated Statement, then the Estimated Inventory Valuation reflected therein shall be decreased, on a dollar for dollar basis, by such difference.

Section 2.5     <u>Closing Payments and Deliveries</u>.

(a)     On the Closing Date:

(i)     Buyer shall:

(A)     pay to Sellers an amount equal to (x) the Estimated Purchase Price as set forth in the Estimated Statement *less* (y) the Holdback Amount (as defined below), which shall be paid by wire transfer of immediately available funds;

24

(B) deposit with the Escrow Agent the sum of $1,000,000 by wire transfer of immediately available funds (the "Holdback Amount"), to be released by the Escrow Agent and delivered to the Parties in accordance with the provisions of this Agreement and the Escrow Agreement;

(C) deliver to Sellers a Bill of Sale substantially in the form of Exhibit E (the "Bill of Sale"), duly executed by Buyer;

(D) deliver to Sellers an Assignment and Assumption Agreement substantially in the form of Exhibit F (the "Assignment and Assumption Agreement"), duly executed by Buyer;

(E) deliver to Sellers an Assignment and Assumption of Lease substantially in the form of Exhibit G (a "Lease Assignment Agreement"), duly executed by Buyer;

(F) deliver to Sellers a Services Agreement substantially in the form of Exhibit H (the "Services Agreement"), duly executed by Buyer;

(G) deliver to Sellers a Trademark assignment agreement in the form of Exhibit I hereto (the "Trademark Assignment Agreement"), duly executed by Buyer;

(H) deliver to Sellers a duly executed certificate from an officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) is satisfied; and

(I) deliver Transfer Tax forms, if any, to Sellers, as are required by state and local authorities to be executed in the connection with recording the limited warranty deeds transferring fee simple title to the Owned Real Property to be acquired in the Closing to Buyer.

(ii) Sellers shall:

(A) deliver to Buyer a Bill of Sale, duly executed by Sellers;

(B) deliver to Buyer an Assignment and Assumption Agreement, duly executed by Sellers;

(C) deliver to Buyer a Lease Assignment Agreement, duly executed by each applicable Seller;

(D) deliver to Buyer a Trademark Assignment Agreement, duly executed by each applicable Seller;

(E) deliver to Buyer a Services Agreement, duly executed by each applicable Seller;

25

(F)　　deliver to Buyer a duly executed certificate from an officer of each applicable Seller to the effect that each of the conditions specified in Section 7.1(a) and Section 7.1(b) is satisfied;

(G)　　deliver to Buyer a duly executed FIRPTA Affidavit from each applicable Seller (or, if such Seller is a disregarded entity for U.S. federal income tax purposes, its regarded owner). If, on or before the Closing Date, Buyer shall not have received each FIRPTA Affidavit, Buyer may withhold from the Purchase Price such sums as are required to be withheld therefrom under section 1445 of the IRC;

(H)　　deliver duly executed limited warranty deeds transferring fee simple title to the Owned Real Property, free and clear of all Liens other than Permitted Liens, to Buyer, in the form attached hereto on Exhibit J (each, a "Deed"); and

(I)　　deliver Transfer Tax forms, if any, to Buyer, as are required by state and local authorities to be executed in the connection with recording the limited warranty deeds transferring fee simple title to the Owned Real Property to be acquired in the Closing to Buyer.

Section 2.6    Inventory.

(a)　　Commencing at 5:00 p.m. Central Time on a date that is at least three (3) Business Days preceding the Closing Date, or on such other date or at such other time as the Parties may mutually agree in writing (the date of such Inventory with respect to the Closing being the "Inventory Date"), a physical count of the Inventory, and calculation of the value thereof, shall be made by either (i) National Inventory Auditing Services ("Sellers' Inventory Taker") or (ii) to the extent Sellers' Inventory Taker is not available, a nationally-recognized, independent inventory service (the "Inventory Taker") selected and engaged by Buyer, in its sole discretion. The Inventory Taker will conduct the physical inventory in accordance with instructions set forth in Section 2.6(a) of the Disclosure Schedule ("Inventory Purchase Instructions") and otherwise in accordance with the terms and conditions of this Section 2.6. Each Party shall be entitled to have Representatives present during the inventory taking and the fees and expenses of the Inventory Taker shall be borne fifty percent (50%) by Buyer and fifty percent (50%) by Sellers. The physical inventory shall not include the Excluded Inventory. The Inventory Taker shall value all Inventory carried at the Properties on the Inventory Date, excluding the Excluded Inventory, at the prices set forth in Section 2.6(a) of the Disclosure Schedule (such value, the "Closing Inventory Valuation").

(b)　　To the extent Buyer has not received the Consent of all applicable Governmental Authorities to sell alcoholic beverages from any particular Store that is part of the Acquired Assets, after diligently pursuing all such necessary Consents, then either (i) to the extent permitted under applicable Law, Buyer shall or shall cause one of its Affiliates to purchase such Inventory for re-sale at another grocery store or supermarket that Buyer owns or controls, pursuant to the terms of this Agreement or (ii) to the extent the acquisition of such Inventory as contemplated under clause (i) of this Section 2.6(b) is not permitted under applicable Law,

26

Inventory shall not include, and the Closing Inventory Valuation performed by the Inventory Taker shall exclude the cost of, the alcoholic beverage Inventory located at such Store. With respect to any spirits, wine or liquor (or similar) Permit or alcoholic beverage Inventory conveyed hereunder, at Buyer's sole cost and expense, the Parties shall comply with all applicable Laws, including the creation of any necessary escrow and the disbursement or release of any funds held in such escrow.

(c)     The complete inventory prepared by the Inventory Taker shall be prepared in accordance with the usual and customary practices of the industry and shall show the total cost of the Inventory for each Store, the Commissary and the Warehouse determined in the manner provided above. The Closing Inventory Valuation determined by the Inventory Taker shall be final and binding on the Parties, absent fraud or manifest error.

(d)     Notwithstanding Sellers' obligations in Section 5.2 to conduct Business in the Ordinary Course of Business and to maintain comparable levels and mix of Inventory at the Properties, Sellers may sell down Excluded Inventory without replenishment commencing fourteen (14) days prior to the Inventory Date for each particular Store, the Commissary and the Warehouse. Sellers shall remove at their expense all of the remaining Excluded Inventory from the Properties prior to the Inventory Date in order to avoid accidental inclusion thereof in the Inventory count

