Auction - Real Estate (Owned)
Confidential

---

# PURCHASE AGREEMENT

## BY AND AMONG

## CGI JOLIET LLC,

## CENTRAL GROCERS, INC.

## AND

## SUPERVALU Holdings, Inc.

## AS OF JULY 25, 2017

---

| | | |
|---|---|---|
| ARTICLE I | DEFINITIONS | 1 |
| Section 1.1 | Definitions | 1 |
| Section 1.2 | Interpretations | 9 |
| ARTICLE II | PURCHASE AND SALE | 10 |
| Section 2.1 | Purchase and Sale of Assets | 10 |
| Section 2.2 | Designation Rights Contracts | 10 |
| Section 2.3 | Transferred Contracts | 11 |
| Section 2.4 | Liabilities | 12 |
| Section 2.5 | Consideration; Deposit; Escrow Amount | 14 |
| Section 2.6 | Closing | 15 |
| Section 2.7 | Closing Payments and Deliveries | 15 |
| Section 2.8 | Buyer's Inspection/Title Review | 16 |
| Section 2.9 | Allocation | 16 |
| Section 2.10 | Proration | 16 |
| Section 2.11 | Removal of Tangible Personal Property | 17 |
| Section 2.12 | Environmental | 18 |
| ARTICLE III | SELLER'S REPRESENTATIONS AND WARRANTIES | 18 |
| Section 3.1 | Organization of Seller; Good Standing | 18 |
| Section 3.2 | Authorization of Transaction | 18 |
| Section 3.3 | Noncontravention; Government Filings | 18 |
| Section 3.4 | Title to Assets | 19 |
| Section 3.5 | Intentionally omitted | 19 |
| Section 3.6 | Litigation; Decrees | 19 |
| Section 3.7 | Brokers' Fees | 19 |
| Section 3.8 | Taxes | 19 |
| Section 3.9 | Compliance with Laws | 20 |
| Section 3.10 | Employees | 20 |
| Section 3.11 | Notice to ROFR Parties | 20 |
| Section 3.12 | Disclaimer of Other Representations and Warranties | 20 |
| ARTICLE IV | BUYER'S REPRESENTATIONS AND WARRANTIES | 21 |
| Section 4.1 | Organization of Buyer; Good Standing | 21 |
| Section 4.2 | Authorization of Transaction | 21 |
| Section 4.3 | Noncontravention | 21 |
| Section 4.4 | Litigation; Decrees | 21 |
| Section 4.5 | Brokers' Fees | 22 |
| Section 4.6 | Sufficient Funds; Adequate Assurances | 22 |
| Section 4.7 | No Other Representations and Warranties | 22 |
| ARTICLE V | PRE-CLOSING COVENANTS | 22 |
| Section 5.1 | Efforts; Cooperation | 22 |
| Section 5.2 | Conduct of the Business Pending the Closing | 23 |
| Section 5.3 | Bankruptcy Court Matters | 23 |
| Section 5.4 | Notice of Developments | 24 |
| Section 5.5 | Access; No Contact | 24 |
| Section 5.6 | Bulk Transfer Laws | 24 |
| Section 5.7 | Maintenance of the Assets | 24 |
| ARTICLE VI | OTHER COVENANTS | 25 |

{6891272:}

i

| | | |
|---|---|---|
| Section 6.1 | Further Assurances | 25 |
| Section 6.2 | Access; Enforcement; Record Retention | 25 |
| Section 6.3 | Certain Tax Matters | 25 |
| Section 6.4 | Insurance Matters | 26 |
| Section 6.5 | Acknowledgements | 26 |
| Section 6.6 | Press Releases and Public Announcements | 27 |
| Section 6.7 | No Right to Employment; No CBA or Withdrawal Liability | 27 |
| ARTICLE VII | CONDITIONS TO OBLIGATION TO CLOSE | 27 |
| Section 7.1 | Conditions to Buyer's Obligations | 27 |
| Section 7.2 | Conditions to Seller's Obligations | 28 |
| Section 7.3 | No Frustration of Closing Conditions | 29 |
| ARTICLE VIII | TERMINATION | 29 |
| Section 8.1 | Termination of Agreement | 29 |
| Section 8.2 | Effect of Termination | 30 |
| Section 8.3 | Intentionally Omitted | 30 |
| ARTICLE IX | MISCELLANEOUS | 30 |
| Section 9.1 | Survival | 30 |
| Section 9.2 | Expenses | 30 |
| Section 9.3 | Entire Agreement | 30 |
| Section 9.4 | Incorporation of Exhibits | 31 |
| Section 9.5 | Amendments and Waivers | 31 |
| Section 9.6 | Succession and Assignment | 31 |
| Section 9.7 | Notices | 31 |
| Section 9.8 | Governing Law | 32 |
| Section 9.9 | Submission to Jurisdiction; Service of Process | 33 |
| Section 9.10 | Waiver of Jury Trial | 33 |
| Section 9.11 | Casualty and Condemnation | 33 |
| Section 9.12 | Severability | 34 |
| Section 9.13 | No Third Party Beneficiaries | 34 |
| Section 9.14 | Non-Recourse | 34 |
| Section 9.15 | Mutual Drafting | 35 |
| Section 9.16 | Headings; Table of Contents | 35 |
| Section 9.17 | Counterparts; Facsimile and Electronic Signatures | 35 |
| Section 9.18 | Limitations Under Applicable Law | 35 |
| Section 9.19 | Multiple Sellers | 35 |

Exhibit A – Owned Real Property
Exhibit B – Form of Sale Order
Exhibit C – Intentionally Omitted
Exhibit D – Form of Deed
Exhibit E – Form Bill of Sale
Exhibit F – Assignment and Assumption Agreement
Exhibit G – Furnishings and Equipment
Exhibit H – Excluded Furnishings and Equipment

## PURCHASE AGREEMENT

This Purchase Agreement (this "Agreement") is entered into as of July 25, 2017 (the "Execution Date") by and between CGI JOLIET LLC, a Delaware limited liability company, CENTRAL GROCERS, INC., ("CGI") an Illinois corporation (collectively, "Seller"), and SUPERVALU Holdings, Inc., a Missouri corporation, or any one or more of its Affiliates designated as a purchaser of any Acquired Assets at Closing (together, "Buyer"). Seller and Buyer are referred to collectively herein as the "Parties".

### WITNESSETH

WHEREAS, on May 4, 2017, Seller and certain of its affiliates (collectively, the "Debtors") commenced voluntary cases under chapter 11 of title 11 (the "Bankruptcy Cases") of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"),which cases have been transferred to and are now pending in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "Bankruptcy Court"); and

WHEREAS, pursuant to the Bidding Procedures Order (as defined herein) and subject to the terms and upon the conditions set forth herein, Seller desires to sell, transfer and assign to Buyer, and Buyer desires to purchase and acquire the Acquired Assets, as more specifically provided herein.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1    Definitions. For purposes of this Agreement:

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by Contract, or otherwise.

"Acquired Assets" means all of Seller's right, title, and interest in and to all of the following assets:

(a)    all rights and interests of Seller's with respect to the Owned Real Property, together with all structures, facilities improvements, fixtures and other appurtenances thereto and rights, title and interest in respect thereof and all privileges, servitudes, easements, adjacent and adjoining streets, alleys, rights-of-way, other surface use agreements related thereto;

(b)    all insurance benefits to the extent set forth in Section 9.11;

{6891272·}

(c)    to the extent transferable, all Permits related to the Acquired Assets;

(d)    to the extent transferable, all rights of Seller under all warranties, representations, and guarantees related to or affecting any Acquired Assets;

(e)    the Furnishings and Equipment; and

(f)    to the maximum extent permitted by the Bankruptcy Code, all Transferred Contracts, the rights and benefits accruing thereunder, including the Transferred Contracts Proceeds, and to the extent in the possession or control of any Debtor, all material documents related thereto.

"Agreement" has the meaning set forth in the preamble.

"Allocation Principles" has the meaning set forth in Section 2.9.

"Assessments" has the meaning set forth in Section 6.3(b).

"Assumed Liabilities" has the meaning set forth in Section 2.4(a).

"Bankruptcy Cases" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bidding Procedures Order" means that certain order Approving (a) Global Bidding Procedures, (b) Bid Protections Granted to Certain Stalking Horse Purchasers, (c) the Form and Manner of Notice of Auctions, Sale Transactions and Sale Hearing, (d) the Assumption and Assignment Procedures, and (e) the Date for Auctions, if necessary, and Sale Hearings, dated June 2, 2017 (Del. Case No. 17-10993(LSS); ECF No. 338).

"Business" means the operations of Seller at and in relation to the Acquired Assets.

"Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the laws of the State of Illinois or is a day on which banking institutions located in the State of Illinois are authorized or required by Law or other governmental action to close.

