## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No. 17-13886 |
| | : | |
| CENTRAL GROCERS, INC., *et al.*, | : | Chapter 7 |
| | : | |
| Debtors. | : | (Jointly Administered) |

| | | |
|---|---|---|
| In re: | : | Case No. 17-18810 |
| | : | |
| CGI JOLIET, LLC, *et al.*, | : | Chapter 7 |
| | : | |
| Debtors. | : | (Jointly Administered) |

### <u>NOTICE OF MOTION</u>

**PLEASE TAKE NOTICE** that on **July 25, 2019, at 11:00 a.m.**, or as soon thereafter as counsel may be heard, I shall appear before the **Honorable Pamela S. Hollis**, Bankruptcy Judge, in Courtroom No. 644, U.S. Courthouse, 219 South Dearborn Street, Chicago, Illinois, or in her absence, before such other Judge who may be sitting in her place and stead and hearing bankruptcy motions, and shall then and there present the **Motion to Authorize Estates to Enter into, and to Approve, the Settlement Agreement between the Estates and for Other Relief,** a copy of which is attached and herewith served upon you, and shall pray for the entry of an order in conformity with the prayer of said pleading, at which hearing you may appear if you see fit.

Dated: July 8, 2019

Gregg Szilagyi, chapter 7 trustee of the
Raceway Estates

By: */s/ Robert M. Fishman*
     *One of his attorneys*

Robert M. Fishman
Ira Bodenstein
David R. Doyle
FOX ROTHSCHILD LLP
321 North Clark Street, Suite 1600
Chicago, IL 60654
Phone: (312) 541-0151
rfishman@foxrothschild.com
ibodenstein@foxrothschild.com
ddoyle@foxrothschild.com

Respectfully submitted,

Howard Samuels, chapter 7 trustee of the
Select Estates

By: */s/ Michael M. Eidelman*
     *One of his attorneys*

Michael M. Eidelman
Allison B. Hudson
VEDDER PRICE
222 North LaSalle Street
Chicago, IL 60601
Phone: (312) 609-7500
meidelman@vedderprice.com
ahudson@vedderprice.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | : | Case No. 17-13886 |
| | : | |
| CENTRAL GROCERS, INC., *et al.*, | : | Chapter 7 |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |
| In re: | : | Case No. 17-18810 |
| | : | |
| CGI JOLIET, LLC, *et al.*, | : | Chapter 7 |
| | : | |
| Debtors. | : | (Jointly Administered) |

**MOTION TO AUTHORIZE ESTATES TO ENTER INTO, AND TO APPROVE, THE
SETTLEMENT AGREEMENT BETWEEN THE ESTATES AND FOR OTHER RELIEF**

Howard B. Samuels, not individually, but as chapter 7 trustee ("Select Trustee") for the

estates of Central Grocers, Inc., Strack and Van Til Super Market, Inc., and SVT, LLC

(collectively, the "Select Estates") and Gregg E. Szilagyi, not individually, but as chapter 7 trustee

("Raceway Trustee, and together with the Select Trustee, the "Trustees") for the estates of CGI

Joliet, LLC, Currency Express, Inc., Raceway Central, LLC, Raceway Central Calumet Park LLC,

Raceway Central Chicago Heights LLC, Raceway Central Downers Grove LLC, Raceway Central

Joliet North LLC, Raceway Central LLC North Valpo, and Raceway Central Wheaton LLC

(collectively, the "Raceway Estates" and together with the Select Estates, the "Debtors' Estates"),

hereby move the Court, pursuant to Sections 363(b) and 105 of title 11, United States Code, and

Rules 9006(c) and 9019 of the Federal Rules of Bankruptcy Procedure, (1) for authority to enter

into a Settlement Agreement (defined hereinbelow) between the Debtors' Estates, (2) to approve

the terms of the Settlement Agreement, (3) for entry of permanent injunctions in each of the

Debtors' Estates as set forth hereinbelow, (4) for reduction of the notice period provided in Rule

2002(a)(2) and (3); and (5) for such other and further relief as the Court may deem appropriate (the "Motion")[1].  In support of the Motion, the Trustees state as follows:

## INTRODUCTION

1.      On or about May 2, 2017, certain creditors of Central Grocers, Inc. ("CGI") commenced an involuntary case under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") against CGI in the United States Bankruptcy Court for the Northern District of Illinois (the "Court").

2.      On or about May 4, 2017, all of the above-named debtors including CGI (collectively, the "Debtors") filed voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court") and continued to operate their businesses and manage their affairs under the jurisdiction of the Delaware Bankruptcy Court as debtors in possession.

3.      On or about June 13, 2017, this Court directed that the venue for each of the Debtors' Chapter 11 Cases pending in the Delaware Bankruptcy Court be transferred to this Court.