Section 2.7     Allocation. Buyer and Sellers agree to allocate the Purchase Price (as finally determined hereunder), the Assumed Liabilities, and all other relevant items among the Acquired Assets in accordance with section 1060 of the IRC and the treasury regulations thereunder (the "Allocation Principles"). No later than sixty (60) days after the Closing Date, Sellers shall deliver to Buyer an allocation of the Purchase Price and the Assumed Liabilities (and all other relevant items) as of the Closing Date among the Acquired Assets determined in a manner consistent with the Allocation Principles (the "Purchase Price Allocation") for Buyer's review. Buyer shall have an opportunity to review the proposed Purchase Price Allocation for a period of thirty (30) days after receipt of the proposed Purchase Price Allocation. If Buyer disagrees with any aspect of the proposed Purchase Price Allocation, Buyer shall notify Sellers in writing prior to the end of such thirty (30)-day period (an "Allocation Objection Notice"), setting forth Buyer's proposed Purchase Price Allocation and specifying, in reasonable detail, any good faith dispute as to Sellers' Purchase Price Allocation. If prior to the conclusion of such thirty (30)-day period, Buyer notifies Sellers in writing that it will not provide any Allocation Objection Notice or if Buyer does not deliver an Allocation Objection Notice within such thirty (30)-day period, then the proposed Purchase Price Allocation shall be deemed final, conclusive and binding upon each of the Parties. Sellers and Buyer shall use commercially reasonable efforts to resolve any objection by Buyer to the proposed Purchase Price Allocation. If, within ten (10) days after Sellers receive an Allocation Objection Notice, the Parties have not resolved all objections and agreed upon a final Purchase Price Allocation, the Parties shall engage an independent accounting firm mutually acceptable to Buyer and Sellers (the "Independent Accountant") to resolve any outstanding disputes, and such resolution shall be final, conclusive and binding upon each of the Parties. The fees and disbursements of the Independent Accountant shall be shared equally by Sellers, on the one hand, and Buyer, on the other hand. Sellers and Buyer shall make appropriate adjustments to the Purchase Price Allocation to reflect any adjustments to the Purchase Price. Buyer and Sellers agree (and agree to cause their respective

27

Subsidiaries and Affiliates) to prepare, execute, and file IRS Form 8594 and all Tax Returns on a basis consistent with the final Purchase Price Allocation, and none of the Parties will take any position inconsistent with the final Purchase Price Allocation on any Tax Return or in any audit or Tax proceeding, in each case unless otherwise required by a change in Law or pursuant to the good faith resolution of a Tax contest. Notwithstanding any other provision of this Agreement, the terms and provisions of this <u>Section 2.7</u> shall survive the Closing without limitation.

Section 2.8    <u>Purchase Price Adjustment</u>.

(a)    The following items, for the pertinent time periods, shall be added to (in the case of amounts to be paid by Buyer) or deducted from (in the case of amounts to be paid by Sellers) the Purchase Price, as the case may be, (an amount equal to the sum of such additions (which shall be expressed as positive numbers in such calculation) and deductions (which shall be expressed as negative numbers in such calculation), which aggregate amount may be a positive or negative number, the "<u>Adjustment Amount</u>"):

(i)    If, as of the applicable Effective Time, Sellers have paid Personal Property Taxes with respect to a Straddle Tax Period, an amount shall be added to the Adjustment Amount accordingly, equal to (A) the amount of such Personal Property Taxes paid by Sellers multiplied by (B) a fraction, the numerator of which is equal to the number of days which shall have elapsed from (but not including) the Closing Date through the end of the Straddle Tax Period and the denominator of which is the number of days in the entire Straddle Tax Period (the "<u>Personal Property Tax Adjustment</u>");

(ii)    If, as of the applicable Effective Time, Sellers have paid Real Property Taxes with respect to a Straddle Tax Period, an amount shall be added to the Adjustment Amount accordingly, equal to (A) the amount of such Real Property Taxes paid by Sellers multiplied by (B) a fraction, the numerator of which is equal to the number of days which shall have elapsed from (but not including) the Closing Date through the end of the Straddle Tax Period and the denominator of which is the number of days in the entire Straddle Tax Period (the "<u>Real Property Tax Adjustment</u>");

(iii)    Sellers shall attempt to obtain final meter readings for utilities at the Properties as of the applicable Effective Time and shall pay for all utilities through the applicable Effective Time and, in the event a Seller shall not have paid for any such utilities because it was not practicable to obtain any such meter reading for any utility as of the applicable Effective Time or because there are utilities which are not metered, then the cost of any such utilities shall be prorated, as of the applicable Effective Time, between Sellers and Buyer (based on Sellers' good faith estimates of such costs based on Sellers' most recent utility bills for such utilities) as follows: (x) Sellers shall bear the proportion of, and shall be solely responsible for, the cost of such utilities equal to a fraction, the numerator of which is equal to the number of days which shall have elapsed from the beginning of the applicable utility period through the applicable Effective Time and the denominator of which is the number of days in the entire applicable utility period and (y) Buyer shall be responsible for the remainder (the "<u>Utility Proration</u>"); <u>provided</u>, <u>however</u>, that the Closing Adjustment Amount shall account for any deficiency in the original proration based on the final utility bills once received;

28

(iv)     any and all other Leased Real Property rental income, expenses, payments or receipts, rentals, costs, charges or fees connected with a Seller's or any Affiliate of a Seller's use or operation of any Property, including, without duplication, Prepaid Expenses, and all common area costs paid by a Seller or any Affiliate thereof to landlords or third parties pursuant to any declarations, reciprocal easement agreements, shopping center covenants or other covenants, conditions or restrictions that encumber any Property, shall be prorated between Sellers and Buyer as of the applicable Effective Time and Sellers shall bear their (and their Affiliates') proportion thereof through the applicable Effective Time; any and all revenues from Acquired Assets such as copy machines, vending machines, pay phones and the like shall be apportioned as of the end of the month in which the applicable Effective Time occurs and Sellers shall retain such revenues for that month prior to the applicable Effective Time; and with respect to any percentage rents on adjusted gross sales payable under any of the Property Leases ("Percentage Rents"): (A) such Percentage Rents shall be estimated as of the applicable Effective Time for the month or quarter (as the case may be) for the relevant installment; (B) such estimated Percentage Rents shall be apportioned for that payment period as between the Buyer and Sellers as of the applicable Effective Time (the "Percentage Rent Proration"); (C) the estimated amount of such Percentage Rents apportioned to Sellers shall be taken into account in calculating the Estimated Adjustment Amount hereunder (and shall therefore reduce the amount payable by the Buyer at the Closing); (D) the actual Percentage Rents payable for such installment period, if any, shall be paid by Buyer when due; and (E) the Closing Adjustment Amount shall account for any inaccuracy in the original proration of Percentage Rent based on the final invoices for Percentage Rent once received;

(v)     the Adjustment Amount shall be (A) decreased by the amount of any Transfer Taxes owed by Sellers pursuant to Section 6.5 in the event that such amount has not been paid at the Closing, and (B) increased by the amount of any Transfer Taxes owed by Buyer pursuant to Section 6.5 in the event that such amount has not been paid at the Closing; and

(vi)     the Adjustment Amount shall be increased or decreased, as applicable, on a dollar for dollar basis, by an aggregate amount equal to the difference between the amount of Cash left at each Store as of the Effective Time and an aggregate amount equal to the Per Store Cash Closing Balance for such Store.

(b)     Within ninety (90) days after the Closing Date, Buyer shall prepare and deliver to Sellers a statement (the "Closing Statement") setting forth the calculation of the Adjustment Amount as of the Closing Date (which amount may be a negative or positive number) (the "Closing Adjustment Amount") with reasonable supporting details.