"Buyer" has the meaning set forth in the preamble.

"Claim" has the meaning ascribed by Bankruptcy Code section 101(5), including all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"Closing" has the meaning set forth in Section 2.6.

"Closing Date" has the meaning set forth in Section 2.6.

"Contested Assumption Notice" has the meaning set forth in Section 2.2(c).

"Contract" means any written agreement, contract, arrangement, commitment, promise, obligation, right, instrument, document or other similar understanding, which in each case is in writing and signed by parties intending to be bound thereby, other than the Leases.

"Contracting Parties" has the meaning set forth in Section 9.14.

"Counterparty" and "Counterparties" each have the respective meanings set forth in Section 2.2(a).

"Cure Costs" means any and all amounts, costs, or expenses that must be paid or actions or obligations that must be performed or satisfied pursuant to the Bankruptcy Code to effectuate the assumption by the applicable Debtor, and the assignment to Buyer, of the executory contracts and unexpired leases, as determined by the Bankruptcy Court or agreed to by the applicable Debtor and the non-Debtor counterparty to the applicable executory contracts and unexpired leases.

"Damages" means any actual losses, claims, Liabilities, debts, damages, fines, penalties, or costs (in each case, including reasonable out of pocket expenses (including reasonable fees and expenses of counsel)).

"Decree" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order, or any other order of any Governmental Authority.

"Delaware Bankruptcy Court" has the meaning set forth in the recitals.

"Designation Rights Contracts" means (i) the NCG Lease, (ii) that certain equipment leased among CGI and HYG Financial Services, Inc. (f/k/a NMGH Financial Services, Inc.) and (iii) that certain equipment lease among CGI and Plug Power.

"Designation Rights Period" has the meaning set forth in Section 2.2(a).

"Designation Procedures" has the meaning set forth in Section 2.3.

"Employment, Labor, and Benefits Laws and Obligations" means: (a) all Law(s) or obligations of any kind relating to, touching upon, or concerning the Seller's employment or other relationships with its employees or contractors including those relating to the hiring, firing, and treatment of employees, employment practices, terms and conditions of employment, equal employment opportunity, discrimination, immigration, harassment, retaliation, whistle blowing, compensation, wages, overtime payments, hours, benefits, income tax withholding, the payment of Social Security and other similar taxes, workplace safety, privacy, defamation and slander, the classification of individuals as contractors or employees, mass layoffs or plant closings, and matters including those arising under Title VII, the Fair Labor Standards Act, the Age Discrimination in Employment Act, the Americans with Disability Act, the Equal Pay Act, the

Uniformed Services Employment and Reemployment Act, the Family and Medical Leave Act, the Occupational Safety and Health Act, the National Labor Relations Act, the Immigration Reform & Control Act, Executive Order 11246, the WARN Act, ERISA, and any like, same or similar state or local laws rules, or regulations; (b) all Law(s) or obligations arising out of any collective bargaining agreement or amendments, supplements, letters of understanding, or memorandum of agreement or understanding between the Seller or any of its Affiliates and any union or other labor organization (collectively "CBAs") and any pending or unresolved grievances or arbitration under any such CBA; and (c) any and all Law(s) or obligations relating to or arising out of any employee benefit plan, including but not limited to denial of benefits, claims of breach of fiduciary duty, or any withdrawal Liability from any multi-employer pension plan.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, including the Multiemployer Pension Plan Amendments Act and Multiemployer Pension Reform Act of 2014.

"Escrow Agent" means First American Title Insurance Company.

"Escrow Agreement" means that certain Escrow Agreement, dated as of June 28, 2017 by and among Seller, Buyer, and the Escrow Agent.

"Escrow Amount" has the meaning set forth in Section 2.5(b).

"Excluded Liabilities" has the meaning set forth in Section 2.4(b).

"Final Order" means an order of the Bankruptcy Court (i) as to which the time to appeal (other than the time to appeal pursuant to Rule 60 of the Federal Rules of Civil Procedure) shall have expired and as to which no appeal shall be then pending, or (ii) if an appeal shall have been filed or sought (except for an appeal under rule 60 of the Federal Rules of Civil Procedure), either (A) no stay of the order shall be in effect or (B) if such a stay shall have been granted by the Bankruptcy Court, then (1) the stay shall have been dissolved or (2) an order of the district court having jurisdiction to hear the appeal shall have affirmed the order and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such district court order or timely motion to seek review or rehearing of such order shall have been made, any court of appeals having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the district court's (or lower appellate court's) order upholding the order of the Bankruptcy Court and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible.

"Furnishings and Equipment" means all equipment, machinery, material handling equipment, IT Assets, trade fixtures, furnishings, furniture, store models, shelving, refrigeration equipment and other tangible property located at, in, around or associated with the Acquired Assets, including those items listed on Exhibit G under the heading "Furnishings and Equipment", and all attachments, appliances, fittings, gas and oil burners, fuel, hydrogen cells,

lighting fixtures, signs, doors, cabinets, partitions, pallets, mantels, motors, pumps, screens, plumbing, heating, air conditioning, refrigerators, freezers, refrigerating and cooling systems, waste disposal and storing, wiring, telephones, televisions, monitors, security systems, racks, ovens, stoves, carpets, floor coverings, wall coverings, office equipment, kitchen appliances, computers (including point of sale terminals and systems), registers, order entry devices, safes, trash containers, meters and scales, combinations, codes and keys, and any other furniture, fixtures, equipment and improvements provided, however, the assets listed on Exhibit H attached hereto are expressly excluded from the Furnishings and Equipment (the "Excluded Furnishings & Equipment").

"GAAP" means United States generally accepted accounting principles consistently applied.

"Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, arbitrator, department, or other governmental entity.

"Hazardous Materials" mean any substance or material which is defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "extremely hazardous waste", "acutely hazardous wastes", "restricted hazardous waste", "toxic substances", or "known to cause cancer or reproductive toxicity" (or words of similar import), petroleum products (including crude oil or any fraction thereof), PCBs, ureaformaldehyde, lead-based paint, asbestos containing materials or any other chemical, substance or material which is prohibited, limited or regulated under any federal, state or local Law, ordinance, regulation, order, permit, license, decree, common law, or treaty now or hereafter in force regulating, relating to or imposing liability or standards concerning materials or substances known or suspected to be toxic or hazardous to health or safety, the environment or natural resources.

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

"IT Assets" means all owned computer systems, including the software (including any warehouse management system), data files, source code, object code, application programming interfaces, computerized databases and other software-related specifications and documentation, firmware, hardware (including computers, servers, databases, peripheral devices and telecommunications devices), networks, interfaces, platforms and related systems.

"Knowledge" of Seller (and other words of similar import) means the actual knowledge of the Chief Executive Officer or Chief Restructuring Officer of Central Grocers, Inc.

"Law" means any constitution applicable to, and any statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority or common law.

"Leases" means all leases, subleases, licenses, concessions, options, contracts, extension letters, easements, reciprocal easements, assignments, termination agreements, subordination agreements, nondisturbance agreements, estoppel certificates and other agreements (written or

oral), and any amendments or supplements to the foregoing, and recorded memoranda of any of the foregoing, pursuant to which Seller holds any leasehold or subleasehold estates and other rights of use and/or occupancy of any Acquired Assets.

"Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether directly incurred, absolute or contingent, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

"Lien" means any mortgage, pledge, lien, charge, security interest, option, right of first refusal, easement, security agreement or other encumbrance or restriction on the use or transfer of any property.

"Litigation" means any action, cause of action, suit, claim, charge, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at law or in equity (including actions or proceedings seeking injunctive relief) and whether before any Governmental Authority.

"Material Adverse Effect" means any effect or change that has a material adverse effect on the condition of the Acquired Assets, taken as a whole, other than any effects or changes arising from or related to: (a) general business or economic conditions in any of the geographical areas in which the Acquired Assets are located; (b) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (c) financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (d) the taking of any action contemplated by this Agreement taken with the consent of the other Party; (e) any effects or changes as a result of the announcement or pendency of this Agreement; (f) any filing or motion made under sections 1113 or 1114 of the Bankruptcy Code; (g) the sale of any other assets or stores to any third parties by Seller or any of its Affiliates; (h) any effects or changes arising from or related to the material breach of the Agreement by Buyer; (i) any strike or labor dispute except where such strike or labor dispute involves the Acquired Assets, (n) the failure of Seller to obtain any consent, permit, authorization, waiver or approval required in connection with the transactions contemplated hereby; (o) any effect resulting from the filing of the Bankruptcy Cases.

"NCG Lease" means that certain Master Lease Agreement No. 01337 (and related Equipment Schedule No. 001) dated as of April 17, 2014, by and between Central Grocers, Inc. and Northfield Capital Group, LLC.