4.      Between May 4, 2017 and December 4, 2017, certain of the Debtors embarked upon a sale process under which:  (i) Strack and Van Til Super Market, Inc. ("Strack") and SVT, LLC ("SVT") sold substantially all of the assets relating to twenty (20) grocery stores to Indiana Grocery Group, LLC, a Delaware limited liability company, and (ii) CGI sold its distribution center to an affiliate of Supervalu Holdings, Inc., all as authorized by this Court.

5.      The Official Committee of Unsecured Creditors (the "OCC") was formed by the United States Trustee during the Chapter 11 Cases pursuant to order of court dated May 15, 2017. Subsequently, the OCC retained counsel and played an active role in the Chapter 11 Cases.  As

---

[1] Unless otherwise defined herein, capitalized terms used herein shall have the meanings defined in the ABL Lender Settlement Agreement.

part of its duties and responsibilities, the OCC initiated an investigation into certain pre-petition transactions between certain of the Debtors and PNC Bank, National Association, in its capacity as administrative agent and collateral agent ("Agent") for various lenders (collectively, the "ABL Lenders").

6.    On or about August 14, 2017, the OCC filed the *Motion of the Official Committee of Unsecured Creditors for an Order Granting the Committee (I) Derivative Standing to Assert, Prosecute, and Settle Certain Causes of Action on Behalf of the Debtors' Estates, and (II) Certain Related Relief* (Dkt. No. 555, the "Standing Motion").  Attached as an exhibit to the Standing Motion was a draft complaint (the "Complaint") against the Agent and the ABL Lenders.

7.    The Complaint asserted the following claims and causes of action:  (i) an action to avoid and recover the SVT Mortgages (as defined in the Standing Motion) as preferences; (ii) an action to avoid the DC ABL Second Mortgage (as defined in the Standing Motion) as a fraudulent transfer; (iii) an action to avoid the Raceway Mortgages (as defined in the Standing Motion) as fraudulent transfers; (iv) an action to obtain a declaratory judgment that the DC ABL Second Mortgage has been released and discharged; (v) an action to obtain a declaratory judgment that the Raceway Mortgages have been released and discharged; (vi) an action to obtain a declaratory judgment that neither the Agent nor any other of the Lenders holds a valid, perfected, or enforceable lien on certain specified assets; and (vii) a determination of the existence of a valid diminution claim (collectively, the "Estates' Claims").

8.    The Complaint was never filed.  Instead, the Agent, the ABL Lenders, the Debtors, and the OCC consensually resolved the Estates' Claims (as described below).

9.    On or about October 23, 2017, the OCC filed (i) the *Motion of the Official Committee of Unsecured Creditors pursuant to Federal Rule of Bankruptcy Procedure 9019(a)*

96990780.v3-7/8/19

*for Entry of an Order Approving Settlement and Compromise of Claims* (Dkt. No. 857, the "<u>ABL Lender Settlement Motion</u>") seeking approval of the settlement agreement between the Debtors' Estates, on the one hand, and the Agent and the ABL Lenders, on the other, attached to the Lender Settlement Motion (the "<u>ABL Lender Settlement Agreement</u>"), and (ii) the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order, in furtherance of the Global Settlement with the Secured Parties, Approving the Allocation of Proceeds of the Global Settlement* (Dkt. No. 902, the "<u>Allocation Motion</u>") to establish an allocation formula for the sharing of the proceeds payable under the ABL Lender Settlement Agreement (the "<u>ABL Settlement Proceeds</u>") among the Debtors' Estates.   The ABL Lender Settlement Motion expressly contemplated the filing of the Allocation Motion and a separate, subsequent approval of allocating the ABL Settlement Proceeds amongst the Debtors' Estates by Court order.   The OCC sought the approval of this proposed allocation through the Allocation Motion.

10.     In the Allocation Motion, the OCC proposed distributing the ABL Settlement Proceeds (with the exception of the Director Actions and Member Actions described in paragraph 7.f. of the ABL Settlement Agreement which shall remain in the estate holding such causes of action) based on a hypothetical pro rata value allocation, on an Estate-by-Estate basis, of the Estates' Claims.   The resulting analysis was attached to the Allocation Motion as an exhibit and is set forth below in paragraph 11.