(c)     If Sellers dispute any amounts shown on the Closing Statement, Sellers shall deliver to Buyer within twenty (20) days after receipt of the Closing Statement a notice (the "Dispute Notice") setting forth Sellers' calculation of such amounts and describing in reasonable detail the basis for the determination of such different amounts. If Sellers do not deliver a Dispute Notice to Buyer within such twenty (20) day period, the Closing Statement prepared and delivered by Buyer shall be deemed to be the "Final Closing Statement". The Parties shall use

29

commercially reasonable efforts to resolve such differences within a period of thirty (30) days after Sellers have given the Dispute Notice. If the Parties resolve such differences, the Closing Statement shall be updated to reflect those resolutions and such updated Closing Statement shall be deemed to be the Final Closing Statement. If Buyer and Sellers do not reach a final resolution on the Closing Statement within thirty (30) days after Sellers have given the Dispute Notice, unless Buyer and Sellers mutually agree to continue their efforts to resolve such differences, the Independent Accountant shall be engaged to resolve, and shall resolve, such differences, pursuant to an engagement agreement by and among Buyer, Sellers and the Independent Accountant (which Buyer and Sellers agree to execute promptly), in the manner provided below. The Independent Accountant shall only decide the specific amounts under dispute by the Parties (the "Disputed Items"), solely in accordance with the terms of this Agreement. Buyer and Sellers shall each be entitled, along with its agents and representatives, to make a presentation to the Independent Accountant, pursuant to procedures to be agreed to among Buyer, Sellers and the Independent Accountant (or, if they cannot agree on such procedures, pursuant to procedures determined by the Independent Accountant), regarding such Party's determination of the amounts to be set forth on the Final Closing Statement; and the Parties shall use commercially reasonable efforts to cause the Independent Accountant to resolve the differences between Buyer and Sellers and determine the amounts to be set forth on the Final Closing Statement within twenty (20) days after the engagement of the Independent Accountant. The Independent Accountant's determination shall be based solely on such presentations of the Parties and any supplemental material provided by either Party in connection therewith (i.e., not on independent review) and on the definitions and other terms included herein. Such determination by the Independent Accountant shall be final and binding on the Parties, absent fraud or manifest error. The Closing Statement determined by the Independent Accountant shall be deemed to be the Final Closing Statement. The fees and expenses of the Independent Accountant shall be paid by the Party whose calculation of the Closing Adjustment Amount is farther from the Independent Accountant's calculation thereof. Nothing in this Section 2.8(c) shall be construed to authorize or permit the Independent Accountant to: (i) determine any questions or matters whatsoever under, or in connection with, this Agreement except for the Disputed Items; or (ii) resolve any such differences by making an adjustment to the Closing Statement that is outside of the range defined by amounts as finally proposed by Buyer and Sellers. Sellers and their accountants and other representatives shall be permitted reasonable access to the financial records of Buyer used to prepare the Closing Statement, at reasonable times during regular business hours during the period beginning on the delivery of the Closing Statement and ending on the date when the Final Closing Statement becomes final and binding on the Parties in accordance with the Agreement.

(d)     Promptly, but no later than five (5) Business Days after the final determination of the Final Closing Statement, if the Closing Adjustment Amount set forth in the Closing Statement: (i) exceeds the Estimated Adjustment Amount set forth in the Estimated Statement, Buyer shall pay or cause to be paid, by wire transfer of immediately available funds to the account(s) designated by Sellers, such excess amount and Buyer and Sellers shall deliver a Joint Written Instruction to the Escrow Agent instructing the Escrow Agent to deliver the Holdback Amount to Sellers; or (ii) is less than the Estimated Adjustment Amount, Buyer and Sellers shall: (A) if such shortfall is less than the Holdback Amount, (x) deliver a Joint Written Instruction to the Escrow Agent instructing the Escrow Agent to deliver an amount equal to such shortfall to Buyer from the Holdback Amount, and (y) deliver a Joint Written Instruction to the Escrow Agent instructing the Escrow Agent to deliver the difference between the Holdback Amount and

30

such shortfall to Sellers, (B) if the shortfall is equal to or exceeds the Holdback Amount, deliver Joint Written Instructions to the Escrow Agent instructing the Escrow Agent to deliver all of the Holdback Amount to Buyer and if such shortfall exceeds the Holdback Amount, Sellers shall pay or cause to be paid the excess of the shortfall over the Holdback Amount by wire transfer of immediately available funds to the account(s) designated by Buyer. Any payments made pursuant to this <u>Section 2.8(d)</u> shall be treated as an adjustment to the Purchase Price by the Parties and shall be paid in cash.

(e)     Notwithstanding anything to the contrary contained herein, if the Personal Property Tax Adjustment, Real Property Tax Adjustment or Percentage Rent Proration cannot be finally determined at the time of the delivery of the Closing Statement because of the unavailability of the final amount of applicable Taxes or Percentage Rents Proration at such time, such items shall be apportioned or reapportioned, as the case may be, as soon as practicable after the delivery of the Final Closing Statement. To the extent there is any dispute with respect to any such apportionment or reapportionment, the Parties shall resolve such disputes in accordance with the dispute resolution procedures applicable to the Final Closing Statement as set forth in <u>Section 2.8(c)</u>. Upon any such apportionment or reapportionment becoming final and binding on the Parties, Sellers or Buyer (as the case may be) shall pay any amounts due to the other Party as a result thereof within thirty (30) days after written demand (accompanied by reasonable supporting documentation).

(f)     If any payments are to be made from Sellers to Buyer pursuant to any provision of this Agreement (including, but not limited to, this <u>Section 2.8</u>), such amounts owed from Sellers to Buyer shall be entitled to administrative priority treatment under Section 503 of the Bankruptcy Code. Sellers shall not have any right to set-off amounts due Buyer pursuant to this Agreement by any amounts which may be owed by Buyer to Sellers pursuant to any other agreement or Order.

Section 2.9     <u>Delivery of Possession</u>. At the Closing, Sellers shall deliver to Buyer possession of the Properties and all Excluded Assets shall have been removed by Sellers from each of the Properties (unless otherwise agreed by the Parties). Buyer shall take possession of the Properties together with the other Acquired Assets being transferred hereunder immediately following the Inventory Taker conducting the physical inventory of the Properties pursuant to <u>Section 2.6(a)</u>, and Buyer shall assume all risk of loss by fire or other casualty and all risks relating to the operation of the Business with respect thereto occurring upon or following the taking of such possession. At such time, Sellers shall deliver to Buyer's designated representative the keys and access and security codes to the Properties and the combinations to all safes located at the Properties and Buyer shall immediately make arrangements to have such locks and codes changed.

Section 2.10     [Reserved].

Section 2.11     <u>Withholding</u>. Notwithstanding any other provision of this Agreement to the contrary, Buyer shall be entitled to deduct and withhold from any consideration or other amounts payable to any Person pursuant to this Agreement such amounts as it is required to deduct and withhold with respect to the payment of such consideration or other amounts under any provision of U.S. federal, state, local, or non-U.S. Tax law. If Buyer determines that any

31

deduction or withholding is required, Buyer will provide prior written notice to Sellers of any such determination within a commercially reasonable amount of time prior to the Closing Date; provided, that in no event shall Buyer be required to pay any additional amounts in respect of such withholding or deduction. Any amounts so deducted and withheld shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

Section 2.12   Designation Rights Contracts.