"Non-Party Affiliates" has the meaning set forth in Section 9.14.

"Notice of Designation" has the meaning set forth in Section 2.2(a).

"Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business through the date hereof consistent with past practice.

"Outside Date" has the meaning set forth in Section 8.1(b)(ii).

"Owned Real Property" has the meaning set forth in Exhibit A.

"Parties" has the meaning set forth in the preamble.

"Permits" means all certificates of occupancy or other certificates, any franchise, approval, permit, license, order, registration, certificate, concessions, authorizations, grants, easements, exemptions, consents, orders, filings, approvals, authorizations and licenses, including all active environmental (which includes storage tanks, and air and storm water discharge) permits, registrations and certificates, used, useable or useful in the operation of the Acquired Assets or the use or enjoyment or benefit of the Acquired Assets.

"Permitted Lien" means (a) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings; (b) mechanic's, workmen's, repairmen's, warehousemen's, carrier's or other similar Liens, including all statutory liens, arising or incurred in the Ordinary Course of Business or with respect to the Acquired Assets that are not overdue and that do not materially affect the value or use of the affected asset, all of which are listed on the Permitted Liens Schedule attached hereto; (c) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property; (d) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects with respect to the Acquired Assets that are identified in public records; (e) any liens shown in any title commitment, report or policy, or otherwise of record; and (f) any other Liens that Buyer has expressly stated are acceptable to Buyer in a writing delivered to Seller.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

"Proration Period" has the meaning set forth in Section 6.3(b).

"Purchase Price" has the meaning set forth in Section 2.3(a).

"Representative" means, when used with respect to a Person, the Person's controlled Affiliates (including Subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, lenders, legal counsel, and accountants).

"Sale Hearing" means a hearing before the Bankruptcy Court to approve this Agreement and the Sale Order.

"Sale Order" means an order of the Bankruptcy Court in a form and substance acceptable to Buyer in its sole discretion, including, but not limited to (unless specifically limited herein) the following terms and conditions (a) approving (i) this Agreement and the execution, delivery, and performance by Seller of this Agreement and the other instruments and agreements

contemplated hereby; (ii) the sale of the Acquired Assets to Buyer free and clear of all Liens, Claims, interests and encumbrances other than any Permitted Liens; (iii) the assumption of the Assumed Liabilities by Buyer on the terms set forth herein; and (iv) the assumption and assignment to Buyer of the Transferred Contracts on the terms set forth herein; (b) determining and holding that Buyer is a good faith purchaser; (c) providing that the Closing will occur in accordance with the terms and conditions hereof; (d) containing provisions customary of Bankruptcy Code section 363 sales in the Bankruptcy Court, including, but not limited to good faith findings, (e) a determination and holding that under any circumstance, including as a result of the purchase of the Acquired Assets, or the subsequent use or occupation of the Acquired Assets, or the hiring of any employees of Seller, the Buyer shall not have any Liability within the meaning of any Law, including under Employment, Labor and Benefits Law or Obligations, on the basis that it is a successor, that the Buyer has "de facto or otherwise merged" into Seller, or that Buyer is a mere or substantial continuation of Seller, and (f) with respect to findings regarding the determination and holding in (e) above, Seller need only use commercially reasonable efforts to obtain findings of fact related thereto if required.

"Seller" has the meaning set forth in the preamble.

"Subsidiary" means, with respect to any Person, on any date, any Person (a) the accounts of which would be consolidated with and into those of the applicable Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date or (b) of which securities or other ownership interests representing more than fifty percent of the equity or more than fifty percent (50%) of the ordinary voting power or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests or more than fifty percent of the profits or losses of which are, as of such date, owned, controlled or held by the applicable Person or one or more subsidiaries of such Person.

"Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Title Policy" has the meaning set forth in Section 7.1(e).

"Transfer Tax" has the meaning set forth in Section 6.3(a).

"Transferred Contracts" has the meaning set forth in Section 2.3.

"Uncontested Assumption Notice" has the meaning set forth in Section 2.2(b).

Section 1.2   <u>Interpretations</u>.  Unless otherwise indicated herein to the contrary:

(a)   When a reference is made in this Agreement to an Article, Section, Exhibit, clause or subclause, such reference shall be to an Article, Section, Exhibit, clause or subclause of this Agreement.

(b)   The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

(c)   The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)   The word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if."

(e)   The use of "or" herein is not intended to be exclusive.

(f)   The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

(g)   All terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.

(h)   References herein to a Person are also to its successors and permitted assigns.  Any reference herein to a Governmental Authority shall be deemed to include reference to any successor thereto.

(i)   Any reference herein to "Dollars" or "$" shall mean United States dollars.

(j)   Buyer acknowledges and agrees that the specification of any dollar amount in the representations, warranties, or covenants contained in this Agreement is not intended to imply that such amounts or higher or lower amounts are or are not material, and Buyer shall not use the fact of the setting of such amounts in any dispute or controversy between the Parties as to whether any obligation, item, or matter is or is not material.

(k)   References in this Agreement to materials or information "furnished to Buyer" and other phrases of similar import include all materials or information made available to Buyer or its Representatives in the data room prepared by Seller or provided to Buyer or its Representatives in response to requests for materials or information.

(l)    Unless the context otherwise requires, the word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if."

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    <u>Purchase and Sale of Assets</u>.    On the terms and subject to the conditions set forth in this Agreement, pursuant to section 363 of the Bankruptcy Code and in accordance with the Bidding Procedures Order and the Sale Order entered by the Bankruptcy Court, Buyer will purchase from Seller, and Seller will sell, transfer, assign, convey, and deliver to Buyer at the Closing the Acquired Assets. Buyer hereby disclaims all Liability or responsibility with respect to any assets of Seller other than the Acquired Assets (the "<u>Excluded Assets</u>"); provided, that the transfer of the Acquired Assets pursuant to this Agreement shall not include the assumption of any Liability related to the Acquired Assets unless Buyer expressly assumes that Liability pursuant to <u>Section 2.4</u>.

Section 2.2    <u>Designation Rights Contracts</u>.

(a)    From the Execution Date through and including July 31, 2017 (the "<u>Designation Rights Period</u>"), Buyer may by written notice pursuant to this Section 2.2(a), designate for assumption and assignment to Buyer any Designation Rights Contract. As soon as practicable, but in no event later than three (3) Business Days of the Debtors' receipt of a written request from Buyer to assume and assign one or more Designation Rights Contracts, the Debtors shall (i) file with the Bankruptcy Court and serve by overnight delivery on the counterparties (each, a "<u>Counterparty</u>" and, collectively, the "<u>Counterparties</u>") to the applicable Designation Rights Contracts a notice of proposed assumption and assignment (a "<u>Notice of Designation</u>"), which shall (a) set forth the Debtors' good-faith calculation of the Cure Costs for each Designation Rights Contract listed on such Notice of Designation; and (b) prominently display the deadline to file objections to the assumption and assignment of the Designation Rights Contracts identified on such Notice of Designation (including any Cure Objection or Adequate Assurance Objection (each as defined in the Bidding Procedures Order)); and (ii) provide or cause to be provided to the Counterparties to the Designation Rights Contracts listed on such Notice of Designation the Buyer's Adequate Assurance Information (as defined in the Bidding Procedures Order). Until any Designation Rights Contract becomes a Transferred Contract pursuant to the Designation Procedures or if at the expiration of the Designation Rights Period the Buyer does not designate such Designation Rights Contract to be a Transferred Contract (1) each Designation Rights Contract shall be held by the applicable Debtors and shall not be rejected pursuant to section 365 of the Bankruptcy Code; (2) the Debtors shall not terminate, amend, supplement, modify, or waive any rights under any Designation Rights Contract or take any affirmative action not required by the terms thereof without the prior written consent of the Buyer; and (3) the Debtors shall not seek to convert, dismiss, or close the Bankruptcy Cases.  If any Designation Rights Contract does not become a Transferred Contract as set forth in Section 2.3 it shall be deemed and Excluded Asset.

(b)    With respect to the assumption and assignment of a Designation Rights Contract for which no timely objection has been filed, the Debtors shall file with the Bankruptcy Court and serve on the applicable Counterparties a notice of uncontested assumption and assignment (an "Uncontested Assumption Notice"). Upon filing an Uncontested Assumption Notice, each Designation Rights Contract listed in such Uncontested Assumption Notice shall be (i) deemed and treated as a "Transferred Contract" within the meaning of Section 2.3 of this Agreement, and (ii) deemed assumed by the applicable Debtor(s) and assigned to the Buyer. With respect to the Designation Rights Contracts listed on an Uncontested Assumption Notice, (a) the Cure Costs for each Designation Rights Contract shall be fixed at the amount set forth in the applicable Notice of Designation; and (b) the Debtors shall pay to the Counterparties to the applicable Designation Rights Contracts such Cure Costs at Closing or as soon thereafter as is practicable.