11.     On or about November 16, 2017, the Bankruptcy Court granted the ABL Lender Settlement Motion and entered the *Order Authorizing and Approving Settlement Agreement by and among the Secured Parties and the Official Committee of Unsecured Creditors of Central Grocers, Inc. et al, on Behalf of Itself, Each of the Debtors and Each of the Debtors' Estates* (Dkt. No. 988, the "<u>ABL Lender Settlement Order</u>").   On the same date, the Bankruptcy Court also

granted the Allocation Motion and entered the *Order Authorizing and Approving Allocation of Proceeds of the Global Settlement* (Dkt. No 989, the "Allocation Order"). The Allocation Order provided that the ABL Settlement Proceeds to be paid to the "Debtors' Estates" as set forth in the ABL Lender Settlement Agreement shall be distributed pursuant to the following allocation (the "Allocation Analysis"):

| | CGI Joliet, LLC | SVT, LLC | Raceway Central Chicago Heights LLC | Raceway Central Downers Grove LLC | Raceway Central Joliet LLC | Raceway Central LLC North Valpo | Raceway Central Wheaton LLC | Raceway Central Calumet Park LLC | Raceway Central LLC | CGI | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Allocation | 49.3% | 21.0% | 3.3% | 4.1% | 3.8% | 4.4% | 3.3% | - | 3.6% | 7.2% | 100.0% |

12.     On or about November 30, 2017, the Chapter 11 Cases were converted to cases under Chapter 7 of the Bankruptcy Code (the "Chapter 7 Cases"), and Peter N. Metrou was appointed interim trustee of the Debtors' Estates.

13.     The Section 341 meeting of creditors in the Chapter 7 Cases took place on January 11, 2018, during which requests were made for the election of a trustee pursuant to Section 702 of the Bankruptcy Code. Thereafter, an election of trustees was conducted by the Office of the United States Trustee. At the conclusion of the election, Howard B. Samuels was elected Chapter 7 Trustee for the Select Estates, and Gregg Szilagyi was elected Chapter 7 Trustee for the Raceway Estates. Both Mr. Samuels and Mr. Szilagyi qualified as trustees and are presently serving in such capacities.

## THE CONTROVERSIES

14.     In connection with the administration of the Raceway Estates, the Raceway Trustee determined that certain property believed by the OCC to be owned by Raceway Central, LLC ("Raceway Central") was in fact owned by Raceway Central Calumet Park, LLC ("Raceway

96990780.v3-7/8/19

Calumet"), resulting in an overstatement of the allocation to Raceway Central and an understatement of the allocation to Raceway Calumet.

15.     In addition to this error, the Raceway Trustee and the Select Trustee each (a) identified certain inconsistencies between or among (i) the ABL Settlement Agreement, (ii) the ABL Settlement Motion, (iii) the ABL Settlement Order, (iv) the Allocation Motion, (v) the Allocation Order and (v) the representations made to the Court at the hearing seeking entry of the ABL Settlement Order and the Allocation Order.

16.     As a result, on or about November 13, 2018, the Raceway Trustee filed motions in each of the Chapter 7 Cases to (I) *Modify the Allocation Order and the Allocation Analysis Approved Thereby;* (II) *Modify the Definition of "Net Proceeds" Approved by the Settlement Order; and* (III) *Grant Other Appropriate Relief* (CGI Joliet Dkt. No. 28) (CGI Dkt. No. 2406) (the "Raceway Trustee 60(b) Motion").  Similarly, on or about November 14, 2018, the Select Trustee filed, in each of the Chapter 7 Cases, his *Motion to Clarify the Allocation Order to Specifically Set Forth the Types of Assets that Are Not Subject to the Allocation Analysis and for Other Appropriate Relief* (CGI Dkt. No. 2414) (CGI Joliet Dkt. No. 133) (the "Select Trustee 60(b) Motion," and together with the Raceway Trustee 60(b) Motion, the "60(b) Motions").

17.     On or about December 13, 2018, the Bankruptcy Court entered an order (CGI Joliet Dkt. No. 149) (CGI Dkt. No. 2540) granting partial relief on the Raceway Trustee 60(b) Motion and modifying the Allocation Analysis to provide as follows (the "Revised Allocation Analysis"):

| | CGI Joliet, LLC | SVT, LLC | Raceway Central Chicago Heights LLC | Raceway Central Downers Grove LLC | Raceway Central Joliet North LLC | Raceway Central LLC North Valpo | Raceway Central Wheaton LLC | Raceway Central Calumet Park LLC | Raceway Central LLC | CGI | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Allocation** | 49.3% | 21.0% | 3.3% | 4.1% | 3.8% | 4.4% | 3.3% | 1.8% | 1.8% | 7.2% | 100.0% |

18.     The following proofs of claim have been filed by the Select Trustee in the Raceway

Estates (the "Select Proofs of Claims"):

| | CGI Joliet, LLC | Raceway Central Chicago Heights LLC | Raceway Central Downers Grove LLC | Raceway Central Joliet North LLC | Raceway Central LLC North Valpo | Raceway Central Wheaton LLC | Raceway Central Calumet Park LLC | Raceway Central, LLC | Currency Express, Inc. |
|---|---|---|---|---|---|---|---|---|---|
| **Claim No.** | 1410 | 1296 | 1335 | 1323 | 1307 | 1363 | 1288 | 1337 | 1293 |
| **Amount** | $-0- | $-0- | $-0- | $-0- | $-0- | $-0- | $-0- | $-0- | $-0- |