(a)      Sellers have provided Buyer with a list of the Designation Rights Contracts, which list contains a good faith estimate of the amount of Cure Costs applicable to each such Designation Rights Contract (and if no Cure Cost is estimated to be applicable with respect to any particular Designation Rights Contract, the amount of such Cure Cost shall be designated as "$0.00"). From and after the date hereof, Buyer may, at any time and from time to time through (and including) seven (7) Business Days following the Closing Date and prior to the entry of an order of the Bankruptcy Court approving the rejection of such Designation Rights Contracts, by written notice pursuant to this Section 2.12(a), include any Designation Rights Contract in the definition of Transferred Contracts and, from such notice date, such Designation Rights Contract shall be deemed a Transferred Contract hereunder and require Sellers to give not less than five (5) Business Days' notice to the non-Seller parties to any such Designation Rights Contract of the Sellers' proposed assumption and assignment thereof to Buyer and the amount of Cure Costs associated with such Designation Rights Contract. Buyer may, at any time and from time to time through (and including) seven (7) Business Days following the Closing Date and prior to the assumption and assignment of such Designation Rights Contract, by written notice pursuant to this Section 2.12(a), include any Designation Rights Contract in the definition of Excluded Contracts and, from such notice date, such Designation Rights Contract shall be deemed to be an Excluded Contract hereunder.   To exercise its rights under this Section 2.12(a) to include Designation Rights Contract in the definitions of Transferred Contracts and Excluded Contracts, as applicable, Buyer shall deliver one or more written notices to the Sellers specifying the Designation Rights Contract(s) to be so included (a "Buyer Assumption Notice").   If any Designation Rights Contract is added to the schedule of Transferred Contracts, the Sellers shall promptly take such steps as are reasonably necessary, including, if applicable, prompt delivery of notice to the non-Seller counterparty to such Contract, to cause such Contract to be assumed by the applicable Seller, and assigned to the Buyer, from and after the Closing. Notwithstanding the foregoing, no prepetition Cure Costs with respect to any Designation Rights Contract shall be due until the permanent assumption by Sellers thereof pursuant to this Section 2.12.

(b)      From and after the Closing, with respect to any Designation Rights Contract, all consideration or proceeds received by Sellers in respect of, and other benefits deriving from, such Designation Rights Contract ("Designation Rights Contracts Proceeds") shall constitute Purchased Assets and be promptly delivered to Buyer to the extent such Designation Rights Contract is ultimately assumed by Buyer pursuant to this Agreement.   Buyer shall provide all reasonable cooperation and assistance reasonably required by the Sellers to enable the Sellers to provide, or cause to be provided, the services contemplated by this Section 2.12.   Without limiting the generality of the foregoing, to the extent deemed necessary by the Buyer:

WEIL:\96189313\21\76248.0003

(i)     Subject to Section 2.12(b)(iii), Buyer may establish new accounts (the "Buyer Accounts") for the deposit of the Designation Rights Contracts Proceeds and the disbursement of amounts payable to Sellers under this Section 2.12(b), and Sellers shall promptly upon Buyer's reasonable request execute and deliver all necessary documents to open and maintain such accounts.  The Buyer Accounts shall be dedicated solely to the deposit of the Designation Rights Contracts Proceeds and the disbursement of amounts payable under this Section 2.12(b), and Buyer shall exercise sole signatory authority and control with respect to the Buyer Accounts.  Sellers shall not be responsible for, and Buyer shall pay as an operational expense hereunder, all bank fees and charges, including wire transfer charges, related to the Buyer Accounts.  Upon Buyer's designation of the Buyer Accounts, all Designation Rights Contracts Proceeds, including credit card proceeds, shall be deposited into the Buyer Accounts.  During the period between the Closing and the date Buyer establishes the Buyer Accounts, if any, all Designation Rights Contracts Proceeds, including credit card proceeds, shall be collected by Buyer and deposited on a daily basis into depository accounts (as determined by Buyer) for the Designation Rights Contracts, which accounts shall be designated solely for the deposit of Designation Rights Contracts Proceeds, including credit card proceeds, and the disbursement of amounts payable by Buyer under this Section 2.12(b)(i). Notwithstanding anything to the contrary contained herein, Sellers shall have no ownership interest in, and shall not be entitled to withdraw any, Designation Rights Contracts Proceeds.

(ii)     Subject to Section 2.12(b)(iii), Buyer shall have the right to use Sellers' credit card facilities, including credit card terminals and processors, credit card processor coding, the merchant identification numbers and existing bank accounts, for Designation Rights Contracts Proceeds derived from credit card purchases.  In the event that Buyer elects to use Sellers' credit card facilities, Sellers shall process credit card transactions on behalf of Buyer and for Buyer's account, applying customary practices and procedures.

(iii)     Without limiting the foregoing, Sellers shall reasonably cooperate with Buyer to download data from all credit card terminals in any Owned Real Property or properties subject to Real Property Leases each day and to effect settlement with Sellers' credit card processors, and shall take such other actions as are reasonably necessary to process credit card transactions on behalf of Buyer under Sellers' merchant identification numbers.  At the Buyer's request, Sellers shall reasonably cooperate with Buyer to establish Sellers' merchant identification numbers under the Buyer's name to enable Buyer to process all Designation Rights Contracts Proceeds derived from credit card purchases for the Buyer's account.  To the extent Sellers receive proceeds from Buyer's operation of the Acquired Assets after the Closing; Sellers shall promptly deposit such proceeds into the Buyer Accounts.  To the extent Buyer operates the Acquired Assets using Sellers' Permits pursuant to Section 5.1(b) and to the extent Sellers receive any proceeds from Buyer's operation of the Acquired Assets from any governmental agency, including EBT or like benefit programs or deriving from any Designation Rights Contracts, Sellers shall promptly deposit such proceeds into the Buyer Accounts.  Sellers and Buyer shall reconcile such deposits and make appropriate transfers to the Buyer Accounts at least once per week.

33

(c)     Sellers shall take all reasonable actions required to assume and assign the Transferred Contracts to Buyer, including, taking all reasonable actions required to obtain a Bankruptcy Court order (which order may be the Sale Order) containing a finding that the proposed assumption and assignment of the Transferred Contracts to Buyer satisfies all applicable requirements of section 365 of the Bankruptcy Code.

## ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers represent and warrant to Buyer that the statements contained in this Article III are true and correct, except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule").

Section 3.1     Organization of Sellers; Good Standing. Each Seller is a corporation or limited liability company, as applicable, duly organized, validly existing and in good standing under the Laws of the state of its incorporation or formation, as applicable, and has, subject to the necessary authority from the Bankruptcy Court, all requisite corporate or limited liability company (as applicable) power and authority to own, lease and operate its assets and to carry on its business as now being conducted and is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification or licensing necessary, except where the failure to be so organized, existing, qualified or licensed, in good standing or to have such power and authority, individually or in the aggregate, has not had, and would not reasonably be expected to have, a Material Adverse Effect.

Section 3.2     Authorization of Transaction. Subject to the Bankruptcy Court's entry of the Bidding Procedures Order, Sale Order and any other necessary order to close the sale of the Acquired Assets, each Seller has full power and authority (including full corporate or other organizational power and authority) to execute and deliver this Agreement, the Related Agreements and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder. The execution, delivery, and performance of this Agreement, the Related Agreements and all other agreements contemplated hereby to which each Seller is a party have been duly authorized by such Seller. Upon due execution hereof and thereof by each Seller, this Agreement, the Related Agreements and all other agreements contemplated hereby to which each Seller is a party (assuming in each case due authorization, execution and delivery by Buyer where applicable) shall constitute, subject to the Bankruptcy Court's entry of the Bidding Procedures Order, the Sale Order and any other necessary order to close the sale of the Acquired Assets, the valid and legally binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity (the "Bankruptcy and Equity Exception").