(c)    With respect to the assumption and assignment of a Designation Rights Contract for which a timely objection has been filed, the Debtors shall file with the Bankruptcy Court and serve on the applicable Counterparties a notice of contested assumption and assignment (a "Contested Assumption Notice"). To the extent not resolved by the parties prior to a hearing before the Bankruptcy Court, the resolution of an objection to the assumption and/or assignment of a Designation Rights Contract shall be determined at a hearing before the Bankruptcy Court. With respect to Cure Objections, the Debtors shall maintain a cash reserve equal to either (i) the amount the objecting Counterparty has asserted to be required to cure the asserted defaults under the applicable Designation Rights Contract, or (ii) such other cash reserve amount as may be ordered by the Bankruptcy Court. Upon resolution of the objections with respect to the assumption and/or assignment of a Designation Rights Contract (whether by Bankruptcy Court order or consent of the Debtors and the applicable Counterparty) listed in a Contested Assumption Notice, (a) such Designation Rights Contract shall be deemed and treated as a "Transferred Contract" within the meaning of Section 2.3 of this Agreement; and (b) such Transferred Contract shall be deemed assumed by the Debtors and assigned to the Buyer. With respect to the assumption of a Designation Rights Contracts for which a timely Cure Objection has been filed, (1) the Cure Costs for such Designation Rights Contract shall be determined by the Bankruptcy Court (unless otherwise determined by mutual consent of the Debtors and the applicable Counterparty); and (2) the Debtors shall pay to the applicable Counterparty the Cure Costs, as determined in accordance with this Section 2.2(c), within five (5) Business Days after the Cure Objection is resolved.

(d)    The Debtors shall take all reasonable actions required to assume and assign to Buyer the Designation Rights Contracts designated for assumption and assignment in accordance with Section 2.2(a) hereof, including, taking all reasonable actions required to obtain a Bankruptcy Court order (which order may be the Sale Order) containing a finding that the proposed assumption and assignment of the applicable Designation Rights Contracts to Buyer satisfies all applicable requirements of section 365 of the Bankruptcy Code

Section 2.3    Transferred Contracts. Any Designation Rights Contract that is designated for assumption and assignment to Buyer pursuant to Section 2.2(a) hereof and is

subsequently deemed assumed by the applicable Debtor(s) and assigned to Buyer pursuant to the procedures set forth in Section 2.2 hereof (the "Designation Procedures") shall constitute a "Transferred Contract" (such Designation Rights Contracts collectively, the "Transferred Contracts"). To Seller's Knowledge, subject only to compliance with the Designation Procedures, including the satisfaction of Cure Costs applicable to the Transferred Contracts, and entry of the Sale Order, each Transferred Contract may be assumed by the applicable Debtor(s) and assigned to Buyer pursuant to section 365 of the Bankruptcy Code. Any consideration or proceeds received by Debtors in respect of, and any other benefits deriving from, a Transferred Contract that has been assigned to Buyer in accordance with the Designation Procedures shall constitute Acquired Assets and be promptly delivered to Buyer.

Section 2.4    Liabilities.

(a)    Assumed Liabilities.  Upon the terms and subject to the conditions of this Agreement, Buyer shall, effective at the time of the Closing, assume and agree to discharge and perform when due, only the liabilities and obligations of Seller (and only those liabilities and obligations of Seller) with respect to the Acquired Assets but only to the extent arising after the Closing in the Ordinary Course of Business and that do not relate to any failure to perform, improper performance, warranty, or other breach, default, or violation of Seller on or prior to the Closing, provided however, that with respect to any Transferred Contract, Buyer shall only assume and agree to discharge and perform the liabilities and obligations of Seller after such Designation Rights Contract becomes a Transferred Contract (the "Assumed Liabilities").

(b)    Excluded Liabilities.  All Claims against any Debtor, and all Liabilities and obligations of any Debtor (in each case of any nature whatsoever, whether now existing or hereafter arising on or after the Closing Date) that are not expressly assumed by Buyer pursuant to Section 2.4(a) are collectively referred to herein as the "Excluded Liabilities." Buyer shall not assume, be deemed to have assumed, or otherwise be responsible or liable for or as a successor to, any of the Excluded Liabilities. Excluded Liabilities include, but shall not be limited to:

(i)    any and all Liabilities and obligations for Taxes of the Seller, including, Taxes arising from or with respect to the Acquired Assets to the extent attributed to the operation of the Acquired Assets on or before the Closing Date or the transactions contemplated by this Agreement;

(ii)    any and all Liabilities for indebtedness of Seller;

(iii)    any and all Liabilities and obligations under or relating to any environmental Law to the extent related to, arising or resulting from the ownership or operation of the Acquired Assets or Excluded Assets or the Business prior to Closing, including any Liability for (i) any release of or exposure to any Hazardous Materials at or from any Owned Real Property or in connection with the operation of the Business or the Acquired Assets or Excluded Assets to the extent such release or exposure occurred prior to the Closing, (ii) any violation of environmental Law prior to the Closing in connection with the operation of the

Acquired Assets or the Excluded Assets or the Business, or (iii) any offsite transportation and disposal of Hazardous Materials prior to the Closing in connection with the operation of the Acquired Assets or Excluded Assets or the Business;

(iv)    any and all Liabilities and obligations for any violation of any Law arising prior to or related to the period before the Closing Date;

(v)    any and all Liabilities and obligations for: (i) costs and expenses incurred by Seller or owed in connection with the administration of the Bankruptcy Cases (including, without limitation, the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by Seller or any official creditors' committee, fees and expenses due under the DIP Credit Agreement or the Pre-Petition Facility; and (ii) all costs and expenses of Seller incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement;

(vi)    any Liabilities of Seller under Contracts and Permits arising on or prior to Closing or under those Contracts and Permits which constitute Excluded Assets or which are not assigned to and assumed by Buyer pursuant to the provisions of this Agreement;

(vii)    all Cure Costs with respect to Designation Rights Contracts and Transferred Contracts that arise on or prior to the Closing Date;

(viii)    all Liabilities and obligations (i) relating to worker's compensation claims (whether reported or not), (ii) relating to the exempt or non-exempt status of any employee of Seller, (iii) relating to the classification of employees as independent contractors, (iv) relating to any Employment, Labor, and Benefits Laws and Obligations and any other obligation to pay wages, vacation pay, severance pay or any other payments to the employees of Seller;

(ix)    any and all Liabilities and obligations (w) that are the subject of any dispute, litigation, arbitration, judgment, order, decree or other proceeding, (x) with respect to periods prior to the Closing Date including that are or could be asserted as a claim in litigation or arbitration after the Closing Date, (y) relating to any bodily injury, or damage to property, incurred by any Person arising as a result of actions or omissions prior to the Closing;

(x)    any Liabilities or obligations based on any "defacto merger", "business continuation" or "successor-in-interest" theories of Liability, or otherwise arising out of any theory based on the purchase of the Acquired Assets by Buyer;

(xi)    any Liability or obligation of Seller to its equityholders or Affiliates;

(xii)    any and all Liabilities and obligations of Seller to the extent that their existence or magnitude constitutes or results in a breach of a representation, warranty or covenant made by Seller to Buyer under this Agreement as confirmed or repeated in any certificate provided by Seller hereunder, or makes the information contained in any schedule or exhibit incorrect or incomplete unless specifically assumed in writing by Buyer (regardless of any update to such schedule or any notice or delivery from Seller or any filing by Seller with any Governmental Authority after the Execution Date);

(xiii)    any Liabilities arising out of any representations, warranties, covenants, actions or failure to act by Seller in connection with any Transferred Contract, including any claims by any person or entity other than the counter-party to such Transferred Contract;

(xiv)    the obligations and Liabilities of Seller under this Agreement, the ancillary agreements and all other instruments and agreements executed in connection therewith; and

(xv)    all Liabilities or obligations to any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including those arising under any employee benefit plan, any denial of benefits claims, breach of fiduciary duty claims or any withdrawal liability associated with a multi-employer pension plan, or any CBA, including any pending or resolved grievances and arbitrations.

Section 2.5    Consideration; Deposit; Escrow Amount.

(a)    The consideration for the Acquired Assets shall be the aggregate Dollar amount equal to $61,000,000.00 (the "Purchase Price").