19.     The following proofs of claim have been filed by the Raceway Trustee in the Select

Estates (the "Raceway Proofs of Claims"):

| | SVT, LLC | CGI | Strack and Van Til Super Market, Inc. |
|---|---|---|---|
| **Claim No.** | 1446 | 1389 | |
| **Amount** | $-0- | $-0- | |

20.     In the Select Trustee 60(b) Motion, the Select Trustee contends the Select Estates

hold certain claims and rights against the Raceway Estates including but not limited to claims

based upon various theories to substantively consolidate the administration of or otherwise

combine, merge, or join in any fashion for any purpose, one or more of the Raceway Estates into

or with one or more of the Select Estates (collectively the "Substantive Consolidation Claims"),

and (b) that the Allocation Order needs to be modified and clarified to specifically set forth the

types of assets that are not subject to the Allocation Analysis, and which belong to the Estate that

owns such claim and/or asset, including proceeds from Non-Member Avoidance Actions, Director

Actions and Commercial Tort Claims (all claims and rights of any kind, nature, or description

under any theory of law held by one or more of the Select Estates or the Select Trustee against one or more of the Raceway Estates, including but not limited to Substantive Consolidation Claims, shall be hereinafter referred to as the "Select Estates Claims").

21.    The Raceway Estates, and each of them, dispute any and all of the Select Estates Claims.

22.    In the Raceway Trustee 60(b) Motion, the Raceway Trustee contends that (a) the definition of Net Proceeds contained in the ABL Lender Settlement Agreement needs to be amended to reflect a fairer sharing of costs associated with the maintenance and disposition of real estate assets (the "Adjusted Net Proceeds Definition") and (b) the Raceway Estates hold certain claims and rights against the Select Estates including but not limited to claims to modify the Allocation Order to provide for a greater percentage of the ABL Settlement Proceeds to be distributed to the Raceway Estates and the reduction of the allocation of the ABL Settlement Proceeds to the Select Estates (collectively, the "Raceway Estates Reallocation Claim") (all claims and rights of any kind, nature, or description under any theory of law held by one or more of the Raceway Estates or the Raceway Trustee against one or more of the Select Estates, including but not limited to the Adjusted Net Proceeds Definition and the Raceway Estates Reallocation Claim, shall be hereinafter referred to as the "Raceway Estates Claims").

23.    The Select Estates, and each of them, dispute any and all of the Raceway Estates Claims.

24.    The following pension funds have filed proofs of claim or amended proofs of claim in each of the Estates as follows:

96990780.v3-7/8/19

| Pension Fund | Amount of Claim |
|---|---|
| United Food and Commercial Workers Union and Employers Midwest Pension Fund (the "**Amended Midwest Fund Proof of Claim**") | $58,478,728.00 |
| United Food and Commercial Workers International Union-Industry Pension Fund (the "**Amended National Fund Proof of Claim**") | $20,594,996.00 |
| Chicago Area International Brotherhood of Teamsters Pension Fund (the "**Chicago Teamsters Fund Proof of Claim**") | $5,101,230.00 |

## THE PROPOSED SETTLEMENT

25.     The Select Trustee and the Raceway Trustee, on behalf of their respective estates, have each determined that resolution of the various issues in dispute in the 60(b) Motions (collectively, the "Disputes"), such as the appropriate allocation of proceeds of certain types of legal actions and the treatment of costs and expenses related to the maintenance and disposition of real estate and the prosecution of the various legal claims, as well as the Substantive Consolidation Claims, are all best resolved by compromise and agreement.  Accordingly, the Trustees have engaged in lengthy and extensive negotiations, with the assistance of counsel and other professionals, toward a consensual resolution.  The Trustees have concluded that the settlement of the Disputes (the "Settlement") as set forth in this Settlement Agreement[2] (the "Settlement Agreement," a copy of which is attached hereto and made part hereof as **Exhibit A**) will avoid protracted, risky and expensive litigation, and result in all of the Debtors' Estates receiving a substantial and valuable benefit if the Settlement is consummated.

---

[2] The language in subparagraph 2(c) of the Settlement Agreement has yet to accepted by the Pension Funds and the parties will work diligently to resolve the issue by the time of the settlement hearing (scheduled on July 25, 2019).