Section 3.3     Noncontravention; Government Filings. Except as set forth on Section 3.3 of the Disclosure Schedule, neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Article II), will (a) conflict with or result in a breach or violation of or default under the organizational documents of any Seller, (b) subject to the entry of the Sale

34

Order and any other necessary order to close the sale of the Acquired Assets, materially conflict with, or result in any material violation or material breach of or material default (with or without notice or lapse of time, or both) under any Law or Decree to which any Seller is subject in respect of the Acquired Assets, or (c) subject to the entry of the Sale Order and any other necessary order to close the sale of the Acquired Assets, materially conflict with, result in a material breach or violation of, constitute a material default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any material Contract or material Permit constituting an Acquired Asset to which any Seller is a party or to which any of the Acquired Assets is subject. Other than (x) the applicable requirements of the HSR Act, and (y) as required or pursuant to the Bankruptcy Code, the Bidding Procedures Order, the Sale Order, and any other necessary order to close the sale of the Acquired Assets, no Seller is required to give any notice to, make any material filing with, or obtain any material Consent from any Person in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement.

Section 3.4    Title to Assets; Sufficiency. Immediately prior to the Closing, Sellers will have, and upon delivery to Buyer on the Closing Date of the Related Agreements, and in accordance with the terms of the Sale Order, Sellers will thereby transfer to Buyer, good and valid title to, or, in the case of property leased by Sellers, a valid leasehold interest in, all of the Acquired Assets, free and clear of all Liens (other than any Permitted Liens). Except for the Excluded Assets and any other assets, each of which is set forth on Section 3.4 of the Disclosure Schedule, the Acquired Assets constitute all of the assets and properties, used or held for use in the Business and are sufficient for Buyer to conduct the Business from and after the Closing Date as currently conducted. Other than Contracts with respect to the supply of Inventory to the Properties, no Affiliate of Sellers owns any assets or is a party to any Contracts that are primarily used in the operation of the Business.

Section 3.5    Real Property.

(a)    Section 3.5(a) of the Disclosure Schedule sets forth the location of each Store leased to a Seller by a third party, and a list of all related Leases for real property at which the Properties are located, including any Leases for real property at the Properties (including the Owned Real Property) in which Seller is the lessor, sublessor, or licensor (such Leases, the "Real Property Leases"). Sellers have made available to Buyer a true and complete copy of each Real Property Lease in Sellers' possession or control. With respect to each Real Property Lease, (a) such Real Property Lease is in full force and effect, (b) subject to the Bankruptcy and Equity Exception, Sellers have a valid and enforceable leasehold interest under such Real Property Lease, free and clear of all Liens except Permitted Liens, and (c) neither such Seller nor, to Sellers' Knowledge, the counterparty thereto is in material breach or material default under such Real Property Lease, except for those defaults that will be cured in accordance with the Sale Order or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Real Property Leases and that would not constitute a Liability of Buyer at or after the Closing). To the Knowledge of Sellers, there does not exist any actual or threatened or contemplated condemnation or eminent domain proceedings that affect any Real Property Leases or any part thereof, and no Seller has received any notice, oral or written, of the intention of any Governmental Authority or other Person to take or use all or any part thereof.

35

(b)     Section 3.5(b) of the Disclosure Schedule sets forth a list of all real property owned by Sellers to be acquired by Buyer (the "Owned Real Property"). Sellers have good and valid fee simple title to all Owned Real Property, free and clear of all Liens other than Permitted Liens.

Section 3.6     Litigation; Decrees. Other than the Bankruptcy Case or with respect to any Excluded Liabilities, (i) there is no material Litigation pending, or, to Sellers' Knowledge, threatened by or before any Governmental Authority, nor, to Sellers' Knowledge, is there any material investigation pending by any Governmental Authority, in each case, against Sellers in connection with the Business and (ii) neither Sellers nor any of their respective assets or properties is subject to any outstanding material Decree applicable to the Business.

Section 3.7     Labor Relations. Except as set forth in Section 3.7 of the Disclosure Schedule, (a) no Seller is a party to or bound by any collective bargaining agreement covering the Covered Employees, (b) there are no strikes, work stoppages, slowdowns, lockouts, or arbitrations pending, or to the Knowledge of Sellers, threatened against or involving any of the Stores, (c) there are no material grievances or other labor disputes pending or, to the Knowledge of Sellers, threatened against or involving any of the Stores, (d) there are no material unfair labor practice charges, grievances or complaints pending or, to the Knowledge of Sellers, threatened by or on behalf of any of the Covered Employees (including, solely for purposes of this Section 3.7, employees of the Properties who are on short-term disability, long-term disability or any other approved leave of absence), (e) there are no actions pending, or to the Knowledge of Sellers, threatened against or involving Sellers alleging any Covered Employee is not authorized to work in the United States or other violation of immigration law requirements, (f) Sellers are in compliance in all material respects with all Laws respecting employment, immigration, employment practices and terms and conditions of employment, including wages and hours and the classification and payment of employees, and (g) in the last two (2) years no Seller has taken any action that would constitute a "mass layoff" or "plant closing" within the meaning of the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar state, local or foreign plant closing regulation ("WARN Act Laws") or that could otherwise trigger notice requirements or Liability under the WARN Act Laws, in each case, with respect to a Store or Covered Employees.

Section 3.8     Brokers' Fees. Other than the fees and expenses payable to Peter J. Solomon Company in connection with the transactions contemplated hereby, which shall be borne by Sellers, no Seller has entered into any Contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer or any of its Affiliates could become liable or obligated to pay.

36

Case 17-13886  Doc 355-1  Filed 07/18/17  Entered 07/18/17 10:03:54  Desc Exhibit
Page 42 of 50

Section 3.9    Taxes.

(a)    In each case with respect to the Acquired Assets and the Business, Sellers have timely filed all material Tax Returns required to be filed with the appropriate Tax authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of Sellers), and all such Tax Returns are true, correct and complete in all material respects; and all material amounts of Taxes payable by or on behalf of each Seller have been timely paid.

(b)    No Seller is a foreign person within the meaning of section 1445 of the IRC.

(c)    All deficiencies asserted or assessments in respect of material Taxes made as a result of any examinations by any Tax authority of the Tax Returns related to the Acquired Assets or the Business have been fully paid, and there are no other audits, investigations or similar proceedings by any Tax authority in progress (other than audits, investigations or similar proceedings of which the Sellers have not received written notice and as to which the Sellers have not sent anything in writing to the applicable Tax authority), nor has any Seller received any written notice from any Tax authority that it intends to conduct such an audit, investigation or similar proceeding, in each case, related to the Acquired Assets or the Business (other than any proof of claim filed by a taxing authority in the Bankruptcy Cases).

(d)    Sellers have complied in all material respects with all applicable Laws relating to the payment and withholding of Taxes with respect to the Acquired Assets and the Business (including, for the avoidance of doubt, Taxes related to employee salaries, wages or other compensation) and have duly and timely withheld and paid over to the appropriate Tax authorities all material amounts required to be so withheld and paid over under all applicable Laws with respect to the Acquired Assets and the Business.