(b)    Pursuant to the terms of the Escrow Agreement, Buyer deposited with the Escrow Agent the sum of $5,000,000 (the "Escrow Amount"). The Escrow Amount shall be released by the Escrow Agent and delivered to either Buyer or Seller, in accordance with the provisions of this Agreement and the Escrow Agreement. Pursuant to the Escrow Agreement, the Escrow Amount (together with all accrued investment income thereon, if any) shall be distributed as follows:

(i)    if the Closing shall occur, the Escrow Amount shall be paid to Seller and applied towards the Purchase Price payable by Buyer to Seller under Section 2.5(a) and all accrued investment income thereon, if any, shall be delivered to Buyer at the Closing;

(ii)    if this Agreement is terminated by Seller pursuant to Section 8.1(e), the Escrow Amount, together with all accrued investment income thereon, if any, shall be delivered to Seller following entry of an order of the Bankruptcy Court finding that there has been a material breach by Buyer of this Agreement; or

(iii)    if this Agreement is terminated for any reason other than by Seller pursuant to <u>Section 8.1(e)</u>, the Escrow Amount, together with all accrued investment income thereon, shall in each case be returned to Buyer within five (5) days of such termination.

Section 2.6    <u>Closing</u>.    The closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York (or such other location as shall be mutually agreed upon by Seller and Buyer) commencing at 10:00 a.m. local time on a date (the "<u>Closing Date</u>") that is the third (3rd) Business Day following the date upon which all of the conditions to the obligations of Seller and Buyer to consummate the transactions contemplated hereby set forth in <u>Article VII</u> (other than conditions that by their nature are to be satisfied at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or on such other date as shall be mutually agreed upon by Seller and Buyer prior thereto. For purposes of this Agreement and the transactions contemplated hereby, the Closing will be deemed to occur and be effective, and title to and risk of loss associated with the Acquired Assets, shall be deemed to occur at 12:01 am, New York City time, on the Closing Date.

Section 2.7    <u>Closing Payments and Deliveries</u>

(a)    On the Closing Date, Buyer shall pay the Purchase Price (less the Escrow Amount, which shall be released to Seller by the Escrow Agent) to Seller, by wire transfer of immediately available funds into an account designated by Seller.

(b)    At the Closing, Seller will deliver to Buyer (i) a duly executed Assignment and Assumption Agreement substantially in the form of <u>Exhibit F</u> (the "<u>Assignment and Assumption Agreement</u>") to the extent Acquired Assets include any Transferred Contracts; (ii) a duly executed certificate from an officer of Seller to the effect that each of the conditions specified in <u>Section 7.1(a)</u> and <u>Section 7.1(b)</u> are satisfied; (iii) duly executed limited warranty deeds transferring fee simple title to the Owned Real Property to be acquired at the Closing to Buyer, in substantially the form of <u>Exhibit D</u>, (iv) a duly executed bill of sale substantially in the form of <u>Exhibit E</u> (the "<u>Bill of Sale</u>"); (v) a non-foreign affidavit dated as of the Closing Date in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the IRC so that Buyer is exempt from withholding any portion of the Purchase Price pursuant to Section 1445 of the IRC, (vi) such documents and affidavits as may be reasonably required by Buyer's title company, including regarding existence and authority of Seller, parties in possession and mechanic's liens so as to eliminate any exceptions from those matters in any title insurance policy obtained by Buyer and (vii) possession of the Acquired Assets. At Closing Seller will deliver all keys to the Owned Real Property, keys to Acquired Assets, combinations to any safes, passwords for all IT Assets, and any security devices making up an Acquired Asset in Seller's possession. Seller will cooperate in good faith to locate and deliver all other keys, combinations, passwords and security devices not otherwise in Seller's possession and control related to any Acquired Asset.

(c)     At the Closing, Buyer will deliver to Seller a duly executed certificate from an officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) is satisfied.

Section 2.8     Buyer's Inspection/Title Review.  Buyer acknowledges and agrees that this Agreement shall not be subject to any diligence period.  Buyer has the right to examine (including the right to survey), at Buyer's sole cost and expense, all matters related to the Owned Real Property and to purchase title insurance with respect to same.  Notwithstanding anything contained to the contrary in this Agreement, it shall be a condition to Closing hereunder that a nationally recognized title insurance company selected by the Buyer and reasonably approved by Seller is ready, willing and able to deliver at Closing an ALTA standard title insurance policy (excluding any endorsements to such title policy) which insures Buyer's fee simple ownership interest in the Owned Real Property in an amount equal to the Purchase Price, subject to the Permitted Liens.

Section 2.9     Allocation.  Buyer and Seller agree to allocate the Purchase Price (as finally determined hereunder), and all other relevant items among the Acquired Assets in accordance with section 1060 of the IRC and the Treasury Regulations thereunder (the "Allocation Principles").  No later than three (3) days prior to the Closing Date, Buyer shall deliver to Seller an allocation of the Purchase Price (and all other relevant items) as of the Closing Date among the Acquired Assets determined in a manner consistent with the Allocation Principles (the "Purchase Price Allocation"), in which event Buyer and Seller will negotiate in good faith to resolve any such dispute; provided that nothing in this Agreement will require Seller and Buyer to agree to a Purchase Price Allocation. Buyer and Seller agree (and agree to cause their respective subsidiaries and Affiliates) to prepare, execute, and file IRS Form 8594 and all Tax Returns on a basis consistent with the Purchase Price Allocation if a mutually agreed-upon Purchase Price Allocation is reached; provided, however, that nothing contained herein shall prevent Buyer or Seller from settling any proposed deficiency or adjustment by any taxing authority based upon or arising out of the mutual allocation, and neither Buyer nor Seller shall be required to litigate before any court any proposed deficiency or adjustment by any taxing authority challenging such mutual allocation.  Not later than thirty (30) days prior to the filing of their respective Internal Revenue Service Forms 8594 relating to this Agreement, Buyer and Seller will deliver to the other party a copy of its Internal Revenue Service Form 8594.  None of the Parties will take any position inconsistent with the Purchase Price Allocation if mutually agreed-upon on any Tax Return or in any audit or Tax proceeding, unless otherwise required by a final determination by a Governmental Authority.  Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 2.9 shall survive the Closing without limitation.

Section 2.10    Proration.

(a)     Charges for utilities serving the Acquired Assets shall be determined as of the Closing Date.  Buyer shall be responsible for all utility charges for the period from and after the Closing Date.  Seller shall be responsible for all utility charges for the period through the date immediately prior to the Closing Date.

(b)     Transfer Taxes shall be paid in the manner set forth in Section 6.3.

(c)    As to all non-monthly real estate related payments, the same shall be apportioned between Seller and Buyer as of 12:01 a.m. on the Closing Date. If any amounts are payable in installments, all installments due through the Closing together with the accrued but unpaid portion of any other installments not yet due as of the Closing shall be prorated based on the periods of time covered by such installments occurring before and after the Closing Date.

(d)    Any rents or other income paid or payable to the owner of the Owned Real Property shall be apportioned between Seller and Buyer as of 12:01 a.m. on the Closing Date. If any such amounts are payable in installments, all installments through the Closing shall be prorated based on the periods of time covered by such installments occurring before and after the Closing Date. If on the Closing Date any subtenant or licensee is in arrears in the payment of rent or has not paid the rent payable by it and which is attributable to the month in which the Closing occurs (whether or not it is in arrears for such month on the Closing Date), any rent received by Buyer or Seller after the Closing shall be applied to amounts due and payable by such tenant in the following order of priority: first, to rent attributable to the month in which the Closing occurred, and, thereafter, ratably, between rent attributable to the months following the month in which the Closing occurred and rent attributable to the months preceding the month in which the Closing occurred. If rent or any portion thereof received by Seller or Buyer after the Closing is due and payable to the other party by reason of the foregoing allocation, the appropriate sum shall be promptly paid to such other party.

(e)    Buyer agrees to reasonably cooperate with Seller at no cost to Buyer in connection with all efforts by Seller to collect any rent owed to Seller for the period up to and including the Closing Date.

(f)    Subtenant security deposits shall not be assigned and an amount equal to such security deposits shall be a credit to the Buyer.

(g)    If any of the items subject to apportionment under the foregoing provisions cannot be apportioned at the Closing because of the unavailability of the information necessary to compute such apportionment, or if any errors or omissions in computing apportionments at the Closing are discovered subsequent to the Closing, then such item shall be reapportioned and such errors and omissions corrected as soon as practicable after the Closing Date and the proper party reimbursed.

Section 2.11    Removal of Tangible Personal Property. On or before the Closing Date, Seller shall remove, at Seller's sole cost and expense, any tangible personal property that is not purchased under this Agreement that is located at the Owned Real Property. Such removal shall be done in such manner as to avoid any damage to the Acquired Assets. Any material damage to the Acquired Assets resulting from such removal shall be paid by Seller to Buyer at Closing. Should Seller fail to remove such tangible personal property as required by this Section, Buyer shall have the right, but not the obligation, to remove the same at Seller's sole cost and expense or to exercise any other right or remedy otherwise available at law or in equity. Seller shall promptly reimburse Buyer for all material costs and expense incurred by Buyer in connection with any tangible personal property not removed by Seller on or before the Closing.