96990780.v3-7/8/19

26.     Principally, the Settlement covers the following subject areas[3]:

a.      Reallocation, notwithstanding the Revised Allocation Analysis, between the Select Estates and the Raceway Estates of the Shared Collection Floor;

b.      Reallocation, notwithstanding the Revised Allocation Analysis, between the Select Estates and the Raceway Estates of the Net Proceeds that may be realized from Director Actions;

c.      Reallocation, notwithstanding the Revised Allocation Analysis, between the Select Estates and the Raceway Estates of the Net Proceeds that may be realized from Commercial Tort Claims;

d.      Reallocation, notwithstanding the Revised Allocation Analysis, between the Select Estates and the Raceway Estates of the Net Proceeds that may be realized from Non-Member Avoidance Actions;

e.      Mutual release of the Select Estates Claims and the Raceway Estates Claims by and between the Select Estates and the Raceway Estates, specifically including the Substantive Consolidation Claims (collectively, the "Mutual Releases");

f.      Provision for the entry by the Bankruptcy Court of a permanent injunction providing that all persons are prohibited from pursuing either the Select Estates Claims against the Raceway Estates and/or the Raceway Estates Claims against the Select Estates;

g.      Allowance of the Amended Midwest Fund Proof of Claim, the Amended National Fund Proof of Claim, and the Chicago Teamsters Fund Proof of Claim; and

---

[3] While this Motion describes many of the components comprising the Settlement Agreement, it is in summary fashion.  Any party desiring a comprehensive understanding of the Settlement Agreement is directed to Exhibit A.

      h.     As between the Debtors' Estates, modification of the ABL Lenders' Settlement Agreement's definition of "Net Proceeds" to the Settlement Agreement's definition of "Adjusted Net Proceeds."

27.     The Trustees considered all of the arguments in favor of and against reallocation of the various sources of potential revenue to the Debtors' Estates, specifically including the Shared Collection Floor, the Director Actions, the Commercial Tort Claims and the Non-Member Avoidance Actions (collectively, the "<u>Reallocated Assets</u>"), along with other litigation proceeds and real estate proceeds[4]. Rather than spend extensive resources litigating these issues, knowing the difficult nature of the proof of the intent of the parties to the ABL Lender Settlement Agreement, and the risks associated with contract language interpretations, the Trustees reached an agreement on what they believe, in their collective business judgment, is a fair reallocation of the Net Proceeds of the Reallocated Assets[5], as follows:

---

[4] The allocation of proceeds from Member Actions is not modified by this Settlement Agreement.

[5] In addition to the allocation of proceeds between the Raceway Estate and the Select Estates as set forth in the chart below, the Select Trustee also reallocated the share of proceeds to be realized by the Select Estates, all as set forth in the Settlement Agreement.

| Category of ABL Settlement | Percentage of Recalculated Net Proceeds to Raceway Estates | Percentage of Recalculated Net Proceeds to Select Estates |
|---|---|---|
| The Shared Collection Floor (inclusive of True-Up Amount) | 60% | 40% |
| Director Actions | 10% | 90% |
| Commercial Tort Claims | 35% | 65% |
| Non-Member Avoidance Actions[6] | 12% | 88% |

28.      The Trustees also determined that it was in the best interest of all of the Debtors' Estates to resolve all of the Raceway Estates Claims, specifically including the Raceway Proofs of Claims and the Raceway Reallocation Claims (addressed in Paragraph 26 above), and to resolve all of the Select Estates Claims, specifically including the Select Proofs of Claim and the Substantive Consolidation Claims (collectively, the "Released Claims").  The litigation of the Select Estates Claims and the Raceway Estates Claims would have been extremely costly, time consuming and fraught with uncertainty.  By resolving all of these claims, the Trustees are putting the Debtors' Estates in a position to address the allowance/disallowance of the claims of third party creditors and to more promptly make interim distributions to the creditors holding allowed claims.  Both of the 60(b) Motions, upon consummation of the Settlement Agreement, are to be withdrawn with prejudice.

29.      The Trustees request that the Court grant certain relief in order for the Mutual Releases to have their intended effect of forever freeing each of the Debtors' Estates from having to address the Released Claims.  First, the Trustees request that the Court make a determination

---

[6] Applies only to Net Proceeds collected by the Select Estates after the date on which this Settlement Agreement is approved by the Court.

96990780.v3-7/8/19

that all of the Released Claims, including the Substantive Consolidation Claim, are the sole property of the Debtors' Estates.  Second, the Trustees request that the Court conclude that upon the entry of an Order approving the Settlement, and upon the consummation of the Settlement Agreement, that the release of the Released Claims by the Debtors' Estates constitutes res judicata as to the assertion of any of the Released Claims by any third party, including creditors of the Debtors' Estates.  Lastly, it is imperative that the Court issue a permanent injunction in conjunction with the Settlement (the "Injunction") applicable to all Persons (as defined in Section 101(41) of the Bankruptcy Code), including the Select Trustee and the Raceway Trustee, and all creditors of the Debtors' Estates, that permanently bars, enjoins and restrains the commencement, prosecution or assertion of any action or proceeding against any of the Debtors' Estates on account of, or with respect to, the Released Claims.