(e)    Since April 1, 2014, no written claim has been made by a Tax authority in a jurisdiction in which Sellers do not currently file a Tax Return such that any Seller is or may be subject to taxation by that jurisdiction with respect to the Acquired Assets or the Business.

(f)    No agreement, waiver or other document or arrangement extending or having the effect of extending the period for assessment or collection of Taxes (including any applicable statute of limitation) has been executed or filed with any Tax authority by or on behalf of any Seller that would be binding on Buyer with respect to the Acquired Assets and the Business (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course of Business).

(g)    There are no Liens for a material amount of Taxes upon the Acquired Assets, except for Permitted Liens.

(h)    None of the Acquired Assets is an interest (other than indebtedness within the meaning of section 163 of the IRC) in an entity taxable as a corporation, partnership, trust or real estate mortgage investment conduit for U.S. federal income tax purposes.

(i)    With respect to the Business and the Acquired Assets, Sellers have collected all material sales and use Taxes required to be collected, and have remitted, or will remit on a timely

37

basis, such amounts to the appropriate taxing authority, or have been furnished properly completed exemption certificates and have maintained all such records and supporting documents in the manner required by all applicable sales and use Tax statutes and regulations.

Section 3.10   Tangible Personal Property.

(a)    Sellers have good and valid title to all Furnishings and Equipment, free and clear of all Liens other than Permitted Liens.

(b)    Section 3.10(b) of the Disclosure Schedule sets forth a list of all Transferred Contracts that constitute Leases of personal property ("Personal Property Leases") relating to personal property held, used or intended to be used by Sellers in the Business. Sellers have made available to Buyer true and complete copies of the Personal Property Leases. Section 3.10(b) of the Disclosure Schedule may be supplemented with additional Personal Property Leases after the date of this Agreement to the extent such additional Personal Property Leases have been designated as Transferred Contracts after the date hereof in accordance with Section 2.12.

(c)    Sellers have a valid and enforceable leasehold interest under each of the Personal Property Leases, subject to the Bankruptcy and Equity Exception. No party to any of the Personal Property Leases has exercised any termination rights with respect thereto.

Section 3.11   Transferred Contracts.

(a)    Each of the Transferred Contracts is in full force and effect and is a valid and binding obligation of the applicable Seller(s) and, to Sellers' Knowledge, the other parties thereto, in accordance with its terms and conditions, in each case subject to the terms of the Sale Order and the Bankruptcy and Equity Exception. Sellers have made available to Buyer true and complete copies of each Transferred Contract in Sellers' possession or control. Except for those defaults that will be cured or waived in accordance with Section 365 of the Bankruptcy Code (or that do not need to be cured under the Bankruptcy Code to permit the assumption and assignment of the Transferred Contracts and that would not be a Liability of Buyer at or after the Closing), there is no material default under any of the Transferred Contracts by any Seller or, to the Knowledge of Sellers, by any other party thereto, and Sellers have not received any written notice of any default or event that with notice or lapse of time or both would constitute a default by Sellers under any Transferred Contract. Subject only to the satisfaction of the Cure Costs applicable to the Transferred Contracts and the entry of the Sale Order, each Transferred Contract may be assumed by Sellers and assigned to Buyer pursuant to section 365 of the Bankruptcy Code. For purposes of this Section 3.11(a), the term "Transferred Contracts" excludes all Real Property Leases.

(b)    Section 3.11(b) of the Disclosure Schedule sets forth a list of all Bonding Requirements required as of the date hereof with respect to the Transferred Contracts, with the amount of such Bonding Requirements set forth in Section 3.11(b) of the Disclosure Schedule next to each such Transferred Contract. Section 3.11(b) of the Disclosure Schedule may be supplemented with Bonding Requirements for Transferred Contracts after the date of this Agreement to the extent such Contracts have been designated as Transferred Contracts after the date hereof in accordance with Section 2.12.

38

Section 3.12    Employee Benefits.

(a)       Section 3.12(a) of the Disclosure Schedule lists all Employee Benefit Plans.
"Employee Benefit Plans" means "employee benefit plans," as defined in section 3(3) of ERISA,
including any Multiemployer Plans, and all other material employee benefit plans, programs,
policies, practices, or other arrangements providing benefits (other than governmental plans and
statutorily required benefit arrangements), including bonus or incentive plans, deferred
compensation arrangements, stock purchase, stock option, change of control, severance pay, sick
leave, vacation pay, disability, medical insurance and life insurance, in each case, whether
written or unwritten, maintained or contributed to by Sellers and ERISA Affiliates with respect
to Covered Employees (including, solely for purposes of this Section 3.12(a), employees of the
Properties who are on short-term disability, long-term disability or any other approved leave of
absence).

(b)       True, correct and complete copies of the following documents, with respect to
each of the Employee Benefit Plans (excluding Employee Benefit Plan documents which relate
to Multiemployer Plans), have been made available to Buyer: (A) any plan documents, and all
material amendments thereto, (B) the most recent Forms 5500, (C) the most recent summary plan
descriptions (including letters or other documents updating such descriptions) and (D) the most
recent IRS determination letter.

(c)       Each of the Employee Benefit Plans sponsored by Sellers and its Subsidiaries that
is intended to qualify under section 401 of the IRC has been determined by the IRS to be so
qualified, and, to the Knowledge of Sellers, nothing has occurred with respect to the operation of
any such plan which could reasonably be expected to result in the revocation of such favorable
determination.

(d)       Each of the Employee Benefit Plans (excluding any Employee Benefits Plans
which are Multiemployer Plans) has been maintained, in all material respects, in accordance with
its terms and all provisions of applicable Law.

(e)       Except as set forth on Section 3.12(a) of the Disclosure Schedule, no Seller nor
any ERISA Affiliate has, within the past six (6) years, sponsored, maintained, contributed or
been required to contribute to (i) any Multiemployer Plan; or (ii) any plan subject to Title IV or
Section 302 of ERISA or Section 412 of the IRC, in each case, with respect to a Covered
Employee or former employee of the Stores.

Section 3.13    Compliance with Laws; Permits.

(a)       Sellers are in compliance in all material respects with all Laws applicable to the
Business (except for Laws addressed in Section 3.14). Sellers have not received any material
written notice of or been charged with the material breach or violation of any Laws applicable to
the Business. To the Knowledge of Sellers, there are no investigations pending or threatened
against Sellers regarding the possible material breach or violation of any Laws applicable to the
Business.

(b)       Section 3.13(b) of the Disclosure Schedule sets forth a Store-by-Store list of all
material Permits held, used or intended to be used by Sellers, or otherwise required, to operate

39

the Business in substantially the same manner as such Stores have been operated in the past six (6) months, including spirits, liquor, wine and similar Permits and all Permits required pursuant to any Environmental Law, in each case each of which is in effect on the date hereof, and all applications for any such Permits that are in process on the date hereof. Sellers are in compliance in all material respects with all such Permits. Sellers hold all of such material Permits and such Permits constitute all Permits which are required for the Business as presently conducted. Each such Permit is in full force and effect and has not expired. All applications required to have been filed for the renewal of such Permits have been duly filed on a timely basis with the appropriate Governmental Authority, and all other filings required to have been made with respect to such Permits have been duly made on a timely basis with the appropriate Governmental Authority. No Seller has received any notice from any Governmental Authority or issuer of any such Permit with respect to the revocation, suspension, restriction, limitation or termination thereof nor is there any Litigation pending or, to Sellers' Knowledge, threatened, the object of which is to revoke, restrict, limit or terminate any such Permit. Sellers are not in material default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a material default or violation) of any term, condition or provision of any such Permit to which Sellers are parties.