Section 2.12   <u>Environmental</u>.   Buyer shall have the right to conduct a physical inspection of the Owned Real Property and to conduct any environmental testing that Buyer desires to complete prior to Closing.   In the event that Buyer becomes aware of any unlawful storage, manufacture, use, discharge, or release of any Hazardous Materials on or near the Owned Real Property in levels that, in the reasonable opinion of an environmental consultant retained by Buyer, require remediation under any Environmental Law, Buyer shall not have the right to terminate this Agreement solely as a result of such finding.

## ARTICLE III
## SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Buyer that the statements contained in this <u>Article III</u> are true and correct, except as disclosed in any forms, statements, or other documents provided or made available to Buyer in the data room established in connection with the sale of the Debtors' assets or filed with the Bankruptcy Court that are publicly available.

Section 3.1   <u>Organization of Seller; Good Standing</u>.   Seller is a limited liability company, duly organized, validly existing and in good standing under the laws of Delaware. Seller has, subject to the necessary authority from the Bankruptcy Court, all requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted, except where the failure to be so organized, existing, or in good standing would not reasonably be expected to have a Material Adverse Effect.

Section 3.2   <u>Authorization of Transaction</u>.   Subject to the Bankruptcy Court's entry of the Sale Order and any other necessary order to close the sale of the Acquired Assets, Seller has full power and authority (including full corporate or other organizational power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.   The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which Seller is a party have been duly authorized by Seller.   Upon due execution hereof by Seller, this Agreement (assuming due authorization and delivery by Buyer) shall constitute, subject to the Bankruptcy Court's entry of the Sale Order and any other necessary order to close the sale of the Acquired Assets, the valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

Section 3.3   <u>Noncontravention; Government Filings</u>.   Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in <u>Article II</u>), will (a) conflict with or result in a breach of the organizational documents of Seller, (b) subject to the entry of the Sale Order and any other necessary order to close the sale of the Acquired Assets, materially violate any Law or Decree to which Seller is subject in respect of the Acquired Assets, or (c) subject to the entry of the Sale Order and any other necessary order to close the sale of the Acquired Assets, result in a material breach of, constitute a material default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice or consent under any material Contract to which Seller is a party or to which the

Acquired Assets is subject, except, in the case of either clause (b) or (c), for such conflicts, violations, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Other than as required or pursuant to the Bankruptcy Code, the Sale Order and any other necessary order to close the sale of the Acquired Assets, Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or prevent or materially impair or delay Seller's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 3.4   <u>Title to Assets</u>.   At the Closing, subject to any Permitted Liens, Seller will have good and valid title to the Acquired Assets. Pursuant to the Sale Order, Seller will convey to Buyer and Buyer will be vested with good and valid title to all of the Acquired Assets, free and clear of all Liens, Claims, interests and encumbrances (other than Permitted Liens). Seller has not leased or otherwise granted to any Person the right to use or occupy the Owned Real Property or any portion thereof. Neither the whole nor any material portion of any Owned Real Property has been damaged or destroyed by fire or other casualty.

Section 3.5   <u>Intentionally omitted</u>.

Section 3.6   <u>Litigation; Decrees</u>.   Other than the Bankruptcy Case, there is no Litigation pending or, to the Knowledge of Seller, threatened, that (a) would reasonably be expected to have a Material Adverse Effect or (b) challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby. Other than the Bankruptcy Case, Seller is not subject to any outstanding Decree that would (a) reasonably be expected to have a Material Adverse Effect or (b) prevent or materially delay Seller's ability to consummate the transactions contemplated hereby or perform in any material respect its obligations hereunder.

Section 3.7   <u>Brokers' Fees</u>.   Other than the fees and expenses payable to Peter J. Solomon Company ("<u>Broker</u>") in connection with the transactions contemplated hereby, which shall be borne by Seller, Seller has not entered into any Contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or obligated to pay.

Section 3.8   <u>Taxes</u>.

(a)   In each case with respect to the Acquired Assets and except for matters that would not reasonably be expected to result in a Material Adverse Effect, (i) Seller has timely filed all Tax Returns required to be filed with the appropriate Tax authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of Seller); and (ii) all Taxes due have been paid (except as prohibited by the Bankruptcy Code).

(b)    Seller is not a foreign person within the meaning of section 1445 of the IRC.

(c)    The Debtors have provided notice of the commencement of the Bankruptcy Cases, the Sale Motion, the Bidding Procedures Order, and the Sale Hearing to all applicable taxing authorities and governmental units with jurisdiction over any of the Acquired Assets.

Section 3.9    <u>Compliance with Laws</u>. Seller has not received any written notice of, or been charged with, the violation of any Laws, except where such violation would not reasonably be expected to result in a Material Adverse Effect. Seller has not received written notice that it has failed to comply with or failed to operate the Acquired Assets in compliance with all applicable Laws in all material respects.

Section 3.10    <u>Employees</u>. CGI Joliet LLC has no employees as of the date of this Agreement.

Section 3.11    <u>Notice to ROFR Parties</u>. Seller has, or will have provided timely notice prior to the Sale Hearing, of the commencement of the Bankruptcy Cases, the Sale Motion, the Bidding Procedures, and the Sale Hearing to all parties holding any rights of first refusal or similar rights to purchase or lease the Acquired Assets or any portion thereof or interest therein.

Section 3.12    <u>Disclaimer of Other Representations and Warranties</u>. Except for the representations and warranties contained in this <u>Article III</u>, neither Seller nor any other Person shall be deemed to have made any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding Seller, the Acquired Assets or any other matter. Notwithstanding anything herein to the contrary, but without limitation of any representation or warranty expressly contained in this <u>Article III</u>, SELLER MAKES NO OTHER (AND HEREBY DISCLAIM EACH OTHER) REPRESENTATION, WARRANTY, OR GUARANTY WITH RESPECT TO THE VALUE, CONDITION, OR USE OF THE ACQUIRED ASSETS, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. Notwithstanding anything herein to the contrary, but without limitation of any representation or warranty expressly contained in this <u>Article III</u>, BUYER ACKNOWLEDGES THAT, SHOULD THE CLOSING OCCUR, BUYER WILL ACQUIRE THE ACQUIRED ASSETS IN AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS, WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED (INCLUDING ANY WITH RESPECT TO ENVIRONMENTAL, HEALTH, OR SAFETY MATTERS). Seller disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant, or representative of Seller or any of their Affiliates) except with respect to any representation or warranty expressly contained in this <u>Article III</u>.

# ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Seller that the statements contained in this Article IV are true and correct as of the date of this Agreement.

Section 4.1    Organization of Buyer; Good Standing.  Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the State of Missouri and has all requisite corporate or similar power and authority to own, lease, and operate its assets and to carry on its business as now being conducted.

Section 4.2    Authorization of Transaction.  Buyer has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which Buyer is a party have been duly authorized by Buyer. This Agreement (assuming due authorization and delivery by Seller) constitutes the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

Section 4.3    Noncontravention.  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Article II), will (a) conflict with or result in a breach of the organizational documents of Buyer, (b) violate any law or Decree to which Buyer is subject in respect of the Acquired Assets, or (c) result in a breach of, constitute a material default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or to which it is bound, except, in the case of either clause (b) or (c), for such conflicts, violations, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer.  Other than as required pursuant Buyer's credit facilities, the Bankruptcy Code, the Sale Order or any other necessary order to close the sale of the Acquired Assets, Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.4    Litigation; Decrees.  There is no Litigation pending or, to Buyer's knowledge, threatened against Buyer that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby. Neither Buyer nor any of its Subsidiaries is subject to any outstanding Decree that would prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform in any material respect its obligations hereunder on a timely basis.

Section 4.5    <u>Brokers' Fees</u>.  Buyer has not entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Seller or any of their Affiliates could become liable or obligated to pay.

Section 4.6    <u>Sufficient Funds; Adequate Assurances</u>.  Buyer has, and upon the Closing will have, immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated hereby.  Buyer is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code, as applicable, with respect to the Transferred Contracts and Assumed Liabilities.

Section 4.7    <u>No Other Representations and Warranties</u>.  Except for the representations and warranties contained in this Article IV, neither Buyer nor any other Person authorized by Buyer makes, and Seller does not rely on, any other express or implied representation or warranty of behalf of Buyer, all of which are hereby disclaimed.  ALL REPRESENTATIONS AND WARRANTIES OF BUYER SHALL EXPIRE ON THE CLOSING DATE.

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

Section 5.1    <u>Efforts; Cooperation</u>.