30.    The Trustees have determined that the Amended Midwest Fund Proof of Claim, the Amended National Fund Proof of Claim, and the Chicago Teamsters Fund Proof of Claim (collectively, the "Fund Claims") should be allowed in the amounts set forth in the Settlement Agreement (and at Paragraph 24 herein).  The Trustees have done their respective due diligence on the Fund Claims, have negotiated with the respective funds and have agreed to the amounts set forth in the respective amended proofs of claim[7].  The allowance of the Fund Claims in all of the Debtors' Estates is an integral part of the global settlement memorialized in the Settlement Agreement, and is necessary resolve of all of the issues addressed therein.

31.    The Trustees have consulted with the Agent and the Lenders on the Settlement Agreement to make certain it was not inconsistent with the obligations of and benefits afforded to the Agent and the Lenders in the ABL Lender Settlement Agreement.  For example, the definition

---

[7] The Amended Midwest Fund Proof of Claim and the Amended National Fund Proof of Claim are in amounts voluntarily reduced in order to reach this Settlement.

of Net Proceeds in the ABL Lender Settlement Agreement accounted for transaction costs, such as attorneys' fees and closing costs, but did not address all of the costs associated with the maintenance and disposition of the assets being administered by the respective Trustees.  For example, it left each Raceway Estate solely responsible for the substantial carrying costs associated with holding and maintaining the real estate in its Estate (such as management fees, real estate taxes, utility bills, and security costs; collectively, the "Real Estate Costs") until the sale of such real estate asset could be negotiated, approved and consummated, notwithstanding that the Select Estates were going to be sharing in the proceeds realized from such a sale as required by the terms of the ABL Lender Settlement Agreement, the Allocation Order and the Allocation Analysis.  The definition also arguably excluded potential costs associated with the evaluation and prosecution of potential causes of action (the "Litigation Costs," and together with the Real Estate Costs, the "Costs") held by the Select Estates, notwithstanding that the Raceway Estates were going to be sharing in the proceeds realized from such litigation as required by the terms of the ABL Lender Settlement Agreement, the Allocation Order and the Allocation Analysis.   The Trustees determined that since that portion of the proceeds from either the sale of real estate or the disposition of litigation that was payable to the Debtors' Estates was being shared by all of the Debtors' Estates, so too should the Costs be similarly shared.  The Adjusted Net Proceeds Definition, as provided at Paragraph 7(a) of the Settlement Agreement, is as follows:

> *On a property by property, lawsuit by lawsuit basis, all of the net proceeds of each such sale, collection, or disposition of any asset (i.e., gross proceeds less the reasonable direct costs and expenses incurred in connection with (i) the maintenance and preservation of the respective property pending sale, including costs for utilities, the property manager, security, and any necessary repairs, and the payment of real estate taxes (at a sale closing or otherwise), professional fees incurred in providing such maintenance and preservation, and (ii) the sale, collection, or disposition, including consultant fees (including, without limitation, the fees incurred by the Select Trustee's solvency expert, which are to be prorated among all such applicable properties/lawsuits regardless of the amount, if any, of*

14

> *proceeds generated thereby), brokers' fees, and professional fees (to the extent incurred after the Settlement Effective Date) associated with any sale, collection, or prosecution of any claim or cause of action, transaction fees, and transfer and similar taxes).*

Notwithstanding the Adjusted Net Proceeds definition, the Settlement Agreement does not impair or affect "Net Proceeds" payable to the Agent under the ABL Lender Settlement Agreement.  In other words, Adjusted Net Proceeds will be calculated when making intra-Estate claims while Net Proceeds will be calculated for paying amounts due to the Agent and Lenders under the ABL Lender Settlement Agreement.

## BASIS FOR RELIEF

32.     The Trustees are authorized to compromise the Raceway Estates Claims and the Select Estates Claims pursuant to section 363(b) of the Bankruptcy Code and Fed. R. Bankr. P. 9019(a).  Section 363(b) of the Bankruptcy Code provides that a trustee "may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  The settlement of claims involves the use of estate property outside the ordinary course of business and requires court approval under § 363(b).  *In re Resource Technology Corp.*, 356 B.R. 435, 444 (Bankr. N.D. Ill. 2007); *In re Telesphere Communications, Inc.,* 179 B.R. 544, 551 (Bankr. N.D. Ill. 1994) ("The settlement of a cause of action held by the estate is plainly the equivalent of a sale of that claim.").  Fed. R. Bankr. P. 9019(a) authorizes the court, after a hearing on such notice as the court directs, to approve a compromise or a settlement. Fed. R. Bankr. P. 9019(a).