(c)     Section 3.13(c) of the Disclosure Schedule sets forth a list of all Bonding Requirements required as of the date hereof with respect to the Permits listed in Section 3.13(b) of the Disclosure Schedule, with the amount of such Bonding Requirements set forth in Section 3.13(c) of the Disclosure Schedule next to each such Permit.

Section 3.14     Environmental Matters. With respect to each Store and the Commissary and the business and operations conducted at each Property by the applicable Seller:

(a)     each Seller is in, and during the past three (3) years has been in, material compliance with all Environmental Laws, and no Seller has received any material written notice of or been charged with the material breach or violation of any Environmental Laws which remains outstanding;

(b)     there is no material Litigation pending, or to Sellers' Knowledge, threatened against Sellers pursuant to any Environmental Law or otherwise with respect to any alleged violation of Environmental Law or Release of, or exposure to, any Hazardous Materials;

(c)     there has been no Release of any Hazardous Material into the indoor or outdoor environment (whether on-site or off-site) arising from Sellers' operation of any Property in material violation of or in a manner or location that could reasonably be expected to require any remediation or other response actions which would reasonably be expected to result in Sellers incurring material Liabilities under Environmental Laws;

(d)     to the Knowledge of Sellers, there is not now at, on, under or in any Property, any of the following: (i) aboveground or underground storage tanks; (ii) dry cleaning establishments or other business operations using chlorinated solvents in any capacity at any Store; (iii) PCBs; (iv) damaged and friable asbestos-containing materials, or (v) equipment containing ozone-depleting refrigerants subject to Title VI of the Clean Air Act or 40 CFR Part 82;

40

(e)      all aboveground storage tanks and underground storage tanks are in material compliance with Environmental Laws; and

(f)      to the Knowledge of Sellers, Sellers have made available to Buyer complete and true copies of all material environmental reports, studies, investigations, regulatory compliance assessments, audits and material correspondence in its possession or reasonable control, with respect to each Property and the business and operations conducted at each Property and any of the Acquired Assets.

Section 3.15   <u>Statement of Sales</u>. As of the date hereof, the written sales figures provided to Buyer for the Stores, as referenced on Section 3.15 of the Disclosure Schedule, (a) are complete and correct in all material respects, (b) present fairly in all material respects the sales of each Store for the period specified and (c) have been prepared in good faith using substantially the same accounting methods, practices, principles, policies and procedures used in the preparation of such sales figures for prior periods in the Ordinary Course of Business, in each case, in all material respects.

Section 3.16   <u>Insurance</u>. All of Sellers' material policies of insurance by which the Acquired Assets are covered (the "<u>Insurance Policies</u>") are in full force and effect. All premiums due on such Insurance Policies have been paid or, if due and payable prior to the Closing, will be paid prior to the Closing in accordance with the payment terms of such Insurance Policies. All such Insurance Policies are valid and binding in accordance with their terms and have not been subject to a lapse in coverage. Sellers have not received any written notice of cancellation or non-renewal of any such Insurance Policy. There are no material claims related to the Business pending under any such Insurance Policies as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights. No Seller is in default under, or has otherwise failed to comply with, in any material respect, any provision contained in any such Insurance Policy. The Insurance Policies are of the type and in the amounts customarily carried by Persons operating retail grocery stores comparable to the Stores, including fire and casualty insurance on all improvements to the Stores, sufficient in amount (subject to commercially reasonable deductibles that do not require self-insured retention) to cover the costs of replacing any such improvements of any Store that might be damaged or destroyed with like improvements.

Section 3.17   <u>Intellectual Property</u>.

(a)      Section 3.17(a) of the Disclosure Schedule sets forth a list of (i) each item of Business Intellectual Property that is Registered (including the respective registration or application number and the record owner thereof) (the "<u>Registered Business Intellectual Property</u>") and (ii) each material Trademark related to the Business that is not Registered, including, without limitation, each material private label Trademark related to the Business. Each item of Registered Business Intellectual Property is subsisting (and, to the Knowledge of Sellers, no such fees or filings with respect to any material Registered Business Intellectual Property are due within ninety days after the date of the Closing) and is, to Sellers' Knowledge, valid and enforceable. No such item of Registered Business Intellectual Property, or any material Trademark related to the Business that is not Registered, is subject to any outstanding Order, judgment or Decree restricting its use by Sellers or adversely affecting the Sellers' rights thereto.

41

Except as set forth on Section 3.17 (a) of the Disclosure Schedule, one of the Sellers owns or has valid rights to use each item of Registered Business Intellectual Property and each material Trademark related to the Business that is not Registered, free and clear from all Liens other than Permitted Liens, and no item of Registered Business Intellectual Property or material Trademark related to the Business that is not Registered is the subject of any exclusive outbound license of Intellectual Property.

(b)      Except as set forth in Section 3.17(b) of the Disclosure Schedule or as could not reasonably be expected to result in Buyer incurring material liabilities under Intellectual Property Laws: (i) to the Knowledge of Sellers, the use of the Business Intellectual Property in the operation of the Business does not infringe, violate or misappropriate the Intellectual Property of any Person and (ii) no such claim for infringement, violation or misappropriation is pending or has been threatened in a written notice delivered to any Seller in the twelve (12) months prior to the date hereof.

(c)      To the Knowledge of Sellers, except as set forth in Section 3.17(c) of the Disclosure Schedule or as would not have or reasonably be expected to have a Material Adverse Effect, no Person is infringing, violating, or misappropriating any of the Business Intellectual Property. No Seller has delivered written notice of any such claim for infringement, violation or misappropriation to any Person in the twelve (12) months prior to the date hereof.

Section 3.18   <u>Data Security</u>.

(a)      As it pertains to the operation of the Business, each Seller complies in all material respects with the Payment Card Industry Data Security Standard and all applicable Laws, contracts and company policies governing the collection, sharing, processing, use, safeguarding and destruction of information regarding individuals in the possession or under the control of the Sellers and which relate to the Business, and has not received any written notice or claim alleging a misuse, breach or violation of the same. To the Knowledge of Sellers, within the past twelve (12) months there has been no material security breach of, unauthorized access to, or unauthorized acquisition of, any information regarding individuals or confidential business information in the possession or under the control of Sellers relating to the Business, or, to the Knowledge of Sellers, maintained by any third party service provider on behalf of Sellers and related to the Business.

(b)      Each Seller has (i) a written information security policy (the "<u>WISP</u>"), (ii) a written business continuity plan, (the "<u>BCP</u>"), and (iii) a written incident response plan ("<u>IRP</u>"), and together with the WISP and the BCP, the "<u>Data Security Policies</u>"). Each Seller has provided a copy of its Data Security Policies which relate to the Business to the Buyer. To the Knowledge of Sellers, no Seller has collected, received, used or released (or allowed the release of) any data in violation of, and Seller has not otherwise violated, any of its Data Security Policies.