(a)    Upon the terms and subject to the conditions set forth in this Agreement, each of the Parties shall use (except as otherwise set forth in <u>Section 5.3</u>) its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper, or advisable to consummate and make effective, in as promptly a manner as practicable, the transactions contemplated hereby (including by giving, or causing to be given, any notices to, making any filings  with, and using commercially reasonable efforts to obtain any consents of Governmental Authorities, as applicable, as are necessary and appropriate to consummate the  transactions contemplated hereby).  Without limiting the generality of the foregoing, (i) Seller shall use its commercially reasonable efforts to cause the conditions set forth in <u>Section 7.1</u> that are within its control or influence to be satisfied or fulfilled, (ii) Buyer shall use its commercially reasonable efforts to cause the conditions set forth in <u>Section 7.2</u> that are within its control or influence to be satisfied or fulfilled, and (iii) in the event the Bankruptcy Court requires a consumer privacy ombudsman to be appointed in connection with the transactions contemplated by this Agreement, Buyer shall provide any cooperation reasonably required by such ombudsman and shall use commercially reasonable efforts to take all reasonable actions recommended by such ombudsman in any report provided to the Bankruptcy Court.

(b)   Without limiting the generality of <u>Section 5.1(a)</u>, neither Party shall take any action, or permit any of its Subsidiaries to take any action, to materially diminish the ability of any Party to consummate, or materially delay any Party's ability to consummate, the transactions contemplated hereby, including any action that is intended or would reasonably be expected to result in any of the conditions to any Party's obligations to consummate the transactions contemplated hereby set forth in <u>Article VII</u> to not be satisfied.

Section 5.2   <u>Conduct of the Business Pending the Closing</u>.   Except (i) as required by applicable Law or by order of the Bankruptcy Court, (ii) as required or contemplated by this Agreement or (iii) with the prior written consent of Buyer, no Debtor shall subject the Acquired Assets to any Lien, Claim, interest or encumbrance except for Permitted Liens and any Lien securing any debtor in possession loan facility or granted in an order authorizing use of cash collateral.

Section 5.3   <u>Bankruptcy Court Matters</u>.

(a)   <u>Successful Bidder</u>.   Buyer has been named the successful bidder for the Acquired Assets at an auction conduction in accordance with the Bidding Procedures Order.

(b)   <u>Intentionally omitted</u>.

(c)   <u>Bankruptcy Court Filings</u>.   In accordance with the Bidding Procedures Order, as soon as reasonably practicable following the execution of this Agreement, Seller shall seek approval of the Agreement in accordance with the Bidding Procedures Order or otherwise and file any necessary notice or pleadings required in connection therewith. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the transactions contemplated by this Agreement, including furnishing affidavits or other documents or information, and filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. Buyer shall not, without the prior written consent of Seller, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Acquired Assets hereunder. In the event the entry of the Sale Order or approval of the transactions contemplated by this Agreement shall be appealed, Seller and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

(d)   <u>Sale Order</u>.   Seller shall seek entry of the Sale Order and any other necessary orders to close the sale by the Bankruptcy Court as soon as reasonably practicable following the execution of this Agreement in accordance with the terms and conditions hereof, and Seller shall provide notice of the Sale Order to all Persons necessary to provide Buyer with the benefits and protections set forth in the Sale Order (including notice to all applicable Tax authorities). Buyer and Seller understand and agree that the transaction is subject to approval by the Bankruptcy Court. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in

obtaining entry of the Sale Order. In the event the entry of the Sale Order or approval of the transactions contemplated by this Agreement shall be appealed, Buyer shall notify Seller within 30 days of the filing of a notice of issues on such appeal (the "Issues Notice Filing") whether Buyer waives the requirement that the Sale Order be a Final Order or elects to terminate this Agreement. If Buyer does not provide such notice to Seller, the condition that the Sale Order be a Final Order will be deemed waived. In the event of an appeal, Buyer and Seller shall use their respective commercially reasonable efforts to defend such appeal.

Section 5.4    Notice of Developments.    Seller and Buyer will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which it has knowledge that would reasonably be likely to cause a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in Article VII not to be satisfied as of a reasonably foreseeable Closing Date, (b) the receipt of any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any notice pursuant to this Section 5.4 shall not be deemed to amend or supplement this Agreement and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party.

Section 5.5    Access; No Contact.    Upon the reasonable request of Buyer, and to the extent not otherwise prohibited by applicable Law, Seller will permit Buyer and its Representatives to have, upon reasonable advance written notice, reasonable access to the premises included in the Acquired Assets and Transferred Contracts during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Seller; provided, however, that, for avoidance of doubt, the foregoing shall not require any Person to waive, or take any action with the effect of waiving, its attorney-client privilege with respect thereto. Prior to the Closing, Buyer shall not, and shall cause its Representatives not to, contact any vendors, suppliers, landlords, or licensors of Seller in connection with or pertaining to any subject matter of this Agreement except with the prior written consent of Seller, not to be unreasonably withheld; provided, however, Seller agrees in good faith to make Persons available to Buyer to respond to requests for information or diligence within one (1) Business Day of Buyer's written request.

Section 5.6    Bulk Transfer Laws.    To the greatest extent permitted by applicable Law, Buyer and Seller hereby waive compliance with the terms of any bulk sales or similar Laws in applicable jurisdiction in respect to the transactions contemplated by this Agreement. The Sale Order shall contain a finding by the Bankruptcy Court or shall decree that the Seller and Buyer are not required to comply with such laws.

Section 5.7    Maintenance of the Assets.    Seller shall maintain the Acquired Assets in substantially the same condition as existed on the date of this Agreement reasonable wear and tear excepted and shall not remove any of the Acquired Assets and shall not demolish or remove any improvements or erect new improvements thereon without the prior written consent of Buyer.

## ARTICLE VI
## OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing:

Section 6.1    Further Assurances.    In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will, at the requesting Party's sole cost and expense, take such further action (including the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, providing materials and information) as the other Party may reasonably request which actions shall be reasonably necessary to transfer, convey or assign to Buyer the Acquired Assets.

Section 6.2    Access; Enforcement; Record Retention.    From and after the Closing, upon request by Seller, Buyer will permit Seller and its Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere with the normal business operations of Buyer, to relevant portions of premises, properties, personnel, books and records, and Contracts of or related to the Acquired Assets for the purposes of (a) preparing Tax Returns or (b) complying with the requirements of any Governmental Authority; provided, however, that, for avoidance of doubt, the foregoing shall not require Buyer to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege, (ii) such action could reasonably be expected to result in violation of applicable Law, or (iii) providing such access or information would be reasonably expected to be disruptive or harmful to its operations. Buyer agrees to maintain the files or records which are contemplated by the first sentence of this Section 6.2 in a manner consistent in all material respects with its document retention and destruction policies, as in effect from time to time, until the closing of the Bankruptcy Cases, unless otherwise agreed to by the Parties in writing, or approved by order of the Bankruptcy Court following reasonable notice to Seller and a hearing.

Section 6.3    Certain Tax Matters.

(a)    Transfer Taxes.    Seller shall pay any stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or other non-income Tax, fee or governmental charge (a "Transfer Tax") imposed under applicable law in connection with the transactions contemplated hereby. Accordingly, if Buyer is required by Law to pay any such Transfer Taxes, Seller shall promptly reimburse Buyer for the amount of such Transfer Taxes actually paid by Buyer. Buyer shall be entitled to receive such Tax Returns and other documentation reasonably in advance of filing by Seller, but not less than ten (10) Business Days prior to the due date of such Tax Returns, and such Tax Returns and other documentation shall be subject to Buyer's approval, which shall not be unreasonably withheld, delayed, or conditioned. The party that is required by applicable Law to file any Tax Returns in connection with Transfer Taxes described in the immediately preceding sentence shall prepare and timely file such Tax Returns. The Parties hereto shall cooperate in making, in a timely manner, all Tax Returns, filings, reports, forms and other documentation as are necessary or appropriate to comply with all applicable Laws in connection with the payment of Transfer Taxes and shall cooperate in

good faith to minimize, to the fullest extent possible under such Laws, the amount of any such Transfer Taxes.

(b)    Tax Adjustments.  Taxes (other than Transfer Taxes) and any other assessments, including, without limitation, water and sewer charges (the "Assessments") imposed upon or assessed directly against the Acquired Assets (including real estate Taxes (other than those subsumed in Section 2.10), personal property Taxes and similar Taxes) for the period in which the Closing occurs (the "Proration Period") will be apportioned and prorated between Seller and Buyer as of the Closing Date with Buyer bearing the expense of Buyer's proportionate share of such Assessments which shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of the Assessments and the denominator being the total number of days in the Proration Period, times (ii) the number of days in the Proration Period following the Closing Date, and Seller shall bear the remaining portion of such Assessments.  If the precise amount of any such Assessments cannot be ascertained on the Closing Date, apportionment and proration shall be computed on the basis of the amount payable for each respective item during the period immediately preceding the Proration Period and any proration shall be adjusted thereafter on the basis of the actual charges for such items in the Proration Period and Buyer and Seller agree that such proration shall be deemed conclusive and final and no further adjustments shall be made.