33.     The use, sale, or lease of property of the estate, other than in the ordinary course of business, is authorized when "the transaction makes good business sense" and "preserves the priorities among creditors."  *See, e.g., United Retired Pilots Benefits Protection Assn. v United Airlines, Inc. (In re UAL Corp.)*, 443 F.3d 565, 572 (7th Cir. 2006) ("the criteria for approval [under § 363(b)(1) is] whether the transaction makes good business sense and does not disturb

15

creditors' rights"); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (sale under § 363 involves exercise of fiduciary duty and requires an "articulated business justification").

34.    The central issue in approving a bankruptcy settlement is whether the settlement is in the "best interests of the estate." *In re Energy Co-op., Inc.*, 886 F.2d 921, 927-29 (7th Cir. 1989); *LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.)*, 841 F.2d 159, 161 (7th Cir. 1987). In order to make that determination, a court must compare "the value of the settlement with the probable costs and benefits of litigating." *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007).  Among the factors that the Court should consider in its analysis are (i) the litigation's probability of success, (ii) the litigation's complexity, (iii) the litigation's attendant expense, inconvenience and delay (including the possibility that disapproving the settlement will cause wasting of assets). *See, e.g., Doctors Hosp.*, 474 F.3d at 426; *Energy Co-op., Inc.*, 886 F.2d at 927.

35.    Based on the foregoing analysis, the Court must determine whether the settlement falls within the reasonable range of possible litigation outcomes. *Doctors Hosp.*, 474 F.3d at 426. Since litigation outcomes cannot be precisely determined, the Trustee's decision should not be disturbed unless the settlement "fall[s] below the lowest point in the range of reasonableness." *See, e.g., Energy Co-op.*, 886 F.2d at 929; *In re Commercial Loan Corp.*, 316 B.R. 690, 698 (Bankr. N.D. Ill. 2004).  The approval of a settlement is committed to the sound discretion of the bankruptcy court. *Commercial Loan Corp.*, 316 B.R. 697, 698 (Bankr. N.D. Ill. 2004) <u>citing</u> *In re Andreuccetti*, 975 F.2d 413, 421 (7th Cir. 1992).

36.    The Trustees are further requesting that the Bankruptcy Court issue the Injunction as part of this Settlement.  This request for injunctive relief is fully consistent with applicable law for several reasons.  <u>First</u>, a chapter 7 trustee is the representative of all unsecured creditors of the

96990780.v3-7/8/19

debtor, *see Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1342-43, 48-49 (7th Cir. 1987), "and therefore a judgment for or against the trustee is res judicata in a suit on the same claim by a creditor, provided no conflict of interest made the trustee's representation inadequate." *Gekas v. Pipin* (*Matter of Met-L-Wood Corp.*), 861 F.2d 1012, 1017 (7th Cir. 1988). Creditors with notice of a trustee's proposed settlement are bound by the settlement order under principles of res judicata and barred from individually pursuing the same claims settled by the trustee. *See, e.g. In re Medomak Canning*, 922 F.2d 895, 902-03 (1st Cir. 1990).

37. <u>Second</u>, a bankruptcy court has the power to enjoin non-parties to a proceeding as part of a settlement where the injunction is limited to prosecuting claims of the bankruptcy estate. *See In re Artra Grp., Inc.*, 300 B.R. 699, 705-06 (Bankr. N.D. Ill. 2003) (Hollis, J.) (*citing Fogel v. Zell*, 221 F.3d 995 (7th Cir. 2000)). In other words, an injunction against non-parties may be approved where the injunction is limited to claims of the debtor or those that are derivative of the debtor's claims. *Id.* at 706. Non-parties to a proceeding may also be bound by a settlement under the principles of res judicata where the non-parties are in privity with the settling party. *See In re Artra Grp., Inc.*, 308 B.R. 851, 853 (Bankr. N.D. Ill. 2003) (Hollis, J.) (hereinafter "*Artra II*"). Privity exists between the settling party and a non-party where the "non-party interests [are] adequately represented in the prior proceeding." *Id.* at 853 (*quoting Matter of L & S Indus., Inc.*, 989 F.2d 929, 934 (7th Cir. 1993).

38. In *Artra II*, the creditors' committee sought approval of a settlement that resolved an adversary proceeding brought to substantively consolidate the debtor with its parent company. *See Artra II*, 308 B.R. at 853. The terms of the settlement required the entry of a permanent injunction barring non-parties from pursuing certain claims against the parent and its insiders. *Id.* at 857. The court approved the settlement even though the adversary proceeding enjoined non-

parties "because the permanent injunction … only restrict[ed] the prosecution of claims derivative of those owned exclusively by the Committee or [the debtor]." *Id.* at 857. The Court also found that res judicata would bar creditors from pursuing the enjoined claims because the claims were owned and settled by the committee which adequately represented the interests of the estate's unsecured creditors in the adversary proceeding. *Id.* at 857.