Section 3.19   <u>No Other Representations or Warranties</u>. Except for the representations and warranties contained in Article IV and in the certificate delivered to Sellers pursuant to <u>Section 2.5(a)(i)(H)</u> Sellers acknowledge that neither Buyer nor any of its Representatives has made, and Sellers have not relied upon, any representation or warranty, whether express or implied, with respect to Buyer or any of Buyer's Subsidiaries or their respective businesses,

42

affairs, assets, liabilities, financial condition, results of operations, future operating or financial results, estimates, projections, forecasts, plans or prospects (including the reasonableness of the assumptions underlying such estimates, projections, forecasts, plans or prospects) or with respect to the accuracy or completeness of any other information provided or made available to Sellers by or on behalf of Buyer.

**ARTICLE IV**
**BUYER'S REPRESENTATIONS AND WARRANTIES**

Buyer represents and warrants to each Seller that the statements contained in this <u>Article IV</u> are true and correct.

Section 4.1    <u>Organization of Buyer; Good Standing</u>. Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease, and operate its assets and to carry on its business as now being conducted and is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification or licensing necessary, except where the failure to be so organized, existing, qualified or licensed, in good standing or to have such power and authority would not, individually or in the aggregate, prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.2    <u>Authorization of Transaction</u>. Buyer has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement, the Related Agreements and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder. The execution, delivery, and performance of this Agreement, the Related Agreements and all other agreements contemplated hereby to which Buyer is a party have been duly authorized by Buyer. Upon due execution hereof and thereof, this Agreement, the Related Agreements and all other agreements contemplated hereby to which Buyer is a party (assuming in each case due authorization, execution and delivery by Sellers) shall constitute the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to the Bankruptcy and Equity Exception.

Section 4.3    <u>Noncontravention</u>. Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in <u>Article II</u>) will (a) conflict with or result in a breach or violation of or default under the certificate of incorporation or bylaws, or other organizational documents, of Buyer, (b) conflict with, or result in any violation or breach of or default (with or without notice or lapse of time, or both) under any Law or Decree to which Buyer or its assets or properties are, subject or (c) conflict with, result in a breach or violation of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (b) or clause (c), for such conflicts, breaches, violations, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, prevent or materially impair or delay Buyer's ability to consummate the transactions

43

contemplated hereby or perform its obligations hereunder on a timely basis. Subject to requisite Bankruptcy Court approval, as applicable, and other than the applicable requirements of the HSR Act, Buyer is not required to give any notice to, make any material filing with, or obtain any material Consent from any Person in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement.

Section 4.4    Litigation; Decrees. There is no Litigation pending or, to Buyer's Knowledge, threatened in writing that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby. Buyer is not subject to any outstanding Decree that would prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.5    Brokers' Fees. Buyer has not entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Sellers or any of their Affiliates could become liable or obligated to pay.

Section 4.6    Sufficient Funds; Adequate Assurances. Buyer has, and at the Closing will have, immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated hereby. Buyer is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Transferred Contracts and the related Assumed Liabilities.

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and (except as otherwise expressly stated to apply to a different period) the Closing:

Section 5.1    Efforts; Cooperation; Permits.

(a)    Efforts; Cooperation. Upon the terms and subject to the conditions set forth in this Agreement, each of the Parties shall use its commercially reasonable efforts (except as set forth in Section 5.1(b) or Section 5.3) to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper, or advisable to consummate and make effective, in the most expeditious manner reasonably practicable, the transactions contemplated hereby (including by giving, or causing to be given, any notices to, making any filings with, and using commercially reasonable efforts to obtain any Consents of Governmental Authorities as are necessary and appropriate to consummate the transactions contemplated hereby). Subject to Section 5.1(b) and Section 5.3, without limiting the generality of the foregoing, (a) each Seller shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.1 and Section 7.3 that are within its control or influence to be satisfied or fulfilled and (b) Buyer shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.2 and Section 7.4 that are within its control or influence to be satisfied or fulfilled.

44

(b)      Permits. If Buyer elects to obtain any Permits, Buyer shall (i) use commercially reasonable efforts to obtain all such Permits (including by giving, or causing to be given, any notices to, making any filings with, and using commercially reasonable efforts to obtain any Consents of Governmental Authorities as are reasonably necessary and appropriate to obtain such Permits) and shall diligently pursue such applications and filings to obtain such Permits and (ii) notify Sellers of such election and any assistance it may require from Sellers and Sellers shall use commercially reasonable efforts to assist Buyer in obtaining any such Permits. Sellers shall reasonably cooperate with Buyer and use their commercially reasonable efforts to provide any documents and/or information necessary to assist in obtaining such Permits and to execute such Consents or other papers as may reasonably be required. To the extent permitted by applicable Law and if requested by Buyer, Sellers shall, consistent with applicable Law, execute a power of attorney authorizing Buyer to operate using such Seller's Permits from and after the Closing Date and to execute and file, at Buyer's sole cost and expense, any documents or instruments (including fictitious name consents, which shall be withdrawn as soon as Buyer obtains its own Permits), required in order to permit Buyer to lawfully operate the Business under such Sellers' Permits from and after the Closing Date in accordance with the foregoing, and with respect to liquor or spirits, with the consent of any Governmental Authority required. Buyer shall indemnify and hold Sellers harmless for any Liability arising out of, related to, or resulting from any of the foregoing, including the granting of the power of attorney, other than to the extent arising out of Sellers' fraud or willful misconduct. With respect to Permits relating to the sale of liquor, spirits and tobacco, if requested by Buyer, Sellers shall negotiate in good faith such alcoholic beverage management agreements with respect to the Stores, in form and substance reasonably satisfactory to Buyer and Sellers, as may be reasonably necessary, and shall assist Buyer in the preparation of Buyer's application for alcoholic beverage Permits and such other documentation as may be required by a Governmental Authority, for Buyer to operate the Stores under Sellers' Permits pending Buyer's receipt of such Permits.

Section 5.2      Conduct of the Business Pending Closing.

(a)      Except (i) as set forth on Section 5.2(a) of the Disclosure Schedule, (ii) as required by applicable Law or by order of the Bankruptcy Court, (iii) as required or contemplated by this Agreement or (iv) with the prior written consent of Buyer in its reasonable discretion, each Seller shall (A) conduct the Business only in the Ordinary Course of Business and (B) use commercially reasonable efforts to preserve the present relationships with employees of the Properties and vendors and suppliers of the Business. Without limiting the generality of the foregoing, each Seller agrees from the date of this Agreement until the Closing to: (I) maintain customary hours of operation at the Properties except as a result of security concerns or as required by applicable Law; (II) exercise good faith in pricing merchandise in the Properties in the Ordinary Course of Business, including not to increase such prices other than in the Ordinary Course of Business (including as consistent with Sellers' normal pricing strategy) and to maintain ordinary advertising and promotion practices (including reduced price promotions) with respect to the Business in the Ordinary Course of Business (provided, however, that Sellers may take the actions contemplated by Section 2.6(a) of the Disclosure Schedule with respect to the Excluded Inventory); (III) perform reasonably required repair and maintenance on the Properties and Furnishings and Equipment in the Ordinary Course of Business and as required by the Assumed Leases; (IV) subject to the limitations set forth in Section 5.2(b)(i), maintain staff levels at the Stores, including employees and store managers, in the Ordinary Course of

45