(c)    Tax Refunds. Seller shall be entitled to receive from Buyer all refunds (or credits for overpayments) of Taxes, including any interest paid thereon, by a Governmental Authority, attributable to any tax period ending on or prior to the Closing Date or the portion of any Proration Period ending on and including the Closing Date, net of any costs, fees, expenses or Taxes incurred in obtaining such refunds (or credits). Buyer and Seller shall execute all documents, take reasonable additional actions and otherwise reasonably cooperate as may be necessary to obtain the Tax refunds (or credits) contemplated by this Section 6.3(c). Buyer shall pay any such Tax refund (or the amount of any such credit) to the Seller within five (5) calendar days after Buyer receives such Tax refund from a Governmental Authority or files a Tax Return claiming such credit.

Section 6.4    Insurance Matters.  Buyer acknowledges that, upon Closing, all insurance coverage provided in relation to Seller, or the Acquired Assets that is maintained by Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Buyer, or the Acquired Assets and no further coverage shall be available to Buyer or the Owned Real Property under any such policies. Until the Closing, the Acquired Assets shall remain at the risk of Seller subject to the terms of this Agreement and continue to be insured by Seller.

Section 6.5    Acknowledgements.  Buyer acknowledges that, except for the representations and warranties expressly set forth in Article III (which representations and warranties shall terminate and be of no further force or effect as of the Closing), and without limiting the generality of Section 3.12, Seller does not make any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding Seller, the Acquired Assets or any other matter, and Seller will not be subject to any Liability to Buyer resulting from such matters or the distribution to Buyer, or the use of, any such

information. Buyer acknowledges that, should the Closing occur, Buyer will acquire the Acquired Assets in an "as is" condition and on a "where is" basis, without any representation or warranty of any kind, express or implied (including any with respect to environmental, health or safety matters).

Section 6.6    <u>Press Releases and Public Announcements</u>. No Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other Parties, unless a press release or public announcement is required by applicable Law or a Decree of the Bankruptcy Court. If any such announcement or other disclosure is required by applicable Law or a Decree of the Bankruptcy Court, the disclosing Party to the extent permitted shall give the nondisclosing Parties prior notice of, and an opportunity to comment on, the proposed disclosure. The Parties acknowledge that Seller shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order.

Section 6.7    <u>No Right to Employment; No CBA or Withdrawal Liability</u>

(a)    Nothing herein shall be deemed to create any right to employment or continued employment or to a particular term or condition of employment with Buyer.

(b)    Buyer shall not accept or assume, and Seller does not assign to Buyer, (i) any CBAs or any Liabilities or obligations arising out of any such CBAs between Seller and any union or other labor organization, or (ii) any withdrawal liability under any multi-employer pension plan.

(c)    Buyer shall not assume and shall not be Liable for any violations of or breach of any Employment, Labor, and Benefits Laws and Obligations prior to the Closing Date.

## ARTICLE VII
## CONDITIONS TO OBLIGATION TO CLOSE

Section 7.1    <u>Conditions to Buyer's Obligations</u>.    Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in <u>Article III</u> shall have been true and correct on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "material" or "Material Adverse Effect" set forth therein) has not resulted in a Material Adverse Effect;

(b)    Seller shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)    the Bankruptcy Court shall have entered the Sale Order, which order shall have become a Final Order (which shall be in form and content satisfactory to Buyer in its sole and absolute discretion) (the "Final Order Condition); provided, however, Buyer shall notify Seller within 30 days of any Issues Notice Filing whether Buyer waives the Final Order Condition or elects to terminate this Agreement. If Buyer does not provide such notice to Seller, the Final Order Condition shall be deemed waived;

(d)    no material Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement;

(e)    The title company shall be unconditionally prepared to issue to Buyer, as of Closing, a standard owner's policy of title insurance in the full amount of the Purchase Price insuring fee simple title to the Owned Real Property to be vested in Buyer, subject to the Permitted Liens (the "Title Policy") (the "Title Policy Condition"), provided, however, Buyer shall notify Seller within 30 days of any Issues Notice Filing whether Buyer waives the Title Policy Condition or elects to terminate this Agreement. If Buyer does not provide such notice to Seller, the Title Policy Condition shall be deemed waived;

(f)    Seller shall have vacated the Owned Real Property and removed all tangible personal property, including, without limitation, all vehicles, other than personal property to be acquired by Buyer as part of the Acquired Assets; and

(g)    each delivery contemplated by Section 2.7(b) to be delivered to Buyer shall have been delivered.

Section 7.2    Conditions to Seller's Obligations.    Seller's obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in Article IV shall have been true and correct on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "material" or "Material Adverse Effect" set forth herein) has not resulted in a Material Adverse Effect;

(b)    Buyer shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)    the Bankruptcy Court shall have entered the Sale Order and no order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date;

(d)    no material Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement; and

(e)    each payment contemplated by <u>Section 2.7(a)</u> to be made to Seller shall have been made, and each delivery contemplated by <u>Section 2.7(c)</u> to be delivered to Seller shall have been delivered.

Section 7.3    <u>No Frustration of Closing Conditions</u>.    Neither Buyer nor Seller may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in <u>Section 7.1</u> or <u>Section 7.2</u>, as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliates' failure to use its reasonable best efforts to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach of a representation, warranty, or covenant hereunder.

## ARTICLE VIII
## TERMINATION

Section 8.1    <u>Termination of Agreement</u>.    The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(a)    by the mutual written consent of the Parties;

(b)    by any Party by giving written notice to the other Parties if:

(i)    any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable; <u>provided, however,</u> that the right to terminate this Agreement under this Section 8.1(b)(i) shall not be available to a Party if the failure to consummate the Closing because of such action by a Governmental Authority shall be due to the failure of such Party to have fulfilled any of its obligations under this Agreement; or

(ii)    the Closing shall not have occurred on or before the date that is 180 days after the Execution Date (the "<u>Outside Date</u>"); <u>provided</u> that if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer or Seller, then the breaching Party may not terminate this Agreement pursuant to this <u>Section 8.1(b)(ii)</u>.

(c)    by Buyer by giving written notice to Seller if there has been a breach by Seller of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of any condition to the obligations of Buyer at Closing, or is reasonably likely to result in any condition to the obligations of Buyer at Closing not being satisfied, and such breach has not been waived by Buyer, or, if such breach is curable, cured by Seller prior to the earlier to occur of (A) ten (10) days after receipt of Buyer's notice of intent to terminate or (B) the Outside Date;

(d)    by Buyer if, prior to Closing, Seller's Bankruptcy Case is converted into a case under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee or examiner with expanded powers is appointed in the Bankruptcy Cases;

(e)    by Seller by giving written notice to Buyer that there has been a breach by Buyer of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Seller at Closing, or is reasonably likely to result in any condition to the obligations of Seller at Closing not being satisfied, and such breach has not been waived by Seller, or, if such breach is curable, cured by Buyer prior to the earlier to occur of (A) ten (10) days after receipt of Seller's notice of intent to terminate or (B) the Outside Date;

(f)    by Seller or Buyer, if the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement; or

(g)    by Buyer by giving written notice to Seller within 30 days of any Issues Notice Filing that Buyer does not waive the Final Order Condition and/or the Title Policy Condition and desires to terminate this Agreement.

Section 8.2    Effect of Termination.    If any Party terminates this Agreement pursuant to Section 8.1, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Article I, Section 2.5(b), Section 3.10, Section 6.6, Article IX, and this Section 8.2 shall survive any such termination) and no Party shall have any Liability (except as set forth in Section 2.5(b)(ii)) to the other Party hereunder; provided, however, that nothing in this Section 8.2 shall relieve any Party from Liability if the circumstances giving rise to such termination were caused by the other Party's breach of this Agreement or by any of the representations and warranties contained in this Agreement by such other Party being incorrect when made.

Section 8.3    Intentionally Omitted.

# ARTICLE IX
# MISCELLANEOUS

Section 9.1    Survival.    No representations or warranties of Seller or Buyer made in this Agreement shall survive the Closing Date, except as otherwise expressly provided in this Agreement.

Section 9.2    Expenses.    Except as otherwise expressly set forth herein, each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants. For the avoidance of doubt, Buyer shall pay all recording fees arising from the transfer of the Acquired Assets.

Section 9.3    Entire Agreement.    This Agreement and the documents contemplated herein (the "Related Agreements") constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written

{6891272;}
WEIL:\96222162\6\76248.0004