39.    Third, unknown creditors who are not in privity with parties to a bankruptcy case may also be bound by an order entered pursuant to § 363(b) – even they are not a party to, nor have notice of, the bankruptcy proceedings. *See Met-L-Wood,* 861 F.2d at 1017. While such an action would not be barred by res judicata, it is still barred because "[a] proceeding under 363 is an *in rem* proceeding. It transfers property rights, and property rights are rights good against the world, not just against parties to a judgment or persons with notice of the proceeding." *Id.*

## ARGUMENT

40.    The Trustees business judgment is that the relief requested by this motion, specifically including the Injunction, is in the best interests of all the Debtors' Estates and their respective creditors based on the Trustees' analysis of the likely outcomes of the legal disputes regarding the Substantive Consolidation Claims, the Adjusted Net Proceeds Definition, the Raceway Reallocation Claims, and the Fund Claims. The practical considerations makes litigation of these disputes a highly unattractive option that subjects the Debtors' Estates and their creditors to substantial risks, delays and expense.

41.    The relief sought in this motion presents a less expensive and a more expedient way to resolve the Disputes. The Trustees business judgment is that it is in the best interests of all of the Debtors' Estates to reach a consensual resolution of these issues rather than to litigate them to their ultimate conclusion. It is the Trustees' collective view that this proposed relief falls within

the reasonable range of litigation outcomes and is the best outcome for the greatest number of creditors of the Debtors' Estates, taking into account the risk, cost and delay associated with each contested matter.

42.     The Injunction is an integral part of the Settlement and the benefit to be realized by the Debtors' Estates. Once this Settlement is approved and consummated, none of the Debtors' Estates want to run the risk of any creditor or other third party seeking to pursue, on its own behalf or allegedly for the benefit of others, any of these Released Claims. The entry of the Injunction is the greatest assurance that the Debtors' Estates can receive that they will not have to expend time or resources dealing with any of the Released Claims in the future.

## NOTICE

43.     Notice of this Motion has been given to: (a) the Office of the United States Trustee; (b) the Standard Parties and the Rule 2002 List (as such terms are defined in the Order Approving Second Amended Case Management Procedures [CGI Docket # 1401]); and (c) all creditors of each of the Debtors' Estates that have filed proofs of Claim in either the Chapter 11 Cases or the Chapter 7 Cases. The Trustees request that the Court shorten the 21 day notice period required by Rules 2002(a) (2) and (3) to the 16 days given of this Motion, and determine that the notice of the Motion, as set forth above, is sufficient under the circumstances and any further or additional notice is waived.

WHEREFORE, the Trustee respectfully requests that this Court enter an order, substantially in the form attached hereto: (a) authorizing the Trustees to enter into the Settlement Agreement; (b) allowing the Fund Claims; (c) determining that all of the Released Claims, including specifically the Substantive Consolidation Claim, are the sole property of the Debtors' Estates; (d)  determining that upon the entry of an Order approving the Settlement, and upon the

consummation of the Settlement Agreement, that the release of the Released Claims by the Debtors' Estates constitutes res judicata as to the assertion of any of the Released Claims by any third party, including creditors of the Debtors' Estates; (e) permanently enjoining all Persons (as defined in Section 101(41) of the Bankruptcy Code), including the Select Trustee and the Raceway Trustee, and all creditors of the Debtors' Estates, from commencing, prosecuting or asserting any action or proceeding against any of the Debtors' Estates on account of, or with respect to, the Released Claims; (f) shortening the 21 day notice period required by Rules 2002(a) (2) and (3) to the 16 days given of this Motion and determining that the notice of this Motion was sufficient; and (g) granting such other and further relief as is just and proper.

Dated: July 8, 2019

Gregg Szilagyi, chapter 7 trustee of the
Raceway Estates

By: /s/ Robert M. Fishman
        *One of his attorneys*

Robert M. Fishman
Ira Bodenstein
David R. Doyle
FOX ROTHSCHILD LLP
321 North Clark Street, Suite 1600
Chicago, IL  60654
Phone: (312) 541-0151
rfishman@foxrothschild.com
ibodenstein@foxrothschild.com
ddoyle@foxrothschild.com

Respectfully submitted,

Howard Samuels, chapter 7 trustee of the
Select Estates

By: /s/ Michael M. Eidelman
        *One of his attorneys*

Michael M. Eidelman
Allison B. Hudson
VEDDER PRICE
222 North LaSalle Street
Chicago, IL 60601
Phone: (312) 609-7500
meidelman@vedderprice.com
ahudson@vedderprice.com

96990780.v3-7/8/19